# EXHIBIT A

E-FILED
4/30/2021 11:59 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV382518
Reviewed By: Y. Chavez

1

Gregory Keenan (*pro hac vice* forthcoming)
DIGITAL JUSTICE FOUNDATION

2

81 Stewart Street

3

Floral Park, New York 11001
(516) 633-2633

4

gregory@digitaljusticefoundation.org

5

Andrew Grimm (*pro hac vice* forthcoming)
DIGITAL JUSTICE FOUNDATION

6

15287 Pepperwood Drive

7

Omaha, Nebraska 68154
(531) 210-2381

8

andrew@digitaljusticefoundation.org

9

Ryan Hamilton (SBN 291349)
HAMILTON LAW LLC

10

5125 South Durango, Suite C

11

Las Vegas, Nevada 89113
(702) 818-1818

12

ryan@hamlegal.com

13

*Attorneys for Plaintiffs*[1]

14

15

**IN THE SUPERIOR COURT OF CALIFORNIA**

16

**FOR THE COUNTY OF SANTA CLARA**

17

**CIVIL DIVISION**

18

THE ESTATE OF █████ "█████"
H███████, JOHN HERNDON, ██████

19

"M██████" H███████, *a minor*, T███
P████ H███████, *a minor*,

20

21

*on behalf of themselves and all others similarly
situated,*

22

23

*Plaintiffs,*

24

v.

NETFLIX INC.,

25

*Defendant.*

26

27

28

Case No.: 21CV382518

**CLASS ACTION**

**Complaint for**
- **Failure to Adequately Warn,**
- **Wrongful Death, and**
- **Negligence.**

**[Jury Trial Demanded]**

---

[1] Additional counsel are listed on the following page.

Rory Stevens (*pro hac vice* forthcoming)
LAW OFFICE OF RORY L. STEVENS
4303 Southwest Cambridge Street
Seattle, Washington 98136
(206) 850-4444
rorylawstevensesq@gmail.com

Megan Verrips (*pro hac vice* forthcoming)
INFORMATION DIGNITY ALLIANCE
P.O. Box 8684
101 Southwest Madison Street
Portland, Oregon 97207
(925) 330-0359
megan@informationdignityalliance.org

James D. Banker (SBN 317242)
DIGITAL JUSTICE FOUNDATION
701 Pennsylvania Avenue Northwest, Apt. 1003
Washington, District of Columbia 20004
(714) 722-5658
jimbanker@gmail.com

Plaintiffs—the Estate of ▌▌▌ "B▌▌" H▌▌▌ and natural persons John Herndon, J▌▌▌ "M▌▌▌" H▌▌▌, a minor, and T▌▌ P▌▌ H▌▌▌, a minor—on behalf of themselves and on behalf of all others similarly situated, hereby make class-action allegations as follows:

## I. NATURE OF THE CASE

1. In April 2017, child suicides spiked. This wave of suicides came as a surprise to most. Teachers, politicians, journalists, hospital staff, psychiatric experts, suicide-prevention advocates, and, most of all, heartbroken families of the victims themselves were all shocked as the number of child deaths mounted.

2. But these suicides were not entirely unforeseen.  One entity had been made aware that these deaths could and would assuredly happen if it did not change its course of action: Defendant Netflix Inc. and its pertinent subsidiaries (collectively "Netflix").

3. Netflix should have been able to foresee this spike in child suicides because its tortious actions and omissions caused these deaths and it was warned in advance.  Yet Netflix proceeded anyway, prioritizing its own strategy goals of market dominance in the youth demographic over the lives and well-being of vulnerable populations it knew would suffer— and die—if it did not provide greater warnings and take reasonable, common-sense steps to avoid using its data in a reckless manner that harmed children.

4. In March of 2017, Netflix released a show, <u>Thirteen Reasons Why</u> ("Show") on its streaming service. Before that, however, it had been warned by experts backed by decades of empirical research that child suicides and other profound psychological harm would occur if impressionable youths were targeted and not warned of the health risks inherent in viewing the Show.

5. Netflix had been put on notice of the risk and concrete prospects of serious, irreparable harm that its Show posed to the most vulnerable of viewers: children.  Yet Netflix failed to take reasonable, appropriate, and commonsensical cautionary measures.  It failed to warn of known harms and health risks—the very risks that it had been warned about ahead of time. Instead, it used its sophisticated, targeted recommendation systems to push the Show on unsuspecting and vulnerable children, using its cutting-edge technology.

6. As children began to die, the experts started to piece the tragedies together.  For example, years after the Show's release, the National Institute of Mental Health associated the 28.9% increase in the child-suicide rate during the month of April 2017 with Netflix's Show—a child-suicide spike that could have been avoided had Netflix taken basic moral responsibilities to warn and to not target its most vulnerable viewers.

7. Yet, even after empirical researchers repeatedly identified the profound human cost of Netflix's decisions, Netflix still did not meaningfully warn about the dangers of its Show, and did not moderate its algorithms to avoid targeting vulnerable children.  Instead, Netflix dug its heels in for years, choosing a path of callous resistance to the realities of hundreds of children whose deaths Netflix had tortiously caused.

## II. PARTIES

8. **Plaintiffs.**  Decedent [████] "B██" H████ was a natural person domiciled in the State of California.  She died as a result of the tortious acts and omissions of Netflix that caused, or at least substantially contributed to, her suicide.  B██'s father, John Herndon; her younger minor brothers, J███ "M████" H███ and T██ P███ H█████; and her Estate are Plaintiffs in this action, all domiciled in California, asserting wrongful-death and survivor claims against Netflix both in their capacities as individuals (and/or individual-representatives of the Estate) and in their capacities as class-representatives on behalf of all others similarly situated.  The survivorship claims are asserted by the Estate and/or John Herndon.  The wrongful-death claims are asserted by B██'s younger minor brothers, J███ "M████" H███ and T██ P███ H█████.

9. **Defendant.**  Netflix is a corporate entity domiciled and at-home in the State of California.  Netflix's tortious acts and omissions caused, or at least substantially contributed to, B██'s suicide and substantial harms, including death, to many other children.

### III. JURISDICTION & VENUE

10. **Jurisdiction.**  This action arises under California causes of action.  This Court has subject-matter jurisdiction.  (See Code Civ. Proc. § 410.10.)  Netflix maintains its principal place of business in Los Gatos, California.  Netflix also maintains systemic, continuous and substantial contacts with California consumers in the form of offering membership subscriptions to its content-streaming service.  Netflix's activities in California are and were highly interactive, systemic and continuous so as to support a finding of general, all-purpose jurisdiction in this Court.  (See Code Civ. Pro. § 410.10.)

11. **Venue.**  Netflix's principal office is in Los Gatos, California, in Santa Clara County and, on information and belief, substantially all of the tortious acts occurred there.  Thus, this Court is a proper venue.  (See Code Civ. Pro § 395, subd. b.)

### IV. STATEMENT OF FACTS

A.  **After the novel <u>Thirteen Reasons Why</u> was published, Netflix adapted it into a startingly graphic streaming show.**

12. In October 2007, Jay Asher's novel <u>Thirteen Reasons Why</u> ("Novel") was published.  The Novel takes readers through transcripts of fictional audiotapes recorded by its main character, Hannah Baker, before her suicide.  Each of the Novel's thirteen fictional transcripts gives an anecdote addressed to another character who Baker partially blamed for causing her suicide.  The Novel was a hit, making the New York Times' young-adult best-seller list a few times.  (Rich, *A Story of a Teenager's Suicide Quietly Becomes a Best Seller*, The New York Times (Mar. 9, 2009).)

13. Years later, Netflix purchased the rights for a television show that had been adapted from the Novel ("Show").  Part of the business case for adapting the Novel into the Show was that the Novel already had a "huge following" and "huge fan base" so the Show was expected to attract younger audiences.  (Rochlin, *Selena Gomez (and Others) on Adapting 'Thirteen Reasons Why' for Netflix*, The New York Times (Mar. 22, 2017).)

14. As with the Novel, the Show features "broken friendships, a fatal auto accident" and "startlingly naturalistic depictions of rape and suicide." Yet Netflix's adaptation of the Novel into thirteen hours of streaming content made several significant changes. (Hale, *Review: '13 Reasons Why' She Killed Herself, Drawn Out on Netflix*, The New York Times (Mar. 30, 2017).)

15. One difference between the Novel and the Show is pacing. The Novel is quick-paced and, as a reviewer notes, "stylistically economical[.]" By contrast, the Show "demands that you listen to a suicide note for thirteen hours, while the suicide in question is built up as the grand climax[.]" (Tolentino, *"13 Reasons Why" Makes a Smarmy Spectacle of Suicide*, The New Yorker (May 10, 2017).)

16. Perhaps the most drastic difference between the Novel and the Show is how they depict the main character Hannah Baker's suicide:

> [The Show's creators] decided to depict Hannah's suicide in "unflinching detail." In the book, she swallows pills. In the show, she saws vertically at her forearms with razor blades, sobbing and screaming in an overflowing, pinkish tub.

(Tolentino, *"13 Reasons Why" Makes a Smarmy Spectacle of Suicide*, The New Yorker (May 10, 2017).)

17. Ultimately, Netflix removed this graphic, three-minute-long scene from the Show in July 2019 after years of public outcry that the scene "glorified suicide." (Watson, *Who has died in 13 Reasons Why?*, Express Online (June 12, 2020).)

**B. Netflix's widespread dissemination of its <u>Thirteen Reasons Why</u> Show was successful but concerning.**

18. When it was released on Netflix's streaming platform in March 2017, the Show was a huge hit. It was especially popular with younger viewers, a key demographic in Netflix's sights as it was trying to maintain its streaming dominance.

19. Yet the Show's release was also marred by controversy. The positive buzz in some circles was stained by other views that the show glorified suicide and was morally irresponsible. (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

20.  One major concern was that this unsuitable content was being "watched by young people on phones or laptops without the awareness of their parents."  (Rosman, *Netflix Triggers Online Debate With a Show About Teen Suicide, '13 Reasons Why,*' The New York Times, Apr. 19, 2017).)

21.  Nonetheless, the Show's broad exhibition was a cultural event.  Twitter debates ignited.  Parents were concerned.  Teenagers imitated the Show in a variety of ways.  Some painted their fingernails to imitate the Show.  One high-school student recorded thirteen cassette tapes when asking a classmate to prom.  (Rosman, *Netflix Triggers Online Debate With a Show About Teen Suicide, '13 Reasons Why*', The New York Times (Apr. 19, 2017).)

**C.  Netflix is *not* being sued for its creation, dissemination, exhibition, advertisement, or other similar promotion of its Show, <u>Thirteen Reasons Why</u>.**

22.  The above allegations in paragraphs 12-21 are provided for background and context but are expressly *not* the basis of why Netflix is being sued.

23.  Specifically, Netflix is *not* being sued because it created a Show of questionable morality that arguably glorifies teenage suicide.  It is *not* being sued because it disseminated, *i.e.*, publicly broadcasted, the Show by offering it for public consumption.  It is *not* being sued because it publicly exhibited this content, advertised it generally to the public, or similarly promoted it.  Netflix is *not* being sued for its creation, dissemination, exhibition, advertisement, or similar promotion of its Show.

24.  Rather, the bases of the claims against Netflix stem from something else: (1) Netflix's failure to adequately warn of its Show's, *i.e.*, its product's, dangerous features and (2) Netflix's use of its trove of individualized data about its users to specifically target vulnerable children and manipulate them into watching content that was deeply harmful to them—despite dire warnings about the likely and foreseeable consequences to such children.  Both are detailed below.

**D. Experts warned Netflix in advance that its Show, <u>Thirteen Reasons Why</u>, would kill children but Netflix gave no adequate warning to viewers of this risk.**

25. When the Show was in production, its creators consulted several mental-health professionals.

26. Contrary to the creators' unexamined hypothesis that depicting the ugliness and brutality of suicide would somehow deter teenage suicides, the consensus of suicide-prevention experts warns of just the opposite effect—the potential for suicide-contagion effects upon impressionable viewers. Depicting suicide as the Show does to children would likely result in deaths. Netflix was warned about this risk in advance but did not heed guidelines about how to warn of suicide-related content. (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

27. Specifically, Dr. Dan Reidenberg, the executive director of a nonprofit suicide-prevention organization, Suicide Awareness Voices of Education, reviewed the Show about a month or so *before* its release. Netflix had asked for Dr. Reidenberg's guidance. Dr. Reidenberg advised Netflix to cancel the release but was told by Netflix that it "wasn't an option." "They made that very clear to me," Dr. Reidenberg later told the press. (Eisenstadt, *'13 Reasons Why' is a hit, but suicide expert told Netflix not to release series*, Syracuse.com (Apr. 26, 2017).)

28. Dr. Reidenberg's concerns were not just about uncomfortable feelings and content. He was worried that the Show itself would *cause* suicides in impressionable children and lead to their deaths if they watched it. (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

29. Nor was Dr. Reidenberg a lone dissenting voice in the scientific community.  Well before Netflix released the Show, it was well-known in the scientific community that depictions of suicide can themselves *cause* suicide in vulnerable populations:

> Mental illness is not a communicable disease, but there's a strong body of evidence that suicide is still contagious.  Publicity surrounding a suicide has been repeatedly and definitively linked to a subsequent increase in suicide, _especially among young people_.

(*E.g.*, Sanger-Katz, _The Science Behind Suicide Contagion_, The New York Times (Aug. 13, 2014) (emphasis added).)

30. Netflix failed to warn of these health risks.  Netflix included some advisories but these advisories have been woefully inadequate because they do not reasonably warn of the risk that the Show could cause suicide.  Some of its advisories were only added a month after the Show's release—well after an anticipated millions of children had viewed the Show. (Andrews, Netflix's _'13 Reasons Why' gets more trigger warnings. Critics say it glamorizes teen suicide_, Washington Post (May 1, 2017).)  To many experts, Netflix's advisories came as too little too late.  (*See* Grunberger, '_13 Reasons Why' warning is a start, experts say, but they want more_, CNN (Apr. 5, 2018).)

31. Even as of the filing of this Complaint, none of Netflix's advisories meaningful warn that the Show itself could cause suicide.  Instead, they use vague language that a reasonable person would think merely indicates mature subject matter, rather than a real risk of genuine harm.

32. As of today, the Show displays the following advisory before the beginning of the first season:

> Hi, I'm Dylan Minette and I play Clay Jensen. I'm Katherine Langford and I play Hannah Baker. I'm Justin Prentice, I play Bryce Walker. I'm Alisha Boe, I play Jessica Davis.
>
> Thirteen Reasons Why is a fictional series that tackles tough real-world issues taking a look at sexual assault, substance abuse, suicide and more. By shedding a light on these difficult topics, we hope our show can help viewers start a conversation. But if you are struggling with these issues yourself this series may not be right for you or you may want to watch it with a trusted adult.
>
> And if you ever feel you need someone to talk with, reach out to a parent, a friend, a school counselor or an adult you trust call a local help line or go to 13ReasonsWhy.info. Because the minute you start talking about it, it gets easier.

Among other problems, this advisory does not warn that viewing the Show could itself *cause* suicide, suicidal ideation, *etc*.

33. Instead, it merely suggests that there are mature themes depicted and that the presence of a trusted adult might be desirable. There is no clear indication of the foreseeable harms, rather than a suggestion that the themes may be emotional or psychologically difficult.

34. Likewise, as of today, the Show's thirteenth episode displays a cursory advisory placard that reads as follows: "The following episode contains graphic depictions of suicide and violence, which some viewers may find disturbing. It is intended for mature audiences. Viewer discretion is advised." This generic language is insufficient to warn reasonable viewers that the episode is not merely mature-themed but that watching it could cause or contribute to suicide or suicidal ideations.

35. Worse, not all of these advisories existed at the time of the Show's release, when Netflix began targeting the Show to vulnerable users and populations. And, the fundamental problem is that these advisories fail to discuss the foreseeable risk of concrete harm to vulnerable persons. By comparison, prescription-drug labels warn of concrete risks of side effects. Cigarette-warning labels indicate risk of health effects from smoking cigarettes, not merely that "discretion is advised."

36. Here, without more express warnings, no reasonable person would be aware of the genuine and real health risks posed by the Show to vulnerable viewers. Without adequate warnings, Netflix did not permit its subscribers and families to make genuinely informed choices upfront about whether the Show's content is right for them, their family, or their children.

37. Moreover, experts were troubled that Netflix's content suggested that seeking help for suicidal ideation is fruitless and useless whereas committing suicide may be a source of individual agency. (Todd, *Here's What 7 Mental Health Experts Really Think About '13 Reasons Why,'* SELF (May 9, 2018).) Netflix failed to give any warning or advisory about how seeking help can improve outcomes and avoid significant self-harm or suicide. Thus, Netflix failed to warn that some of its themes would inhibit impressionable and vulnerable viewers from seeking professional help for their suicidal ideation.

38. Furthermore, Netflix's pre-season advisory is inadequate because it fails to indicate where the most dangerous content appears in the Show. The Show becomes dramatically more graphic over the course of its first season without another warning until episode nine. Thus, the warning at the beginning of the Show followed by comparatively tame episodes would leave a reasonable parent unaware and with no easy way to figure out where the most harmful content would be found and when and how to avoid that content.

39. Netflix failed to warn of the dangers of its Show in another way. Netflix gave no indication of any of the warning signs associated with a high risk for suicide. By no means did Netflix frame its advisories in a way that a vulnerable child or parent would have gleaned any further understanding of the psychological differences between an intense emotional reaction to disturbing content and dangerous signs of suicidal ideation.

40. To this day, Netflix gives no such meaningful warning that its content can cause suicides in vulnerable children. Netflix decided to give no serious warning that its content could kill, despite having been put on notice of this risk in advance of releasing its Show.

**E.    Netflix's failure to adequately warn harmed and caused the death of many children.**

41.    The tragic and significant costs of Netflix's decision not to adequately warn began to appear almost immediately after Netflix released the Show.

42.    Without any meaningful warnings, families and children were largely unaware of the major health risks posed by watching the Show.  They were not warned about an extremely dangerous product that was being targeted at their children.

43.    At first, the indications of Netflix's role in the spike in child suicides was anecdotal.  Then, scientists and empiricists started demonstrating empirically that widespread harm to children came from Netflix's inadequate warnings and targeting of vulnerable kids.

44.    One alarming story came shortly after the Show's release.  A school superintendent in Florida, reported that counselors, teachers, and principals reported over a dozen cases of very concerning behavior by children—a significant spike in "youth at-risk behavior _at the elementary and middle school levels_ to include self-mutilation, threats of suicide, and multiple Baker Act incidents."  (Strauss, _Schools superintendent: Students are harming themselves and citing '13 Reasons Why_, Washington Post (Apr. 29, 2017) (emphasis added).)

45.    Such a result was not unforeseeable.  As one leading psychiatric researcher stated: "Research shows us that the more obvious, florid, dramatic, and explicit the portrayal is as disturbing as it is to most of us, there's the potential that for some people who see it, who are really struggling with something, this winds up being in some way strangely appealing." (Grady, _Critics say 13 Reasons Why has artistic merit. Suicide prevention experts say it's dangerous_, Vox.com (June 9, 2017).)

46.    Empirical research followed.  It confirmed what the educators, parents, and counselors were seeing on the ground.  There was a significant spike in suicides in April 2017 following the Show's release without adequate warning and with significant targeting at children.  The number of Internet searches for how to commit suicide spiked at the same time that fewer children were seeking help from crisis-suicide-prevention services that connect children to mental-health resources and help avoid suicide.  (Thompson et al, _Crisis Text Line use_

*following the release of Netflix series 13 Reasons Why Season 1: Time-series analysis of help-seeking behavior in youth*, 14 Preventive Medicine Reports (June 2019).)

47. Researchers also identified that the spike in hospital admissions at a children's hospital for children suffering from self-harm stemmed from the release of the Show on Netflix's streaming service.  (Cooper et al., *Suicide Attempt Admissions From a Single Children's Hospital Before and After the Introduction of Netflix Series 13 Reasons Why*, 63 Journal of Adolescent Health 688 (Dec. 2018).)

48. Subsequent research has again and again confirmed similar empirical effects on suicide rates in the United States closely correlated to the release of the Show (without adequate warnings and targeted at children).  (Bridge et al., *Association Between the Release of Netflix's 13 Reasons Why and Suicide Rates in the United States: An Interrupted Time Series Analysis*, 59 Journal of the American Academy of Child & Adolescent Psychiatry 236 (Feb. 2020); Niederkrotenthaler et al., *Association of Increased Youth Suicides in the United States With the Release of 13 Reasons Why*, 76 Journal of the American Medical Association – Psychiatry 933 (May 29, 2019).)

49. The effect was not merely domestic.  For example, similar devastating impacts were identified in Canada.  (*E.g.*, Sinyoir et al., *Suicides in Young People in Ontario Following the Release of "13 Reasons Why*," 64 Canadian Journal of Psychiatry (Aug. 21, 2019).)  Even empirical research sponsored and paid for by Netflix indicated troubling trends with respect to the effects of Netflix's failure to warn and targeting sizeable portions of child viewers.

50. All in all, the consensus of empirical research is clear: Netflix's tortious acts and omissions caused hundreds of deaths and thousands of suicide attempts.

51. Netflix's tortious acts caused tragedies with respect to many children, including decedent B▮ H▮▮▮▮.  Netflix released the Show on March 31, 2017.  On information and belief, Netflix made no attempt to avoid recommending and targeting the Show, without adequate warning to vulnerable persons, such as B▮ H▮▮▮ herself.  Moreover, on information and belief, Netflix made no attempt to avoid manipulating users, including minors such as B▮ H▮▮▮, to watch the Show.

52. And, Netflix treated B███ H████ according to its typical practices of monitoring users' activities and manipulating their viewing decisions via sophisticated, targeted recommendation algorithms. That is, Netflix used its data about B███ H████ to recommend the show to her, to manipulate her into watching it.

53. Yet, Netflix gave B███ and her family no warning that watching the Show could cause suicide and suicidal ideation.  Netflix gave B███ no warning of the known health risks associated with viewing the Show.  And, Netflix gave B███ no warning of what the danger signs would be if she began suffering those health risks.  In sum, Netflix never provided a warning of the health risks of watching the Show when using sophisticated, targeted recommendation systems to manipulate the viewing behaviors of minors and to push its dangerous product, *i.e.*, the Show, on minors, such as B███ H████.

**F.    Netflix used unprecedented levels of data collection, algorithmic data processing, and analytical insights to precisely target some of the most vulnerable members in society with traumatic content that had no adequate warning.**

54. It cannot be emphasized enough that what Netflix did was entirely different than merely put a book on library bookshelves or put a show on TV.  A Netflix engineering director put it best when describing Netflix's capabilities with respect to its users in 2013:

> *We know what you played, searched for, or rated, as well as the time, date, and device. We even track user interactions such as browsing or scrolling behavior.*

(Vanderbilt, *The Science Behind the Netflix Algorithms That Decide What You'll Watch Next, Wired* (Aug. 7, 2013) (interview with Netflix's engineering director, Xavier Amtraiain, describing how "**how they control what you watch**" (emphasis added)).)

55. As of 2013, several years before Netflix released the Show on its steaming services, its recommendation engine and algorithms already controlled and actively manipulated the vast majority of what its users decide to watch such that "75 percent of viewer activity is driven by" Netflix's targeted recommendation systems.  (*Ibid.*)

56. Netflix helps users find shows or movies with minimal effort by utilizing algorithms to personalize the user experience.  Netflix's algorithms achieve these personalized recommendations by considering factors like viewing history, time of day a user watches, devices watched on, how long a viewer watches, and information about the titles watched. (Netflix, *How Netflix's Recommendations System Works*, Netflix Help Center (last accessed Apr. 30, 2021).)

57. Netflix has access to nearly limitless data about its users through its online streaming service.  Netflix feeds this information into the Netflix Recommender System, *i.e.*, a series of algorithms that personalize the viewer experience to improve Netflix's viewer retention rate.  Netflix achieves 80% of its stream time utilizing its Recommender System.  (Chong, *Deep Dive into Netflix's Recommender System*, towards data science (Apr. 30, 2020).)

58. Indeed, there is no reason to believe that Netflix treated B███ H█████ any differently, or any of the children targeted and manipulated in watching the Show, than the rest of the users on Netflix's platform.

59. In accordance with Netflix's practices, Netflix watched B███'s browsing and scrolling behavior, tracking them so that Netflix could manipulate and control what content she would watch on the Netflix streaming service.  In accordance with Netflix's practices, Netflix watched the time, date, and devices on which B██ used Netflix's streaming services, tracking them so that Netflix could manipulate and control what content she would watch on the Netflix streaming service.

60. Netflix is, in fact proud of its ability to control what its viewers will watch:



61. Given that Netflix itself estimates that "75 percent of viewer activity is driven" by Netflix's sophisticated, targeted recommendation systems, it is likely that Netflix successfully manipulated B██ H█████'s viewing selections when she used Netflix's streaming services.  Netflix targeted and manipulated B██'s viewing choices, and thereby exposed her to the dangerous health risks associated with watching the Show.

62. After watching the Show during the month of April, B██ experienced emotional and psychological distress and harm.

**G.   Only after hundreds of children died and after thousands were harmed did Netflix removed its most gratuitous scene of violent suicide, having never warned of the harm it could cause while targeting children directly with that content.**

63. After the Show was released without warning and targeted to vulnerable populations, mental health experts worried that the failure to warn coupled with the "graphic depiction of Hannah's suicide might function as a how-to guide."  (Grady, *13 Reasons Why takes a voyeuristic lens to rape and suicide, with complicated results*, Vox.com (May 1, 2017).)

64. After the empirical evidence of widespread harm mounted; after report after report of tragedy for families and children; after child-welfare and suicide-prevention advocates and experts expressed their outrage, Netflix removed the scene that was causing the most harm from the Show.

65. Ultimately, Netflix simply decided to remove its most dangerous content, having never meaningfully warned of the health risks:

> The original, nearly three-minute-long scene — which is no longer available on Netflix — aired midway through the season one finale.  It depicted breakout star Katherine Langford's Hannah assessing her life in the mirror before she is depicted sitting in a bathtub, tear on her cheek, taking a razor blade to her left wrist and piercing the skin.  The camera then holds on the character as she shrieks in pain as blood gushes from an increasingly long cut that extends nearly up to her elbow.  Hannah is then seen gasping for air as her breathing ultimately slows and bloodstained water tips out of the tub.  Not long after, Hannah's mother (Kate Walsh) discovers her daughter's lifeless body in the blood-filled tub.  Male lead Dylan Minnette provides voiceover during the entire scene as he tells the school's guidance counselor (played by Derek Luke) precisely what happened to Hannah.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

[…]

The new scene, which has been updated on the Netflix site, features Hannah looking at herself in the mirror before cutting to her parents' reaction to her suicide.  There is no longer any depiction of the character taking a razor blade to her wrists and the immediate aftermath.

(Goldberg, *Netflix Alters Graphic '13 Reasons Why' Suicide Scene After Controversy, The Hollywood Reporter* (July 15, 2019).)

66. The damage of Netflix's years-long refusal to warn and targeting of children had already been done.  As one example, on April 28, 2017, ██████ "B███" H█████ fell victim to suicide.  B███ H█████ fell victim to the very health risk that medical experts and suicide-prevention experts had warned Netflix about regarding the Show.  B███ H█████ was one of many suicides predicted before the Show's release.  B███ H█████ was a victim of the well-documented, unnatural 28.9% spike in child suicides that occurred after the Show's debut specifically during the month of April 2017.

67. B███ H█████ was laid to rest at the age of 16 at Saint Charles Borromeo Church in Livermore, California on May 15, 2017.

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint

# V. CLASS ACTION ALLEGATIONS

68. The claims asserted herein are appropriate for resolution through a class action.  Not only are the claims susceptible for class resolution, but it is also important that they are adjudicated on a class basis, both because the claims require expertise and the members of the class have, on information and belief, faced significant challenges accessing legal representation.  It is at least known that the Herndon family has faced significant barriers to legal representation.

    a.  As an initial matter, there are complexities to the case that are significant.  The claims involve issues of suicide, suicidal ideation, psychological trauma, as well as larger questions about teenage psychology underlying population awareness of warning signs of suicide and interpretation of advisories, *etc.*  These complex issues are better resolved through a class vehicle rather than burdening each class member and their individualized counsel (if they are able to retain one) with extensive litigation and re-litigation on those questions.

    b.  What is more, there is substantial technological and algorithmic complexity of Netflix's targeting, recommendation, and manipulation activities—requiring certain levels of expertise and dedication to meaningfully understand.  Again, these complexities weigh in strong favor of class resolution because requiring individual plaintiffs to discover the essential issues, comprehend them, try them, *etc.*, would be extraordinarily expensive and consume significant amounts of time.

    c.  Finally, the Herndons have faced substantial barriers to finding any lawyer who was both willing and able to represent them in this case.   In all likelihood, so have the remaining members of the classes.  There have been very real access-to-counsel issues for aggrieved families suffering from Netflix's tortious actions.

These reasons favoring class adjudication run the gamut: abstract questions of justice and fairness; pragmatic synergies and efficiencies in the conduct of the litigation and discovery, and the harsh realities of access to law for public-interest cases in contemporary society for everyday Americans.  All favor class adjudication.

69. Here, as a result of Netflix's inadequate warnings, Netflix caused the death of an estimated hundreds, possibly a thousand, children who committed suicide since the release of the Show, with their many survivors, heirs, *etc.*, holding viable claims. Beyond those who died, there are many more who suffered substantial trauma at the hands of callous business decisions that prioritized reaching certain business milestones over the safety of Netflix's customers. In this situation, the technology is a double-edge sword. Although it permitted the targeting and manipulation of very vulnerable persons, it also permits the class to be ascertained with greater ease. Thus, the classes are both ascertainable and numerous.

70. Common questions of law and fact predominate here. The central thread throughout is Netflix's tortious actions and omissions, both its decisions not to adequately warn and to target and manipulate vulnerable persons. Nearly every legal and factual question in the case appears, at this juncture, susceptible for class-wide adjudication. Therefore, there exists a well-defined community of interest that would be highly impracticable absent class adjudication.

71. Having lost a sibling to suicide as a result of Netflix's failure to provide adequate warning, T███ and M████ H████ have claims typical of the class of plaintiffs who may assert a wrongful death claim for having lost a family member. T███ and M████ H████ may adequately represent this class. Having lost a minor child to suicide as a result of Netflix's failure to provide adequate warning, John Herndon has claims typical of class of plaintiffs who may still assert a survival action. John Herndon may adequately represent this class.

72. The claims here meet the requirements for class-adjudication. In fact, a number of compelling reasons militate in favor of class-certification.

# VI. CAUSES OF ACTION

## First Cause of Action
## Strict Liability—Failure To Warn

73. PLAINTIFFS, the Estate of decedent █████ "B██" H█████ and decedent's surviving father, John Herndon, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated.  These allegations expressly include the clarifications about what is not the bases of these claims.  See ¶¶ 12-21.

74. Netflix manufactured, distributed and/or sold a product, *i.e.*, its Show, Thirteen Reasons Why, and continues to do so. This cause of action does not arise from Netflix's manufacture or creation of the Show, but rather from its targeted distribution of the Show to vulnerable children as well as its sale of the Show without adequate warnings, as part of a subscription package on its streaming service.

75. The Show posed serious health risks that were known to or reasonably knowable by Netflix. Indeed, such health risks had been brought to Netflix's attention prior to the Show's release. The foreseeable health risks of such behavior have been extensively documented by the medical, scientific, and suicide-prevention communities.

76. Ordinary consumers would not have recognized or been aware of the health risks absent an adequate warning. Ordinary consumers would not recognize or be aware of these health risks even after viewing Netflix's later-added advisories.  The advisories merely suggest potential discomfort that may result from mature themes and give no indication of the known health risks caused by the Show.

77. Netflix failed to adequately warn children and their families of the health risks of viewing its Show. As a result of the lack of adequate warning, decedent B██ H█████ and those similarly situated to her were tortiously harmed. Children viewers targeted by Netflix and their adult parents/guardians were not informed that watching the Show could cause or contribute to suicide or suicidal ideations.

WHEREFORE, the aforementioned PLAINTIFFS demand judgment against Defendant Netflix for whatever amount to be determined by a jury after trial, including but not limited to compensatory damages, such as, medical bills, lost wages, lost earning capacity, and pain and suffering and, if applicable, punitive damages, costs, fees, and all other possible relief.  To the extent permissible, declaratory relief is also sought.

## Second Cause of Action
## Wrongful Death

78.  PLAINTIFFS, decedent B█ H█████'s brothers, J████ "M█████" H█████ and T██ P█████ H█████, both minors, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated.  These allegations expressly include the clarifications about what is not the bases of these claims.  See ¶¶ 12-21.

79.  As a direct, proximate, and legal result of Netflix's negligent and intentional acts and omissions, B███ and those similarly situated died.  Netflix caused these deaths through its tortious, negligent, and/or reckless behaviors, including through the tortious targeting of vulnerable persons with the Show, manipulating their viewing behaviors, and without providing fair warning of the health risks associated with the Show.  As a direct, proximate, and legal result of Netflix's failure to warn, decedents suffered injuries that resulted in their deaths.  As a direct, proximate, and legal result of Netflix's tortious acts of targeting dangerous materials at vulnerable populations, Netflix caused decedents' deaths.

80.  As a direct, legal, and proximate result of Netflix's negligent and intentional acts and omissions, aforementioned Plaintiffs have suffered a loss of love, companionship, comfort, affection, society, solace, training and/or moral support and are entitled to damages pursuant to Code of Civil Procedure § 377.60, *et seq*.

WHEREFORE, the aforementioned PLAINTIFFS demand judgment against Defendant Netflix and are entitled to recover wrongful death damages pursuant to California Code of Civil Procedure §377.61, including but not limited to, both economic and non-economic compensatory damages, such as: the loss of financial support the decedent would have contributed to the family, the loss of

gifts or benefits plaintiff would have expected to receive from decedent, funeral and burial expenses, the reasonable value of household service decedent would have provided, as well as, a loss of love, companionship, comfort, affection, society, solace, training and/or moral support.  To the extent permissible, declaratory relief is also sought.

### Third Cause of Action
### Negligence

81. As a direct, proximate, and legal result of Netflix's negligent and intentional acts and omissions, B▆ and those similarly situated died.  Netflix caused these deaths through its tortious, negligent, and/or reckless behaviors, including through the tortious targeting of vulnerable persons with the Show, manipulating their viewing behaviors, and without providing fair warning of the health risks associated with the Show.  As a direct, proximate, and legal result of Netflix's failure to warn, decedents suffered injuries that resulted in their deaths.  As a direct, proximate, and legal result of Netflix's tortious acts of targeting dangerous materials at vulnerable populations, Netflix caused decedents' deaths.

82. PLAINTIFFS, the Estate of decedent I▆▆▆ "B▆▆" H▆▆▆ and decedent's surviving father, John Herndon, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated.  These allegations expressly include the clarifications about what is not the bases of these claims.  See ¶¶ 12-21.

83. Defendant Netflix negligently, carelessly, and/or recklessly failed to warn of the health risks associated with viewing the Show. Such health risks had been brought to Netflix's attention prior to the Show's release.  The foreseeable health risks of such behavior have been extensively documented by the medical, scientific, and suicide-prevention communities.  Nevertheless, Netflix did not provide adequate or reasonable warnings of the health risks associated with viewing the Show.

84. Defendant Netflix negligently, carelessly, and/or recklessly specifically targeted the show to vulnerable populations, including decedent B▆▆ H▆▆▆ and those similarly situated.

85. Defendants Netflix's negligent, carless, and/or reckless conduct and omissions caused and/or significantly contributed to the death of decedent B███ H██████ and those similarly situated.

86. As a direct and legal result of the said wrongful conduct and/or omissions of Defendant Netflix, Plaintiffs suffered substantial harm.

WHEREFORE, PLAINTIFFS demand judgment against DEFENDANT Netflix for whatever for whatever amount to be determined by a jury after trial, including but not limited to punitive damages, economic compensatory damages, and/or non-economic compensatory damages.  To the extent permissible, declaratory relief is also sought.

## VII. DEMAND FOR TRIAL BY JURY

87. Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: April 30, 2021                    Respectfully submitted,

*/s/ Ryan Hamilton*
Ryan Hamilton (Bar No. 291349)
HAMILTON LAW LLC
5125 South Durango, Suite C
Las Vegas, Nevada 89113
(702) 818-1818
ryan@hamlegal.com

Gregory Keenan (*pro hac vice* forthcoming)
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
gregory@digitaljusticefoundation.org

Andrew Grimm (*pro hac vice* forthcoming)
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
andrew@digitaljusticefoundation.org

Rory Stevens (*pro hac vice* forthcoming)
LAW OFFICE OF RORY L. STEVENS
4303 Southwest Cambridge Street
Seattle, Washington 98136
(206) 850-4444
rorylawstevensesq@gmail.com

Megan Verrips (*pro hac vice* forthcoming)
INFORMATION DIGNITY ALLIANCE
P.O. Box 8684
101 Southwest Madison Street
Portland, Oregon 97207
(925) 330-0359
megan@informationdignityalliance.org

James D. Banker (Bar No. 317242)
DIGITAL JUSTICE FOUNDATION
701 Pennsylvania Avenue Northwest, Apt. 1003
Washington, District of Columbia 20004
(714) 722-5658
jimbanker@gmail.com

*Attorneys for Plaintiffs*

on 6/25/2021 11:43 AM      Reviewed By: R. Nguyen        Envelope: 6724954

**CM-020**

| | |
|---|---|
| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):*<br>Ryan A. Hamilton, Esq.<br>California Bar No. 291349<br>5125 South Durango Drive, Suite C<br>Las Vegas, Nevada 89113<br>TELEPHONE NO.: (702) 818-1818    FAX NO. *(Optional):* (702) 974-1139<br>E-MAIL ADDRESS *(Optional):* Ryan@HamLegal.com<br>ATTORNEY FOR *(Name):* The Estate of ▮▮▮ "B▮▮" H▮▮▮ | FOR COURT USE ONLY<br><br>Filed<br>June 25, 2021<br>Clerk of the Court<br>Superior Court of CA<br>County of Santa Clara<br>21CV382518<br>By: RNguyen |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  Santa Clara
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose 95113
BRANCH NAME: Downtown Superior Court

PLAINTIFF/PETITIONER:  The Estate of ▮▮▮▮ "B▮▮" H▮▮▮

DEFENDANT/RESPONDENT:  Netflix, Inc.

| | |
|---|---|
| **EX PARTE APPLICATION FOR EXTENSION OF TIME TO SERVE PLEADING  AND ☑ ORDER EXTENDING TIME TO SERVE AND ☑ ORDER CONTINUING CASE MANAGEMENT CONFERENCE** | CASE NUMBER:<br><br>21CV382518 |
| **Note: This ex parte application will be considered without a personal appearance. (See Cal. Rules of Court, rule 3.1207(2).)** | HEARING DATE:<br>DEPT.: 2     TIME: |

1. Applicant *(name):*  The Estate of ▮▮▮▮ "B▮▮" H▮▮▮▮
   is
   a. ☑ plaintiff
   b. ☐ cross-complainant
   c. ☐ petitioner
   d. ☐ defendant
   e. ☐ cross-defendant
   f. ☐ respondent
   g. ☐ other *(describe):*

2. The complaint or other initial pleading in this action was filed on *(date):*  04/30/2021

3. Applicant requests that the court grant an order extending time for service of the following pleading:
   a. ☑ Complaint
   b. ☐ Cross-complaint
   c. ☐ Petition
   d. ☐ Answer or other responsive pleading
   e. ☐ Other *(describe):*

4. Service and filing of the pleading listed in item 3 is presently required to be completed by *(date):*  June 29, 2021

5. Previous applications, orders, or stipulations for an extension of time to serve and file in this action are:
   a. ☑ None
   b. ☐ The following *(describe all, including the length of any previous extensions):*

6. Applicant requests an extension of time to serve and file the pleading listed in item 3 on the following parties *(name each):*
   Netflix, Inc.

| | | |
|---|---|---|
| Form Approved for Optional Use<br>Judicial Council of California<br>CM-020 [Rev. January 1, 2008] | **EX PARTE APPLICATION FOR EXTENSION OF TIME<br>TO SERVE PLEADING AND ORDERS** | Cal. Rules of Court,<br>rules 3.110, 3.1200–3.1207<br>www.courtinfo.ca.gov |

CM-020

| CASE NAME: | CASE NUMBER: |
|---|---|
| The Estate of ████ "B██" H████ | 21CV382518 |

7. The pleading has not yet been filed and served on the parties listed in item 6 for the following reasons *(describe the efforts that have been made to serve the pleading and why service has not been completed)*:

The clerk notified us that there have been significant delays in processing time due to the Covid-19 Pandemic. Plaintiff is awaiting issuance of the Summons.

☐ Continued on Attachment 7.

8. An extension of time to serve and file the pleading should be granted for the following reasons:

Plaintiff requires additional time because the Summons has not yet been issued. Because of issues with the e-filing system, Plaintiff was forced to file the Complaint alone, without the Summons and Civil Lawsuit Notice. Plaintiff has e-filed the Summons, requesting that it be issued. To date, however, the Summons has not been issued and the deadline for service of process is fast approaching (June 29, 2021). Upon receipt of the issued Summons, Plaintiff will serve Defendant with process.

☐ Continued on Attachment 8.

9. If an extension of time is granted, filing and service on the parties listed in item 6 will be completed by *(date)*:

Plaintiff does not know when the Summons will be issued. Out of an abundance of caution, Plaintiff requests sixty (60) days, to and including August 30, 2021.

10. Notice of this application under rules 3.1200–3.1207 ☐ has been provided as required *(describe all parties or counsel to whom notice was given; the date, time, and manner of giving notice; what the parties or counsel were told and their responses; and whether opposition is expected)* or ☑ is not required *(state reasons)*:

No counsel has appeared on behalf of Defendant.

☐ Continued on Attachment 10.

11. Number of pages attached: __0__

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  06/24/2021

Ryan A. Hamilton, Esq.
(TYPE OR PRINT NAME OF APPLICANT OR ATTORNEY FOR APPLICANT)

► _(signature)_
(SIGNATURE OF APPLICANT OR ATTORNEY FOR APPLICANT)

**Order on Application is** ☐ **below** ☐ **on a separate document.**

## ORDER

1. The application for an order extending time to serve and file the pleading is ☒ granted ☐ denied.
2. The pleading must be served and filed no later than *(date)*:  August 30, 2021
3. ☐ The case management conference is rescheduled to:
   a. Date:
   b. Time:
   c. Place:
4. Other orders:

5. A copy of this application and order must be served on all parties or their counsel that have appeared in the case.

Date:  June 25, 2021

Signed: 6/25/2021 12:32 PM
_(signature)_ Drew Takaichi
JUDICIAL OFFICER
Drew Takaichi

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Netflix, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*

The Estate of ███ "B███" H███, John Herndon, J███ "M███" H███, *a minor,* T███ P███ H███, *a minor.*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

E-FILED
6/29/2021 9:01 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV382518
Reviewed By: A. Rodriguez
Envelope: 6743842

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: *(El nombre y dirección de la corte es):* Superior Court of California, County of Santa Clara, 191 North First Street, San Jose, CA 95113 | CASE NUMBER: *(Número del Caso):* **21CV382518** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Ryan A. Hamilton, Esq., 5125 South Durango Drive, Suite C, Las Vegas, Nevada 89113

| DATE: *(Fecha)* ~~June 22, 2021~~ 6/29/2021 9:01 AM | Clerk of Court Clerk, by *(Secretario)* | A. Rodriguez | , Deputy *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*


[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☒ on behalf of *(specify):* Netflix, Inc.
   under: ☒ CCP 416.10 (corporation)    ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)    ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)    ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA  95113-1090**

FILED

July 2, 2021

Clerk of The Court
Superior Court of CA
County of Santa Clara
21CV382518
By:  rwalker

**Envelope #6787860**

TO:      FILE COPY

RE:                    The Estate of I▮▮▮▮ B▮▮ H▮▮▮▮, et al. v. Netflix, Inc.
CASE NUMBER:      **21CV382518**

## ORDER AND NOTICE OF REASSIGNMENT OF CASE

A review of the above-referenced matter has determined that the Complaint was filed as a proposed class action. Accordingly, reassignment to the Complex Division is appropriate and this matter shall be, and is, reassigned for all purposes, including discovery, law & motion, settlement conference, and trial, to **Department 1** (Complex Civil Litigation), the **HONORABLE SUNIL R. KULKARNI** presiding.

The Case Management Conference is reset from September 7, 2021 to **September 9, 2021 at 2:30 p.m. in Department 1**.

Please contact the Complex Civil Litigation Department, (408) 882-2286, if you have any questions.

Signed: 7/2/2021 11:20 AM

Date Issued:  July 2, 2021

Honorable Beth McGowen
Civil Supervising Judge

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA  95113-1090**

**Electronically Filed**
**by Superior Court of CA,**
**County of Santa Clara,**
**on 7/7/2021 12:54 PM**
**Reviewed By: R. Walker**

TO:    FILE COPY

RE:        <u>The Estate of ██████ "B██" H██████, et al. v. Netflix, Inc.</u>
CASE NUMBER:    **21CV382518**

**Case #21CV382518**
**Envelope: 6795313**

### ORDER DEEMING CASE COMPLEX AND STAYING DISCOVERY
### AND RESPONSIVE PLEADING DEADLINE

WHEREAS, the Complaint was filed by Plaintiffs **THE ESTATE OF** ██████ **"B██" H██████** ("Plaintiff"), et al. in the Superior Court of California, County of Santa Clara, on **April 30, 2021** and reassigned on July 2, 2021 to Department **1** (Complex Civil Litigation), the **Honorable Sunil R. Kulkarni** presiding, pending a ruling on the complexity issue;

IT IS HEREBY ORDERED that:

The Court determines that the above-referenced case is **COMPLEX** within the meaning of California Rules of Court 3.400.  The matter remains assigned, for all purposes, including discovery and trial, to Department **1** (Complex Civil Litigation), the **Honorable Sunil R. Kulkarni** presiding.

The parties are directed to the Court's local rules and guidelines regarding electronic filing and to the Complex Civil Guidelines, which are available on the Court's website.

Pursuant to California Rules of Court, Rule 3.254, the creation and maintenance of the Master Service List shall be under the auspices of (1) Plaintiff **THE ESTATE OF** ██████ **"B██" H██████**, as the first-named party in the Complaint, and (2) the first-named party in each Cross-Complaint, if any.

Pursuant to Government Code section 70616(c), each party's complex case fee is due within ten (10) calendar days of this date.

Plaintiff shall serve a copy of this Order on all parties forthwith and file a proof of service within seven (7) days of service.

Any party objecting to the complex designation must file an objection and proof of service within ten (10) days of service of this Order.  Any response to the objection must be filed within seven (7) days of service of the objection.  The Court will make its ruling on the submitted pleadings.

The Case Management Conference remains set for **September 9, 2021 at 2:30 p.m. in Department 1** and all counsel are ordered to attend by **CourtCall**.

Counsel for all parties are ordered to meet and confer in person at least 15 days prior to the First Case Management Conference and discuss the following issues:

1. Issues related to recusal or disqualification;
2. Issues of law that, if considered by the Court, may simplify or further resolution of the case, including issues regarding choice of law;
3. Appropriate alternative dispute resolution (ADR), for example, mediation, mandatory settlement conference, arbitration, mini-trial;
4. A plan for preservation of evidence and a uniform system for identification of documents throughout the course of this litigation;
5. A plan for document disclosure/production and additional discovery; which will generally be conducted under court supervision and by court order;

6. Whether it is advisable to address discovery in phases so that information needed to conduct meaningful ADR is obtained early in the case (counsel should consider whether they will stipulated to limited merits discovery in advance of certification proceedings), allowing the option to complete discovery if ADR efforts are unsuccessful;

7. Any issues involving the protection of evidence and confidentiality;

8. The handling of any potential publicity issues;

Counsel for Plaintiff is to take the lead in preparing a Joint Case Management Conference Statement to be filed 5 calendar days prior to the First Case Management Conference, and include the following:

1. a brief objective summary of the case;

2. a summary of any orders from prior case management conferences and the progress of the parties' compliance with said orders;

3. significant procedural and practical problems that may likely be encountered;

4. suggestions for efficient management, including a proposed timeline of key events; and

5. any other special consideration to assist the court in determining an effective case management plan.

To the extent the parties are unable to agree on the matters to be addressed in the Joint Case Management Conference Statement, the positions of each party or of various parties should be set forth separately and attached to this report as addenda. The parties are encouraged to propose, either jointly or separately, any approaches to case management they believe will promote the fair and efficient handling of this case. The Court is particularly interested in identifying potentially dispositive or significant threshold issues the early resolution of which may assist in moving the case toward effective ADR and/or a final disposition.

**STAY ON DISCOVERY AND RESPONSIVE PLEADING DEADLINE** Pending further order of this Court, the service of discovery and the obligation to respond to any outstanding discovery is stayed. However, Defendant(s) shall file a Notice of Appearance for purposes of identification of counsel and preparation of a service list. The filing of such a Notice of Appearance shall be without prejudice to the later filing of a motion to quash to contest jurisdiction. Parties shall not file or serve responsive pleadings, including answers to the complaint, motions to strike, demurrers, motions for change of venue and cross-complaints until a date is set at the First Case Management Conference for such filings and hearings.

This Order is issued to assist the Court and the parties in the management of this "Complex" case through the development of an orderly schedule for briefing and hearings. This Order shall not preclude the parties from continuing to informally exchange documents that may assist in their initial evaluation of the issues presented in this Case.

Plaintiff shall serve a copy of this Order on all the parties in this matter forthwith.

SO ORDERED.

Date: _____July 7, 2021_____

_____
Hon. **Sunil R. Kulkarni**
Judge of the Superior Court

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.

-----
Updated on 3/11/21.

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: 291349 | FOR COURT USE ONLY |
|---|---|---|

NAME: Ryan A. Hamilton, Esq.
FIRM NAME: Hamilton Law
STREET ADDRESS: 5125 South Durango Drive, Suite C
CITY: Las Vegas          STATE: NV     ZIP CODE: 89113
TELEPHONE NO.: (702) 818-1818     FAX NO.: (702) 974-1139
E-MAIL ADDRESS: Ryan@HamLegal.com
ATTORNEY FOR (Name): The Estate of ███ "█" H████, John Herndon, ████ "M███" H████,

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior Court (DTS)

Plaintiff/Petitioner: The Estate of ███ "█" H████, John Herndon, ████ "M███" H████
Defendant/Respondent: Netflix, Inc.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: 21CV382518 |
|---|---|

TO (insert name of party being served): C T Corporation System

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: July 9, 2021

Ryan A. Hamilton
(TYPE OR PRINT NAME)

▶

(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of *(to be completed by sender before mailing)*:

1. [X] A copy of the summons and of the complaint.
2. [X] Other *(specify)*:
   Order Deeming Case Complex and Staying Discovery and Responsive Pleading Deadline, Order and Notice of Reassignment of Case, Civil Lawsuit Notice

*(To be completed by recipient)*:

Date this form is signed: _____

▶

(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY, ON WHOSE BEHALF THIS FORM IS SIGNED)

(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov

21CV382518
Santa Clara – Civil

**ATTACHMENT CV-5012**odriguez

# CIVIL LAWSUIT NOTICE

*Superior Court of California, County of Santa Clara*
*191 North First St., San José, CA  95113*

21CV382518

CASE NUMBER: _____

---

### PLEASE READ THIS ENTIRE FORM

---

**PLAINTIFF** (the person suing):  Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint, Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

---

**DEFENDANT** (The person sued): **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format*, in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint*;
2. You must serve by mail  a copy of your written response on the Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

   **Warning: If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

---

**RULES AND FORMS:**  You must follow the California Rules of Court and the Superior Court of California, County of <_CountyName_> Local Civil Rules and use proper forms.  You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José (408-882-2900 x-2926).

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: http://www.sccsuperiorcourt.org/civil/rule1toc.htm

**CASE MANAGEMENT CONFERENCE (CMC):**  You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC.  You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

*You or your attorney must appear at the CMC.*  *You may ask to appear by telephone – see Local Civil Rule 8.*

---

Your Case Management Judge is: Takaichi, Drew C _____ **Department:** _____2_____

The 1st CMC is scheduled for:  (Completed by Clerk of Court)
Date: 9/7/2021 _____ **Time:** _____ in **Department:** _____2_____

The next CMC is scheduled for:  (Completed by party if the 1st CMC was continued or has passed)
Date: _____ **Time:** _____ in **Department:** _____

---

**ALTERNATIVE DISPUTE RESOLUTION (ADR):**  If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

**WARNING:** Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

E-FILED
6/29/2021 9:01 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV382518
Reviewed By: A. Rodriguez
Envelope: 6743842

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Netflix, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
The Estate of ▊▊ "B▊" H▊, John Herndon, J▊
"M▊" H▊, *a minor*, T▊ P▊ H▊, *a minor*.

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: <br> *(El nombre y dirección de la corte es):* Superior Court of California, County of Santa Clara, 191 North First Street, San Jose, CA 95113 | CASE NUMBER: *(Número del Caso):* <br> 21CV382518 |
|---|---|

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

Ryan A. Hamilton, Esq., 5125 South Durango Drive, Suite C, Las Vegas, Nevada 89113

| DATE: <br> *(Fecha)* ~~June 22, 2021~~ 6/29/2021 9:01 AM | Clerk of Court Clerk, by <br> *(Secretario)* | A. Rodriguez | , Deputy <br> *(Adjunto)* |
|---|---|---|---|

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*
3. [x] on behalf of *(specify):* Netflix, Inc.
   under: [x] CCP 416.10 (corporation)   [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership)   [ ] CCP 416.90 (authorized person)
   [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
www.courts.ca.gov

E-FILED
4/30/2021 11:59 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV382518
Reviewed By: Y. Chavez

1   Gregory Keenan (*pro hac vice* forthcoming)
    DIGITAL JUSTICE FOUNDATION
2   81 Stewart Street
3   Floral Park, New York 11001
    (516) 633-2633
4   gregory@digitaljusticefoundation.org

5   Andrew Grimm (*pro hac vice* forthcoming)
    DIGITAL JUSTICE FOUNDATION
6   15287 Pepperwood Drive
7   Omaha, Nebraska 68154
    (531) 210-2381
8   andrew@digitaljusticefoundation.org

9   Ryan Hamilton (SBN 291349)
    HAMILTON LAW LLC
10  5125 South Durango, Suite C
11  Las Vegas, Nevada 89113
    (702) 818-1818
12  ryan@hamlegal.com

13  *Attorneys for Plaintiffs*[1]

14

15          **IN THE SUPERIOR COURT OF CALIFORNIA**

16          **FOR THE COUNTY OF SANTA CLARA**

17                      **CIVIL DIVISION**

18  THE ESTATE OF ▮▮▮ "▮▮▮"          Case No.:    21CV382518
    H▮▮▮, JOHN HERNDON, ▮          **CLASS ACTION**
19  "M▮▮▮" H▮▮▮, *a minor*, T▮
20  ▮▮ H▮▮▮, *a minor*,           **Complaint for**
                                        • **Failure to Adequately Warn,**
21  *on behalf of themselves and all others similarly*   • **Wrongful Death, and**
    *situated,*                       • **Negligence.**
22
                   *Plaintiffs,*      **[Jury Trial Demanded]**
23
              v.
24  NETFLIX INC.,
25                 *Defendant.*

26

27

28
    ――――――――――――――
    [1] Additional counsel are listed on the following page.
                          - 1 -
                        Complaint

1  Rory Stevens (*pro hac vice* forthcoming)
   LAW OFFICE OF RORY L. STEVENS
2  4303 Southwest Cambridge Street
   Seattle, Washington 98136
3  (206) 850-4444
4  rorylawstevensesq@gmail.com

5  Megan Verrips (*pro hac vice* forthcoming)
   INFORMATION DIGNITY ALLIANCE
6  P.O. Box 8684
   101 Southwest Madison Street
7  Portland, Oregon 97207
8  (925) 330-0359
   megan@informationdignityalliance.org
9
   James D. Banker (SBN 317242)
10 DIGITAL JUSTICE FOUNDATION
   701 Pennsylvania Avenue Northwest, Apt. 1003
11 Washington, District of Columbia 20004
12 (714) 722-5658
   jimbanker@gmail.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs—the Estate of ███ "B██" H██████ and natural persons John Herndon, J██ "M█████" H██████, a minor, and T██ P████ H██████, a minor—on behalf of themselves and on behalf of all others similarly situated, hereby make class-action allegations as follows:

## I. NATURE OF THE CASE

1. In April 2017, child suicides spiked. This wave of suicides came as a surprise to most. Teachers, politicians, journalists, hospital staff, psychiatric experts, suicide-prevention advocates, and, most of all, heartbroken families of the victims themselves were all shocked as the number of child deaths mounted.

2. But these suicides were not entirely unforeseen. One entity had been made aware that these deaths could and would assuredly happen if it did not change its course of action: Defendant Netflix Inc. and its pertinent subsidiaries (collectively "Netflix").

3. Netflix should have been able to foresee this spike in child suicides because its tortious actions and omissions caused these deaths and it was warned in advance. Yet Netflix proceeded anyway, prioritizing its own strategy goals of market dominance in the youth demographic over the lives and well-being of vulnerable populations it knew would suffer— and die—if it did not provide greater warnings and take reasonable, common-sense steps to avoid using its data in a reckless manner that harmed children.

4. In March of 2017, Netflix released a show, <u>Thirteen Reasons Why</u> ("Show") on its streaming service. Before that, however, it had been warned by experts backed by decades of empirical research that child suicides and other profound psychological harm would occur if impressionable youths were targeted and not warned of the health risks inherent in viewing the Show.

5. Netflix had been put on notice of the risk and concrete prospects of serious, irreparable harm that its Show posed to the most vulnerable of viewers: children. Yet Netflix failed to take reasonable, appropriate, and commonsensical cautionary measures. It failed to warn of known harms and health risks—the very risks that it had been warned about ahead of time. Instead, it used its sophisticated, targeted recommendation systems to push the Show on unsuspecting and vulnerable children, using its cutting-edge technology.

6.   As children began to die, the experts started to piece the tragedies together.  For example, years after the Show's release, the National Institute of Mental Health associated the 28.9% increase in the child-suicide rate during the month of April 2017 with Netflix's Show—a child-suicide spike that could have been avoided had Netflix taken basic moral responsibilities to warn and to not target its most vulnerable viewers.

7.   Yet, even after empirical researchers repeatedly identified the profound human cost of Netflix's decisions, Netflix still did not meaningfully warn about the dangers of its Show, and did not moderate its algorithms to avoid targeting vulnerable children.  Instead, Netflix dug its heels in for years, choosing a path of callous resistance to the realities of hundreds of children whose deaths Netflix had tortiously caused.

## II. PARTIES

8.   **Plaintiffs.**  Decedent ███ "B███" H███ was a natural person domiciled in the State of California.  She died as a result of the tortious acts and omissions of Netflix that caused, or at least substantially contributed to, her suicide.  B██'s father, John Herndon; her younger minor brothers, J███ "M████" H███ and T██ P███ H████; and her Estate are Plaintiffs in this action, all domiciled in California, asserting wrongful-death and survivor claims against Netflix both in their capacities as individuals (and/or individual-representatives of the Estate) and in their capacities as class-representatives on behalf of all others similarly situated.  The survivorship claims are asserted by the Estate and/or John Herndon.  The wrongful-death claims are asserted by B██'s younger minor brothers, J███ "M████" H███ and T██ P███ H████.

9.   **Defendant.**  Netflix is a corporate entity domiciled and at-home in the State of California.  Netflix's tortious acts and omissions caused, or at least substantially contributed to, B██'s suicide and substantial harms, including death, to many other children.

### III. JURISDICTION & VENUE

10. **Jurisdiction.** This action arises under California causes of action. This Court has subject-matter jurisdiction. (See Code Civ. Proc. § 410.10.) Netflix maintains its principal place of business in Los Gatos, California. Netflix also maintains systemic, continuous and substantial contacts with California consumers in the form of offering membership subscriptions to its content-streaming service. Netflix's activities in California are and were highly interactive, systemic and continuous so as to support a finding of general, all-purpose jurisdiction in this Court. (See Code Civ. Pro. § 410.10.)

11. **Venue.** Netflix's principal office is in Los Gatos, California, in Santa Clara County and, on information and belief, substantially all of the tortious acts occurred there. Thus, this Court is a proper venue. (See Code Civ. Pro § 395, subd. b.)

### IV. STATEMENT OF FACTS

**A. After the novel <u>Thirteen Reasons Why</u> was published, Netflix adapted it into a startlingly graphic streaming show.**

12. In October 2007, Jay Asher's novel <u>Thirteen Reasons Why</u> ("Novel") was published. The Novel takes readers through transcripts of fictional audiotapes recorded by its main character, Hannah Baker, before her suicide. Each of the Novel's thirteen fictional transcripts gives an anecdote addressed to another character who Baker partially blamed for causing her suicide. The Novel was a hit, making the New York Times' young-adult best-seller list a few times. (Rich, *A Story of a Teenager's Suicide Quietly Becomes a Best Seller*, The New York Times (Mar. 9, 2009).)

13. Years later, Netflix purchased the rights for a television show that had been adapted from the Novel ("Show"). Part of the business case for adapting the Novel into the Show was that the Novel already had a "huge following" and "huge fan base" so the Show was expected to attract younger audiences. (Rochlin, *Selena Gomez (and Others) on Adapting 'Thirteen Reasons Why' for Netflix*, The New York Times (Mar. 22, 2017).)

14. As with the Novel, the Show features "broken friendships, a fatal auto accident" and "startlingly naturalistic depictions of rape and suicide." Yet Netflix's adaptation of the Novel into thirteen hours of streaming content made several significant changes. (Hale, *Review: '13 Reasons Why' She Killed Herself, Drawn Out on Netflix*, The New York Times (Mar. 30, 2017).)

15. One difference between the Novel and the Show is pacing. The Novel is quick-paced and, as a reviewer notes, "stylistically economical[.]" By contrast, the Show "demands that you listen to a suicide note for thirteen hours, while the suicide in question is built up as the grand climax[.]" (Tolentino, *"13 Reasons Why" Makes a Smarmy Spectacle of Suicide*, The New Yorker (May 10, 2017).)

16. Perhaps the most drastic difference between the Novel and the Show is how they depict the main character Hannah Baker's suicide:

> [The Show's creators] decided to depict Hannah's suicide in "unflinching" detail." In the book, she swallows pills. In the show, she saws vertically at her forearms with razor blades, sobbing and screaming in an overflowing, pinkish tub.

(Tolentino, *"13 Reasons Why" Makes a Smarmy Spectacle of Suicide*, The New Yorker (May 10, 2017).)

17. Ultimately, Netflix removed this graphic, three-minute-long scene from the Show in July 2019 after years of public outcry that the scene "glorified suicide." (Watson, *Who has died in 13 Reasons Why?*, Express Online (June 12, 2020).)

**B.  Netflix's widespread dissemination of its <u>Thirteen Reasons Why</u> Show was successful but concerning.**

18. When it was released on Netflix's streaming platform in March 2017, the Show was a huge hit. It was especially popular with younger viewers, a key demographic in Netflix's sights as it was trying to maintain its streaming dominance.

19. Yet the Show's release was also marred by controversy. The positive buzz in some circles was stained by other views that the show glorified suicide and was morally irresponsible. (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

20. One major concern was that this unsuitable content was being "watched by young people on phones or laptops without the awareness of their parents." (Rosman, *Netflix Triggers Online Debate With a Show About Teen Suicide, '13 Reasons Why,'* The New York Times, Apr. 19, 2017).)

21. Nonetheless, the Show's broad exhibition was a cultural event. Twitter debates ignited. Parents were concerned. Teenagers imitated the Show in a variety of ways. Some painted their fingernails to imitate the Show. One high-school student recorded thirteen cassette tapes when asking a classmate to prom. (Rosman, *Netflix Triggers Online Debate With a Show About Teen Suicide, '13 Reasons Why'*, The New York Times (Apr. 19, 2017).)

**C. Netflix is *not* being sued for its creation, dissemination, exhibition, advertisement, or other similar promotion of its Show, <u>Thirteen Reasons Why</u>.**

22. The above allegations in paragraphs 12-21 are provided for background and context but are expressly *not* the basis of why Netflix is being sued.

23. Specifically, Netflix is *not* being sued because it created a Show of questionable morality that arguably glorifies teenage suicide. It is *not* being sued because it disseminated, *i.e.*, publicly broadcasted, the Show by offering it for public consumption. It is *not* being sued because it publicly exhibited this content, advertised it generally to the public, or similarly promoted it. Netflix is *not* being sued for its creation, dissemination, exhibition, advertisement, or similar promotion of its Show.

24. Rather, the bases of the claims against Netflix stem from something else: (1) Netflix's failure to adequately warn of its Show's, *i.e.*, its product's, dangerous features and (2) Netflix's use of its trove of individualized data about its users to specifically target vulnerable children and manipulate them into watching content that was deeply harmful to them—despite dire warnings about the likely and foreseeable consequences to such children. Both are detailed below.

1

2

**D.   Experts warned Netflix in advance that its Show, <u>Thirteen Reasons Why</u>, would kill children but Netflix gave no adequate warning to viewers of this risk.**

3

4

25. When the Show was in production, its creators consulted several mental-health professionals.

5

6

7

8

9

10

11

26. Contrary to the creators' unexamined hypothesis that depicting the ugliness and brutality of suicide would somehow deter teenage suicides, the consensus of suicide-prevention experts warns of just the opposite effect—the potential for suicide-contagion effects upon impressionable viewers. Depicting suicide as the Show does to children would likely result in deaths. Netflix was warned about this risk in advance but did not heed guidelines about how to warn of suicide-related content. (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

12

13

14

15

16

17

27. Specifically, Dr. Dan Reidenberg, the executive director of a nonprofit suicide-prevention organization, Suicide Awareness Voices of Education, reviewed the Show about a month or so *before* its release. Netflix had asked for Dr. Reidenberg's guidance. Dr. Reidenberg advised Netflix to cancel the release but was told by Netflix that it "wasn't an option." "They made that very clear to me," Dr. Reidenberg later told the press. (Eisenstadt, *'13 Reasons Why' is a hit, but suicide expert told Netflix not to release series*, Syracuse.com (Apr. 26, 2017).)

18

19

20

21

28. Dr. Reidenberg's concerns were not just about uncomfortable feelings and content. He was worried that the Show itself would *cause* suicides in impressionable children and lead to their deaths if they watched it. (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

22

23

24

25

26

27

28

29. Nor was Dr. Reidenberg a lone dissenting voice in the scientific community. Well before Netflix released the Show, it was well-known in the scientific community that depictions of suicide can themselves *cause* suicide in vulnerable populations:

> Mental illness is not a communicable disease, but there's a strong body of evidence that suicide is still contagious. Publicity surrounding a suicide has been repeatedly and definitively linked to a subsequent increase in suicide, *especially among young people*.

(*E.g.*, Sanger-Katz, *The Science Behind Suicide Contagion*, The New York Times (Aug. 13, 2014) (emphasis added).)

30. Netflix failed to warn of these health risks. Netflix included some advisories but these advisories have been woefully inadequate because they do not reasonably warn of the risk that the Show could cause suicide. Some of its advisories were only added a month after the Show's release—well after an anticipated millions of children had viewed the Show. (Andrews, Netflix's *'13 Reasons Why' gets more trigger warnings. Critics say it glamorizes teen suicide*, Washington Post (May 1, 2017).) To many experts, Netflix's advisories came as too little too late. (*See* Grunberger, '*13 Reasons Why' warning is a start, experts say, but they want more*, CNN (Apr. 5, 2018).)

31. Even as of the filing of this Complaint, none of Netflix's advisories meaningful warn that the Show itself could cause suicide. Instead, they use vague language that a reasonable person would think merely indicates mature subject matter, rather than a real risk of genuine harm.

32. As of today, the Show displays the following advisory before the beginning of the first season:

> Hi, I'm Dylan Minette and I play Clay Jensen. I'm Katherine Langford and I play Hannah Baker. I'm Justin Prentice, I play Bryce Walker. I'm Alisha Boe, I play Jessica Davis.
>
> Thirteen Reasons Why is a fictional series that tackles tough real-world issues taking a look at sexual assault, substance abuse, suicide and more. By shedding a light on these difficult topics, we hope our show can help viewers start a conversation. But if you are struggling with these issues yourself this series may not be right for you or you may want to watch it with a trusted adult.
>
> And if you ever feel you need someone to talk with, reach out to a parent, a friend, a school counselor or an adult you trust call a local help line or go to 13ReasonsWhy.info. Because the minute you start talking about it, it gets easier.

Among other problems, this advisory does not warn that viewing the Show could itself *cause* suicide, suicidal ideation, *etc*.

33. Instead, it merely suggests that there are mature themes depicted and that the presence of a trusted adult might be desirable. There is no clear indication of the foreseeable harms, rather than a suggestion that the themes may be emotional or psychologically difficult.

34. Likewise, as of today, the Show's thirteenth episode displays a cursory advisory placard that reads as follows: "The following episode contains graphic depictions of suicide and violence, which some viewers may find disturbing. It is intended for mature audiences. Viewer discretion is advised." This generic language is insufficient to warn reasonable viewers that the episode is not merely mature-themed but that watching it could cause or contribute to suicide or suicidal ideations.

35. Worse, not all of these advisories existed at the time of the Show's release, when Netflix began targeting the Show to vulnerable users and populations. And, the fundamental problem is that these advisories fail to discuss the foreseeable risk of concrete harm to vulnerable persons. By comparison, prescription-drug labels warn of concrete risks of side effects. Cigarette-warning labels indicate risk of health effects from smoking cigarettes, not merely that "discretion is advised."

36. Here, without more express warnings, no reasonable person would be aware of the genuine and real health risks posed by the Show to vulnerable viewers. Without adequate warnings, Netflix did not permit its subscribers and families to make genuinely informed choices upfront about whether the Show's content is right for them, their family, or their children.

37. Moreover, experts were troubled that Netflix's content suggested that seeking help for suicidal ideation is fruitless and useless whereas committing suicide may be a source of individual agency. (Todd, *Here's What 7 Mental Health Experts Really Think About '13 Reasons Why,'* SELF (May 9, 2018).) Netflix failed to give any warning or advisory about how seeking help can improve outcomes and avoid significant self-harm or suicide. Thus, Netflix failed to warn that some of its themes would inhibit impressionable and vulnerable viewers from seeking professional help for their suicidal ideation.

38. Furthermore, Netflix's pre-season advisory is inadequate because it fails to indicate where the most dangerous content appears in the Show. The Show becomes dramatically more graphic over the course of its first season without another warning until episode nine. Thus, the warning at the beginning of the Show followed by comparatively tame episodes would leave a reasonable parent unaware and with no easy way to figure out where the most harmful content would be found and when and how to avoid that content.

39. Netflix failed to warn of the dangers of its Show in another way. Netflix gave no indication of any of the warning signs associated with a high risk for suicide. By no means did Netflix frame its advisories in a way that a vulnerable child or parent would have gleaned any further understanding of the psychological differences between an intense emotional reaction to disturbing content and dangerous signs of suicidal ideation.

40. To this day, Netflix gives no such meaningful warning that its content can cause suicides in vulnerable children. Netflix decided to give no serious warning that its content could kill, despite having been put on notice of this risk in advance of releasing its Show.

**E.   Netflix's failure to adequately warn harmed and caused the death of many children.**

41.   The tragic and significant costs of Netflix's decision not to adequately warn began to appear almost immediately after Netflix released the Show.

42.   Without any meaningful warnings, families and children were largely unaware of the major health risks posed by watching the Show.   They were not warned about an extremely dangerous product that was being targeted at their children.

43.   At first, the indications of Netflix's role in the spike in child suicides was anecdotal.   Then, scientists and empiricists started demonstrating empirically that widespread harm to children came from Netflix's inadequate warnings and targeting of vulnerable kids.

44.   One alarming story came shortly after the Show's release.   A school superintendent in Florida, reported that counselors, teachers, and principals reported over a dozen cases of very concerning behavior by children—a significant spike in "youth at-risk behavior *at the elementary and middle school levels* to include self-mutilation, threats of suicide, and multiple Baker Act incidents." (Strauss, *Schools superintendent: Students are harming themselves and citing '13 Reasons Why*, Washington Post (Apr. 29, 2017) (emphasis added).)

45.   Such a result was not unforeseeable.   As one leading psychiatric researcher stated: "Research shows us that the more obvious, florid, dramatic, and explicit the portrayal is as disturbing as it is to most of us, there's the potential that for some people who see it, who are really struggling with something, this winds up being in some way strangely appealing." (Grady, *Critics say 13 Reasons Why has artistic merit. Suicide prevention experts say it's dangerous*, Vox.com (June 9, 2017).)

46.   Empirical research followed.   It confirmed what the educators, parents, and counselors were seeing on the ground.   There was a significant spike in suicides in April 2017 following the Show's release without adequate warning and with significant targeting at children.   The number of Internet searches for how to commit suicide spiked at the same time that fewer children were seeking help from crisis-suicide-prevention services that connect children to mental-health resources and help avoid suicide.   (Thompson et al, *Crisis Text Line use*

*following the release of Netflix series 13 Reasons Why Season 1: Time-series analysis of help-seeking behavior in youth*, 14 Preventive Medicine Reports (June 2019).)

47. Researchers also identified that the spike in hospital admissions at a children's hospital for children suffering from self-harm stemmed from the release of the Show on Netflix's streaming service. (Cooper et al., *Suicide Attempt Admissions From a Single Children's Hospital Before and After the Introduction of Netflix Series 13 Reasons Why*, 63 Journal of Adolescent Health 688 (Dec. 2018).)

48. Subsequent research has again and again confirmed similar empirical effects on suicide rates in the United States closely correlated to the release of the Show (without adequate warnings and targeted at children). (Bridge et al., *Association Between the Release of Netflix's 13 Reasons Why and Suicide Rates in the United States: An Interrupted Time Series Analysis*, 59 Journal of the American Academy of Child & Adolescent Psychiatry 236 (Feb. 2020); Niederkrotenthaler et al., *Association of Increased Youth Suicides in the United States With the Release of 13 Reasons Why*, 76 Journal of the American Medical Association – Psychiatry 933 (May 29, 2019).)

49. The effect was not merely domestic. For example, similar devastating impacts were identified in Canada. (*E.g.*, Sinyoir et al., *Suicides in Young People in Ontario Following the Release of "13 Reasons Why*," 64 Canadian Journal of Psychiatry (Aug. 21, 2019).) Even empirical research sponsored and paid for by Netflix indicated troubling trends with respect to the effects of Netflix's failure to warn and targeting sizeable portions of child viewers.

50. All in all, the consensus of empirical research is clear: Netflix's tortious acts and omissions caused hundreds of deaths and thousands of suicide attempts.

51. Netflix's tortious acts caused tragedies with respect to many children, including decedent B█ H████. Netflix released the Show on March 31, 2017. On information and belief, Netflix made no attempt to avoid recommending and targeting the Show, without adequate warning to vulnerable persons, such as B█ H████ herself. Moreover, on information and belief, Netflix made no attempt to avoid manipulating users, including minors such as B█ H████, to watch the Show.

52. And, Netflix treated B███ H███████ according to its typical practices of monitoring users' activities and manipulating their viewing decisions via sophisticated, targeted recommendation algorithms. That is, Netflix used its data about B███ H███████ to recommend the show to her, to manipulate her into watching it.

53. Yet, Netflix gave B████ and her family no warning that watching the Show could cause suicide and suicidal ideation. Netflix gave B████ no warning of the known health risks associated with viewing the Show. And, Netflix gave B████ no warning of what the danger signs would be if she began suffering those health risks. In sum, Netflix never provided a warning of the health risks of watching the Show when using sophisticated, targeted recommendation systems to manipulate the viewing behaviors of minors and to push its dangerous product, *i.e.*, the Show, on minors, such as B███ H██████.

**F.    Netflix used unprecedented levels of data collection, algorithmic data processing, and analytical insights to precisely target some of the most vulnerable members in society with traumatic content that had no adequate warning.**

54. It cannot be emphasized enough that what Netflix did was entirely different than merely put a book on library bookshelves or put a show on TV. A Netflix engineering director put it best when describing Netflix's capabilities with respect to its users in 2013:

> We know what you played, searched for, or rated, as well as the time, date, and device. We even track user interactions such as browsing or scrolling behavior.

(Vanderbilt, *The Science Behind the Netflix Algorithms That Decide What You'll Watch Next, Wired* (Aug. 7, 2013) (interview with Netflix's engineering director, Xavier Amtraiain, describing how "**how they control what you watch**" (emphasis added)).)

55. As of 2013, several years before Netflix released the Show on its steaming services, its recommendation engine and algorithms already controlled and actively manipulated the vast majority of what its users decide to watch such that "75 percent of viewer activity is driven by" Netflix's targeted recommendation systems. (*Ibid.*)

56. Netflix helps users find shows or movies with minimal effort by utilizing algorithms to personalize the user experience.  Netflix's algorithms achieve these personalized recommendations by considering factors like viewing history, time of day a user watches, devices watched on, how long a viewer watches, and information about the titles watched. (Netflix, *How Netflix's Recommendations System Works*, Netflix Help Center (last accessed Apr. 30, 2021).)

57. Netflix has access to nearly limitless data about its users through its online streaming service.  Netflix feeds this information into the Netflix Recommender System, *i.e.*, a series of algorithms that personalize the viewer experience to improve Netflix's viewer retention rate.  Netflix achieves 80% of its stream time utilizing its Recommender System.  (Chong, *Deep Dive into Netflix's Recommender System*, towards data science (Apr. 30, 2020).)

58. Indeed, there is no reason to believe that Netflix treated B███ H█████ any differently, or any of the children targeted and manipulated in watching the Show, than the rest of the users on Netflix's platform.

59. In accordance with Netflix's practices, Netflix watched B███'s browsing and scrolling behavior, tracking them so that Netflix could manipulate and control what content she would watch on the Netflix streaming service.  In accordance with Netflix's practices, Netflix watched the time, date, and devices on which B███ used Netflix's streaming services, tracking them so that Netflix could manipulate and control what content she would watch on the Netflix streaming service.

60. Netflix is, in fact proud of its ability to control what its viewers will watch:



← **Tweet**

**Netflix** ✓ @netflix · Aug 8, 2013
About 75% of Netflix viewing is driven by the recommendation algorithm: wired.com/underwire/2013... via @WIRED

💬 28          ↻ 64          ♡ 68          ↑

61. Given that Netflix itself estimates that "75 percent of viewer activity is driven" by Netflix's sophisticated, targeted recommendation systems, it is likely that Netflix successfully manipulated B███ Herndon's viewing selections when she used Netflix's streaming services. Netflix targeted and manipulated B███'s viewing choices, and thereby exposed her to the dangerous health risks associated with watching the Show.

62. After watching the Show during the month of April, B███ experienced emotional and psychological distress and harm.

**G. Only after hundreds of children died and after thousands were harmed did Netflix removed its most gratuitous scene of violent suicide, having never warned of the harm it could cause while targeting children directly with that content.**

63. After the Show was released without warning and targeted to vulnerable populations, mental health experts worried that the failure to warn coupled with the "graphic depiction of Hannah's suicide might function as a how-to guide." (Grady, *13 Reasons Why takes a voyeuristic lens to rape and suicide, with complicated results*, Vox.com (May 1, 2017).)

64. After the empirical evidence of widespread harm mounted; after report after report of tragedy for families and children; after child-welfare and suicide-prevention advocates and experts expressed their outrage, Netflix removed the scene that was causing the most harm from the Show.

65. Ultimately, Netflix simply decided to remove its most dangerous content, having never meaningfully warned of the health risks:

> The original, nearly three-minute-long scene — which is no longer available on Netflix — aired midway through the season one finale. It depicted breakout star Katherine Langford's Hannah assessing her life in the mirror before she is depicted sitting in a bathtub, tear on her cheek, taking a razor blade to her left wrist and piercing the skin. The camera then holds on the character as she shrieks in pain as blood gushes from an increasingly long cut that extends nearly up to her elbow. Hannah is then seen gasping for air as her breathing ultimately slows and bloodstained water tips out of the tub. Not long after, Hannah's mother (Kate Walsh) discovers her daughter's lifeless body in the blood-filled tub. Male lead Dylan Minnette provides voiceover during the entire scene as he tells the school's guidance counselor (played by Derek Luke) precisely what happened to Hannah.

[…]

The new scene, which has been updated on the Netflix site, features Hannah looking at herself in the mirror before cutting to her parents' reaction to her suicide. There is no longer any depiction of the character taking a razor blade to her wrists and the immediate aftermath.

(Goldberg, *Netflix Alters Graphic '13 Reasons Why' Suicide Scene After Controversy, The Hollywood Reporter* (July 15, 2019).)

66. The damage of Netflix's years-long refusal to warn and targeting of children had already been done. As one example, on April 28, 2017, ███ "B██" H████ fell victim to suicide. B██ H████ fell victim to the very health risk that medical experts and suicide-prevention experts had warned Netflix about regarding the Show. B██ H████ was one of many suicides predicted before the Show's release. B██ H████ was a victim of the well-documented, unnatural 28.9% spike in child suicides that occurred after the Show's debut specifically during the month of April 2017.

67. B██ H████ was laid to rest at the age of 16 at Saint Charles Borromeo Church in Livermore, California on May 15, 2017.

# V. CLASS ACTION ALLEGATIONS

68. The claims asserted herein are appropriate for resolution through a class action. Not only are the claims susceptible for class resolution, but it is also important that they are adjudicated on a class basis, both because the claims require expertise and the members of the class have, on information and belief, faced significant challenges accessing legal representation. It is at least known that the Herndon family has faced significant barriers to legal representation.

   a. As an initial matter, there are complexities to the case that are significant. The claims involve issues of suicide, suicidal ideation, psychological trauma, as well as larger questions about teenage psychology underlying population awareness of warning signs of suicide and interpretation of advisories, *etc.* These complex issues are better resolved through a class vehicle rather than burdening each class member and their individualized counsel (if they are able to retain one) with extensive litigation and re-litigation on those questions.

   b. What is more, there is substantial technological and algorithmic complexity of Netflix's targeting, recommendation, and manipulation activities—requiring certain levels of expertise and dedication to meaningfully understand. Again, these complexities weigh in strong favor of class resolution because requiring individual plaintiffs to discover the essential issues, comprehend them, try them, *etc.*, would be extraordinarily expensive and consume significant amounts of time.

   c. Finally, the Herndons have faced substantial barriers to finding any lawyer who was both willing and able to represent them in this case. In all likelihood, so have the remaining members of the classes. There have been very real access-to-counsel issues for aggrieved families suffering from Netflix's tortious actions.

These reasons favoring class adjudication run the gamut: abstract questions of justice and fairness; pragmatic synergies and efficiencies in the conduct of the litigation and discovery; and the harsh realities of access to law for public-interest cases in contemporary society for everyday Americans. All favor class adjudication.

69. Here, as a result of Netflix's inadequate warnings, Netflix caused the death of an estimated hundreds, possibly a thousand, children who committed suicide since the release of the Show, with their many survivors, heirs, *etc.*, holding viable claims.  Beyond those who died, there are many more who suffered substantial trauma at the hands of callous business decisions that prioritized reaching certain business milestones over the safety of Netflix's customers.  In this situation, the technology is a double-edge sword.  Although it permitted the targeting and manipulation of very vulnerable persons, it also permits the class to be ascertained with greater ease.  Thus, the classes are both ascertainable and numerous.

70. Common questions of law and fact predominate here.  The central thread throughout is Netflix's tortious actions and omissions, both its decisions not to adequately warn and to target and manipulate vulnerable persons.  Nearly every legal and factual question in the case appears, at this juncture, susceptible for class-wide adjudication.  Therefore, there exists a well-defined community of interest that would be highly impracticable absent class adjudication.

71. Having lost a sibling to suicide as a result of Netflix's failure to provide adequate warning, T███ and M████ H████ have claims typical of the class of plaintiffs who may assert a wrongful death claim for having lost a family member. T███ and M████ H████ may adequately represent this class.  Having lost a minor child to suicide as a result of Netflix's failure to provide adequate warning, John Herndon has claims typical of class of plaintiffs who may still assert a survival action. John Herndon may adequately represent this class.

72. The claims here meet the requirements for class-adjudication.  In fact, a number of compelling reasons militate in favor of class-certification.

# VI. CAUSES OF ACTION

### First Cause of Action
### Strict Liability—Failure To Warn

73. PLAINTIFFS, the Estate of decedent █████ "B██" H█████ and decedent's surviving father, John Herndon, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated.  These allegations expressly include the clarifications about what is not the bases of these claims.  See ¶¶ 12-21.

74. Netflix manufactured, distributed and/or sold a product, *i.e.*, its Show, Thirteen Reasons Why, and continues to do so. This cause of action does not arise from Netflix's manufacture or creation of the Show, but rather from its targeted distribution of the Show to vulnerable children as well as its sale of the Show without adequate warnings, as part of a subscription package on its streaming service.

75. The Show posed serious health risks that were known to or reasonably knowable by Netflix. Indeed, such health risks had been brought to Netflix's attention prior to the Show's release. The foreseeable health risks of such behavior have been extensively documented by the medical, scientific, and suicide-prevention communities.

76. Ordinary consumers would not have recognized or been aware of the health risks absent an adequate warning. Ordinary consumers would not recognize or be aware of these health risks even after viewing Netflix's later-added advisories.  The advisories merely suggest potential discomfort that may result from mature themes and give no indication of the known health risks caused by the Show.

77. Netflix failed to adequately warn children and their families of the health risks of viewing its Show. As a result of the lack of adequate warning, decedent B██ H█████ and those similarly situated to her were tortiously harmed. Children viewers targeted by Netflix and their adult parents/guardians were not informed that watching the Show could cause or contribute to suicide or suicidal ideations.

1   WHEREFORE, the aforementioned PLAINTIFFs demand judgment against Defendant Netflix for

2   whatever amount to be determined by a jury after trial, including but not limited to compensatory

3   damages, such as, medical bills, lost wages, lost earning capacity, and pain and suffering and, if

4   applicable, punitive damages, costs, fees, and all other possible relief.  To the extent permissible,

5   declaratory relief is also sought.

**Second Cause of Action**
**Wrongful Death**

78.   PLAINTIFFS, decedent B███ H██████'s brothers, J████ "M█████" H█████ and T█

     P█████ H██████, both minors, hereby repeat and reallege the paragraphs alleged above, on

     behalf of themselves and all others similarly situated.  These allegations expressly include

     the clarifications about what is not the bases of these claims.  See ¶¶ 12-21.

79.   As a direct, proximate, and legal result of Netflix's negligent and intentional acts and

     omissions, B███ and those similarly situated died.  Netflix caused these deaths through its

     tortious, negligent, and/or reckless behaviors, including through the tortious targeting of

     vulnerable persons with the Show, manipulating their viewing behaviors, and without

     providing fair warning of the health risks associated with the Show.  As a direct, proximate,

     and legal result of Netflix's failure to warn, decedents suffered injuries that resulted in their

     deaths.  As a direct, proximate, and legal result of Netflix's tortious acts of targeting

     dangerous materials at vulnerable populations, Netflix caused decedents' deaths.

80.   As a direct, legal, and proximate result of Netflix's negligent and intentional acts and

     omissions, aforementioned Plaintiffs have suffered a loss of love, companionship, comfort,

     affection, society, solace, training and/or moral support and are entitled to damages pursuant

     to Code of Civil Procedure § 377.60, *et seq*.

WHEREFORE, the aforementioned PLAINTIFFS demand judgment against Defendant Netflix and

are entitled to recover wrongful death damages pursuant to California Code of Civil Procedure

§377.61, including but not limited to, both economic and non-economic compensatory damages,

such as: the loss of financial support the decedent would have contributed to the family, the loss of

- 21 -
Complaint

1   gifts or benefits plaintiff would have expected to receive from decedent, funeral and burial

2   expenses, the reasonable value of household service decedent would have provided, as well as, a

3   loss of love, companionship, comfort, affection, society, solace, training and/or moral support.  To

4   the extent permissible, declaratory relief is also sought.

**Third Cause of Action**
**Negligence**

81. As a direct, proximate, and legal result of Netflix's negligent and intentional acts and
omissions, B███ and those similarly situated died.  Netflix caused these deaths through its
tortious, negligent, and/or reckless behaviors, including through the tortious targeting of
vulnerable persons with the Show, manipulating their viewing behaviors, and without
providing fair warning of the health risks associated with the Show.  As a direct, proximate,
and legal result of Netflix's failure to warn, decedents suffered injuries that resulted in their
deaths.  As a direct, proximate, and legal result of Netflix's tortious acts of targeting
dangerous materials at vulnerable populations, Netflix caused decedents' deaths.

82. PLAINTIFFS, the Estate of decedent I███ "B██" H███ and decedent's surviving
father, John Herndon, hereby repeat and reallege the paragraphs alleged above, on behalf of
themselves and all others similarly situated.  These allegations expressly include the
clarifications about what is not the bases of these claims.  See ¶¶ 12-21.

83. Defendant Netflix negligently, carelessly, and/or recklessly failed to warn of the health risks
associated with viewing the Show. Such health risks had been brought to Netflix's attention
prior to the Show's release.  The foreseeable health risks of such behavior have been
extensively documented by the medical, scientific, and suicide-prevention communities.
Nevertheless, Netflix did not provide adequate or reasonable warnings of the health risks
associated with viewing the Show.

84. Defendant Netflix negligently, carelessly, and/or recklessly specifically targeted the show to
vulnerable populations, including decedent B██ H███ and those similarly situated.

85. Defendants Netflix's negligent, carless, and/or reckless conduct and omissions caused and/or significantly contributed to the death of decedent B█ H████ and those similarly situated.

86. As a direct and legal result of the said wrongful conduct and/or omissions of Defendant Netflix, Plaintiffs suffered substantial harm.

WHEREFORE, PLAINTIFFS demand judgment against DEFENDANT Netflix for whatever for whatever amount to be determined by a jury after trial, including but not limited to punitive damages, economic compensatory damages, and/or non-economic compensatory damages. To the extent permissible, declaratory relief is also sought.

## VII. DEMAND FOR TRIAL BY JURY

87. Plaintiffs hereby demand a trial by jury of all issues so triable.

1  DATED: April 30, 2021                    Respectfully submitted,

2                                            */s/ Ryan Hamilton*
                                            Ryan Hamilton (Bar No. 291349)
3                                            HAMILTON LAW LLC
                                            5125 South Durango, Suite C
4                                            Las Vegas, Nevada 89113
5                                            (702) 818-1818
                                            ryan@hamlegal.com
6
                                            Gregory Keenan (*pro hac vice* forthcoming)
7                                            DIGITAL JUSTICE FOUNDATION
8                                            81 Stewart Street
                                            Floral Park, New York 11001
9                                            (516) 633-2633
                                            gregory@digitaljusticefoundation.org
10
                                            Andrew Grimm (*pro hac vice* forthcoming)
11                                           DIGITAL JUSTICE FOUNDATION
12                                           15287 Pepperwood Drive
                                            Omaha, Nebraska 68154
13                                           (531) 210-2381
                                            andrew@digitaljusticefoundation.org
14
                                            Rory Stevens (*pro hac vice* forthcoming)
15                                           LAW OFFICE OF RORY L. STEVENS
16                                           4303 Southwest Cambridge Street
                                            Seattle, Washington 98136
17                                           (206) 850-4444
                                            rorylawstevensesq@gmail.com
18
                                            Megan Verrips (*pro hac vice* forthcoming)
19                                           INFORMATION DIGNITY ALLIANCE
20                                           P.O. Box 8684
                                            101 Southwest Madison Street
21                                           Portland, Oregon 97207
                                            (925) 330-0359
22                                           megan@informationdignityalliance.org
23
                                            James D. Banker (Bar No. 317242)
24                                           DIGITAL JUSTICE FOUNDATION
                                            701 Pennsylvania Avenue Northwest, Apt. 1003
25                                           Washington, District of Columbia 20004
                                            (714) 722-5658
26                                           jimbanker@gmail.com
27
                                            *Attorneys for Plaintiffs*
28

- 24 -
Complaint

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA  95113-1090**

FILED

July 2, 2021

Clerk of The Court
Superior Court of CA
County of Santa Clara
21CV382518
By:  rwalker

TO:     FILE COPY

RE:                 <u>The Estate of ▊▊▊ B▊ H▊▊▊, et al. v. Netflix, Inc.</u>
CASE NUMBER:     **21CV382518**

### ORDER AND NOTICE OF REASSIGNMENT OF CASE

A review of the above-referenced matter has determined that the Complaint was filed as a proposed class action. Accordingly, reassignment to the Complex Division is appropriate and this matter shall be, and is, reassigned for all purposes, including discovery, law & motion, settlement conference, and trial, to **Department 1** (Complex Civil Litigation), the **HONORABLE SUNIL R. KULKARNI** presiding.

The Case Management Conference is reset from September 7, 2021 to **September 9, 2021 at 2:30 p.m. in Department 1**.

Please contact the Complex Civil Litigation Department, (408) 882-2286, if you have any questions.

Signed: 7/2/2021 11:20 AM

Date Issued:  July 2, 2021                     _____

                                               Honorable Beth McGowen
                                               Civil Supervising Judge

---

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA  95113-1090**

**Electronically Filed**
**by Superior Court of CA,**
**County of Santa Clara,**
**on 7/7/2021 12:54 PM**
**Reviewed By: R. Walker**

TO:     FILE COPY

RE:             <u>The Estate of I████ "B███" H█████, et al. v. Netflix, Inc.</u>
CASE NUMBER:    **21CV382518**                          **Case #21CV382518**
                                                        **Envelope: 6795313**

### ORDER DEEMING CASE COMPLEX AND STAYING DISCOVERY
### AND RESPONSIVE PLEADING DEADLINE

WHEREAS, the Complaint was filed by Plaintiffs **THE ESTATE OF** ████ **"B███" H████** ("Plaintiff"), et al. in the Superior Court of California, County of Santa Clara, on April 30, 2021 and reassigned on July 2, 2021 to Department **1** (Complex Civil Litigation), the **Honorable Sunil R. Kulkarni** presiding, pending a ruling on the complexity issue;

IT IS HEREBY ORDERED that:

The Court determines that the above-referenced case is **COMPLEX** within the meaning of California Rules of Court 3.400.  The matter remains assigned, for all purposes, including discovery and trial, to Department **1** (Complex Civil Litigation), the **Honorable Sunil R. Kulkarni** presiding.

The parties are directed to the Court's local rules and guidelines regarding electronic filing and to the Complex Civil Guidelines, which are available on the Court's website.

Pursuant to California Rules of Court, Rule 3.254, the creation and maintenance of the Master Service List shall be under the auspices of (1) Plaintiff **THE ESTATE OF IS████ "B███" H████**, as the first-named party in the Complaint, and (2) the first-named party in each Cross-Complaint, if any.

Pursuant to Government Code section 70616(c), each party's complex case fee is due within ten (10) calendar days of this date.

Plaintiff shall serve a copy of this Order on all parties forthwith and file a proof of service within seven (7) days of service.

Any party objecting to the complex designation must file an objection and proof of service within ten (10) days of service of this Order.  Any response to the objection must be filed within seven (7) days of service of the objection. The Court will make its ruling on the submitted pleadings.

The Case Management Conference remains set for **September 9, 2021 at 2:30 p.m. in Department 1** and all counsel are ordered to attend by **CourtCall**.

Counsel for all parties are ordered to meet and confer in person at least 15 days prior to the First Case Management Conference and discuss the following issues:

1. Issues related to recusal or disqualification;
2. Issues of law that, if considered by the Court, may simplify or further resolution of the case, including issues regarding choice of law;
3. Appropriate alternative dispute resolution (ADR), for example, mediation, mandatory settlement conference, arbitration, mini-trial;
4. A plan for preservation of evidence and a uniform system for identification of documents throughout the course of this litigation;
5. A plan for document disclosure/production and additional discovery; which will generally be conducted under court supervision and by court order;

6. Whether it is advisable to address discovery in phases so that information needed to conduct meaningful ADR is obtained early in the case (counsel should consider whether they will stipulated to limited merits discovery in advance of certification proceedings), allowing the option to complete discovery if ADR efforts are unsuccessful;
7. Any issues involving the protection of evidence and confidentiality;
8. The handling of any potential publicity issues;

Counsel for Plaintiff is to take the lead in preparing a Joint Case Management Conference Statement to be filed 5 calendar days prior to the First Case Management Conference, and include the following:

1. a brief objective summary of the case;
2. a summary of any orders from prior case management conferences and the progress of the parties' compliance with said orders;
3. significant procedural and practical problems that may likely be encountered;
4. suggestions for efficient management, including a proposed timeline of key events; and
5. any other special consideration to assist the court in determining an effective case management plan.

To the extent the parties are unable to agree on the matters to be addressed in the Joint Case Management Conference Statement, the positions of each party or of various parties should be set forth separately and attached to this report as addenda. The parties are encouraged to propose, either jointly or separately, any approaches to case management they believe will promote the fair and efficient handling of this case. The Court is particularly interested in identifying potentially dispositive or significant threshold issues the early resolution of which may assist in moving the case toward effective ADR and/or a final disposition.

**STAY ON DISCOVERY AND RESPONSIVE PLEADING DEADLINE**  Pending further order of this Court, the service of discovery and the obligation to respond to any outstanding discovery is stayed. However, Defendant(s) shall file a Notice of Appearance for purposes of identification of counsel and preparation of a service list. The filing of such a Notice of Appearance shall be without prejudice to the later filing of a motion to quash to contest jurisdiction. Parties shall not file or serve responsive pleadings, including answers to the complaint, motions to strike, demurrers, motions for change of venue and cross-complaints until a date is set at the First Case Management Conference for such filings and hearings.

This Order is issued to assist the Court and the parties in the management of this "Complex" case through the development of an orderly schedule for briefing and hearings. This Order shall not preclude the parties from continuing to informally exchange documents that may assist in their initial evaluation of the issues presented in this Case.

Plaintiff shall serve a copy of this Order on all the parties in this matter forthwith.

SO ORDERED.

Date: ___July 7, 2021___

Hon. **Sunil R. Kulkarni**
Judge of the Superior Court

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.
-----
Updated on 3/11/21.

2

21CV382518
Santa Clara – Civil

**ATTACHMENT CV-5012**rodriguez

# CIVIL LAWSUIT NOTICE
### *Superior Court of California, County of Santa Clara*
### *191 North First St., San José, CA  95113*

CASE NUMBER: _____ 21CV382518 _____

---

### PLEASE READ THIS ENTIRE FORM

---

***PLAINTIFF*** (the person suing):  Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint, Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

---

***DEFENDANT*** (The person sued):  **You must do each of the following to protect your rights:**

1.  You must file a **written response** to the *Complaint, using the proper legal form or format*, in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint*;
2.  You must serve by mail  a copy of your written response on the Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3.  You must attend the first Case Management Conference.

   **Warning: If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

---

***RULES AND FORMS:***  You must follow the California Rules of Court and the Superior Court of California, County of <_CountyName_> Local Civil Rules and use proper forms.  You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José (408-882-2900 x-2926).

- State Rules and Judicial Council Forms:  www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms:  http://www.sccsuperiorcourt.org/civil/rule1toc.htm

***CASE MANAGEMENT CONFERENCE (CMC):***  You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC.  You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

   ***You or your attorney must appear at the CMC.***  You may ask to appear by telephone – see Local Civil Rule 8.

---

Your Case Management Judge is: _____ Takaichi, Drew C _____    Department: _____ 2 _____

The 1st CMC is scheduled for:  (Completed by Clerk of Court)
   Date: _____ 9/7/2021 _____ Time: _____ in Department: _____ 2 _____

The next CMC is scheduled for:  (Completed by party if the 1st CMC was continued or has passed)
   Date: _____ Time: _____ in Department: _____

---

***ALTERNATIVE DISPUTE RESOLUTION (ADR):***  If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

***WARNING:*** Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

**CIVIL LAWSUIT NOTICE**

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO: 291349 | FOR COURT USE ONLY |
|---|---|---|

ATTORNEY OR PARTY WITHOUT ATTORNEY:    STATE BAR NO: 291349
NAME: Ryan A. Hamilton, Esq.
FIRM NAME: Hamilton Law
STREET ADDRESS: 5125 South Durango Drive, Suite C
CITY: Las Vegas    STATE: NV    ZIP CODE: 89113
TELEPHONE NO.: (702) 818-1818    FAX NO.: (702) 974-1139
E-MAIL ADDRESS: Ryan@HamLegal.com
ATTORNEY FOR (Name): The Estate of ████ "████" █████, John Herndon, ████ "█" █████ █████

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior Court (DTS)

Plaintiff/Petitioner: The Estate of ████ "████" █████, John Herndon, ████ "█" █████
Defendant/Respondent: Netflix, Inc.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: 21CV382518 |
|---|---|

TO (insert name of party being served): C T Corporation System

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

Date of mailing: July 9, 2021

Ryan A. Hamilton
(TYPE OR PRINT NAME)                    (SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):

1. [x] A copy of the summons and of the complaint.
2. [x] Other (specify):
   Order Deeming Case Complex and Staying Discovery and Responsive Pleading Deadline, Order and Notice of Reassignment of Case, Civil Lawsuit Notice

(To be completed by recipient):

Date this form is signed: July 28, 2021

Blanca F. Young, on behalf of Netflix, Inc.
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,        (SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ON WHOSE BEHALF THIS FORM IS SIGNED)                ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
POS-015 [Rev. January 1, 2005]

**NOTICE AND ACKNOWLEDGMENT OF RECEIPT — CIVIL**

Code of Civil Procedure,
§§ 415.30, 417.10
www.courtinfo.ca.gov


## CT Corporation

**Service of Process Transmittal**
07/28/2021
CT Log Number 539984536

**TO:**     Lilly Guadarrama
Netflix, Inc.
100 Winchester Cir
Los Gatos, CA 95032-1815

**RE:**     **Process Served in California**

**FOR:**    Netflix, Inc.  (Domestic State: DE)

---

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | The Estate Of ███████ "█████ H██████, John Herndon, █████ "M███████ H██████, a Minor, T███ P████ H██████, a Minor, etc., on behalf of themselves and all others similarly situated, Pltfs. vs. Netflix, Inc., Dft. |
| **DOCUMENT(S) SERVED:** | - |
| **COURT/AGENCY:** | None Specified<br>Case # 21CV382518 |
| **NATURE OF ACTION:** | Wrongful Death |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, GLENDALE, CA |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/28/2021 at 15:02 |
| **JURISDICTION SERVED :** | California |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/28/2021, Expected Purge Date: 08/02/2021 |
| | Image SOP |
| | Email Notification,  Lilly Guadarrama  lilly@netflix.com |
| | Email Notification,  Haley Ly  legal@netflix.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System<br>330 N BRAND BLVD<br>STE 700<br>GLENDALE, CA 91203<br>877-564-7529<br>MajorAccountTeam2@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.

 CT Corporation

**Service of Process Transmittal**
07/28/2021
CT Log Number 539984536

**TO:**     Lilly Guadarrama
Netflix, Inc.
100 Winchester Cir
Los Gatos, CA 95032-1815

**RE:**     **Process Served in California**

**FOR:**    Netflix, Inc.  (Domestic State: DE)

**DOCKET HISTORY:**

| DOCUMENT(S) SERVED: | DATE AND ███████ S██████: | TO: | CT LOG NUMBER: |
|---|---|---|---|
| -- | By Courier on 07/13/2021 at 11:56 | Lilly Guadarrama<br>Netflix, Inc. | 539892597 |



# PROCESS SERVER DELIVERY DETAILS

**Date:**                        Wed, Jul 28, 2021

**Server Name:**                 Jimmy Lizama

Entity Served                    NETFLIX, INC.

Case Number                      21CV382518

Jurisdiction                     CA





July 27, 2021

C T Corporation System
Registered Agent for Netflix, Inc.
330 N. Brand Blvd., Suite 700
Glendale, CA 91203

*Via Service of Process: OneLegal; C T Corporation System, 330 N. Brand Blvd., Suite 700, Glendale, CA 91203*

**Re:**   ***The Estate of I███ "B██" H██████, John Herndon, J████ "M████" H████, T██ F█ H██████ v. Netflix, Inc.; Case No.: 21CV382518***

To the person served:

<u>As notification pursuant to California Code of Civil Procedure 412.30</u>, you are hereby served in the within action on behalf of Netflix, Inc. as a person upon whom a copy of the summons and of the complaint may be delivered to effect service on said party under the provisions of 413.10 and 415.10 of the Code of Civil Procedure.

Sincerely,

Ryan A. Hamilton, Esq.
Licensed in NV, CA, and IN

**ATTACHMENT CV-5012** Rodriguez

# CIVIL LAWSUIT NOTICE
**Superior Court of California, County of Santa Clara**
**191 North First St., San José, CA 95113**

21CV382518

CASE NUMBER: _____

---

### PLEASE READ THIS ENTIRE FORM

---

*PLAINTIFF* (the person suing): Within 60 days after filing the lawsuit, you must serve each Defendant with the *Complaint*, *Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

---

*DEFENDANT* (The person sued): **You must do each of the following to protect your rights:**

1. You must file a **written response** to the *Complaint, using the proper legal form or format,* in the Clerk's Office of the Court, within **30 days** of the date you were served with the *Summons* and *Complaint*;
2. You must serve by mail a copy of your written response on the Plaintiff's attorney or on the Plaintiff if Plaintiff has no attorney (to "serve by mail" means to have an adult other than yourself mail a copy); and
3. You must attend the first Case Management Conference.

   **Warning: If you, as the Defendant, do not follow these instructions, you may automatically lose this case.**

---

*RULES AND FORMS:* You must follow the California Rules of Court and the Superior Court of California, County of < _CountyName_ > Local Civil Rules and use proper forms. You can obtain legal information, view the rules and receive forms, free of charge, from the Self-Help Center at 201 North First Street, San José (408-882-2900 x-2926).

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: http://www.sccsuperiorcourt.org/civil/rule1toc.htm

*CASE MANAGEMENT CONFERENCE (CMC):* You must meet with the other parties and discuss the case, in person or by telephone at least 30 calendar days before the CMC. You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

   *You or your attorney must appear at the CMC. You may ask to appear by telephone – see Local Civil Rule 8.*

---

| | |
|---|---|
| Your Case Management Judge is: Takaichi, Drew C | Department: 2 |
| **The 1st CMC is scheduled for:** (Completed by Clerk of Court) | |
| Date: 9/7/2021   Time: _____ | in Department: 2 |
| **The next CMC is scheduled for:** (Completed by party if the 1st CMC was continued or has passed) | |
| Date: _____   Time: _____ | in Department: _____ |

---

*ALTERNATIVE DISPUTE RESOLUTION (ADR):* If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.sccsuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

*WARNING:* Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

Case 5:21-cv-06895-NC Document 3-1 Filed 08/25/21 Page 69 of 110

Ryan Hamilton SBN 291349
5125 South Durango, Suite C
Las Vegas, Nevada 89113

  TELEPHONE NO.: (702) 818-1818     FAX NO. *(Optional):*
  ATTORNEY FOR *(Name):* Estate of ███ H███, John Herndon, M████ & T██ H███

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
  STREET ADDRESS: 191 North First Street
  MAILING ADDRESS: 191 North First Street
  CITY AND ZIP CODE: San Jose, CA, 95113
  BRANCH NAME: Downtown Superior Court (DTS)

CASE NAME:
Estate of ███ H███, John Herndon, J██ "M███" H███ & T██ H███ v. Netflix, Inc

**Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 6/22/2021 5:29 PM
Reviewed By: A. Rodriguez
Case #21CV382518
Envelope: 6701653**

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [×] **Unlimited** (Amount demanded exceeds $25,000)   [ ] **Limited** (Amount demanded is $25,000) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | 21CV382518<br><br>JUDGE:<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
[ ] Auto (22)
[ ] Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
[ ] Asbestos (04)
[×] Product liability (24)
[ ] Medical malpractice (45)
[ ] Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
[ ] Business tort/unfair business practice (07)
[ ] Civil rights (08)
[ ] Defamation (13)
[ ] Fraud (16)
[ ] Intellectual property (19)
[ ] Professional negligence (25)
[ ] Other non-PI/PD/WD tort (35)
**Employment**
[ ] Wrongful termination (36)
[ ] Other employment (15)

**Contract**
[ ] Breach of contract/warranty (06)
[ ] Rule 3.740 collections (09)
[ ] Other collections (09)
[ ] Insurance coverage (18)
[ ] Other contract (37)
**Real Property**
[ ] Eminent domain/Inverse condemnation (14)
[ ] Wrongful eviction (33)
[ ] Other real property (26)
**Unlawful Detainer**
[ ] Commercial (31)
[ ] Residential (32)
[ ] Drugs (38)
**Judicial Review**
[ ] Asset forfeiture (05)
[ ] Petition re: arbitration award (11)
[ ] Writ of mandate (02)
[ ] Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
[ ] Antitrust/Trade regulation (03)
[ ] Construction defect (10)
[ ] Mass tort (40)
[ ] Securities litigation (28)
[ ] Environmental/Toxic tort (30)
[ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
[ ] Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
[ ] RICO (27)
[ ] Other complaint *(not specified above)* (42)
**Miscellaneous Civil Petition**
[ ] Partnership and corporate governance (21)
[ ] Other petition *(not specified above)* (43)

2. This case [×] is   [ ] is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
  a. [ ] Large number of separately represented parties
  b. [×] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
  c. [×] Substantial amount of documentary evidence
  d. [ ] Large number of witnesses
  e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
  f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [×] monetary   b. [×] nonmonetary; declaratory or injunctive relief   c. [×] punitive
4. Number of causes of action *(specify):* 3: wrongful death, strict liability - failure to warn, negligence
5. This case [×] is   [ ] is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 22, 2021

Ryan Hamilton                  ▶     /s/ Ryan Hamilton
(TYPE OR PRINT NAME)                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

E-FILED
4/30/2021 11:59 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV382518
Reviewed By: Y. Chavez

1   Gregory Keenan (*pro hac vice* forthcoming)
    DIGITAL JUSTICE FOUNDATION
2   81 Stewart Street
    Floral Park, New York 11001
3   (516) 633-2633
4   gregory@digitaljusticefoundation.org

5   Andrew Grimm (*pro hac vice* forthcoming)
    DIGITAL JUSTICE FOUNDATION
6   15287 Pepperwood Drive
    Omaha, Nebraska 68154
7   (531) 210-2381
8   andrew@digitaljusticefoundation.org

9   Ryan Hamilton (SBN 291349)
    HAMILTON LAW LLC
10  5125 South Durango, Suite C
    Las Vegas, Nevada 89113
11  (702) 818-1818
12  ryan@hamlegal.com

13  *Attorneys for Plaintiffs*[1]

14

15          **IN THE SUPERIOR COURT OF CALIFORNIA**

16          **FOR THE COUNTY OF SANTA CLARA**

17                    **CIVIL DIVISION**

18  THE ESTATE OF ███ "█████"          Case No.:   21CV382518
    H█████, JOHN HERNDON, ███
19  "███████" H███████, *a minor*, T███       **CLASS ACTION**
    F█████ H███████, *a minor*,
20
                                               **Complaint for**
21  *on behalf of themselves and all others similarly*     • **Failure to Adequately Warn,**
    *situated,*                                            • **Wrongful Death, and**
22                                                         • **Negligence.**
23                  *Plaintiffs,*
                                               **[Jury Trial Demanded]**
24          v.

    NETFLIX INC.,
25                  *Defendant.*

26

27

28  ─────────────────
    [1] Additional counsel are listed on the following page.

Rory Stevens (*pro hac vice* forthcoming)
LAW OFFICE OF RORY L. STEVENS
4303 Southwest Cambridge Street
Seattle, Washington 98136
(206) 850-4444
rorylawstevensesq@gmail.com

Megan Verrips (*pro hac vice* forthcoming)
INFORMATION DIGNITY ALLIANCE
P.O. Box 8684
101 Southwest Madison Street
Portland, Oregon 97207
(925) 330-0359
megan@informationdignityalliance.org

James D. Banker (SBN 317242)
DIGITAL JUSTICE FOUNDATION
701 Pennsylvania Avenue Northwest, Apt. 1003
Washington, District of Columbia 20004
(714) 722-5658
jimbanker@gmail.com

1  Plaintiffs—the Estate of ▮▮▮ "B▮▮" H▮▮ and natural persons John Herndon, J▮

2  "M▮▮▮" H▮▮, a minor, and T▮ F▮ H▮▮, a minor—on behalf of themselves and on

3  behalf of all others similarly situated, hereby make class-action allegations as follows:

4

5  ## I. NATURE OF THE CASE

6  1.  In April 2017, child suicides spiked. This wave of suicides came as a surprise to most.

7      Teachers, politicians, journalists, hospital staff, psychiatric experts, suicide-prevention

8      advocates, and, most of all, heartbroken families of the victims themselves were all shocked

9      as the number of child deaths mounted.

10 2.  But these suicides were not entirely unforeseen.  One entity had been made aware that these

11     deaths could and would assuredly happen if it did not change its course of action: Defendant

12     Netflix Inc. and its pertinent subsidiaries (collectively "Netflix").

13 3.  Netflix should have been able to foresee this spike in child suicides because its tortious

14     actions and omissions caused these deaths and it was warned in advance.  Yet Netflix

15     proceeded anyway, prioritizing its own strategy goals of market dominance in the youth

16     demographic over the lives and well-being of vulnerable populations it knew would suffer—

17     and die—if it did not provide greater warnings and take reasonable, common-sense steps to

18     avoid using its data in a reckless manner that harmed children.

19 4.  In March of 2017, Netflix released a show, Thirteen Reasons Why ("Show") on its

20     streaming service. Before that, however, it had been warned by experts backed by decades

21     of empirical research that child suicides and other profound psychological harm would occur

22     if impressionable youths were targeted and not warned of the health risks inherent in

       viewing the Show.

23 5.  Netflix had been put on notice of the risk and concrete prospects of serious, irreparable harm

24     that its Show posed to the most vulnerable of viewers: children.  Yet Netflix failed to take

25     reasonable, appropriate, and commonsensical cautionary measures.  It failed to warn of

26     known harms and health risks—the very risks that it had been warned about ahead of time.

27     Instead, it used its sophisticated, targeted recommendation systems to push the Show on

28     unsuspecting and vulnerable children, using its cutting-edge technology.

6. As children began to die, the experts started to piece the tragedies together. For example, years after the Show's release, the National Institute of Mental Health associated the 28.9% increase in the child-suicide rate during the month of April 2017 with Netflix's Show—a child-suicide spike that could have been avoided had Netflix taken basic moral responsibilities to warn and to not target its most vulnerable viewers.

7. Yet, even after empirical researchers repeatedly identified the profound human cost of Netflix's decisions, Netflix still did not meaningfully warn about the dangers of its Show, and did not moderate its algorithms to avoid targeting vulnerable children. Instead, Netflix dug its heels in for years, choosing a path of callous resistance to the realities of hundreds of children whose deaths Netflix had tortiously caused.

## II. PARTIES

8. **Plaintiffs.** Decedent █ "B█" H█ was a natural person domiciled in the State of California. She died as a result of the tortious acts and omissions of Netflix that caused, or at least substantially contributed to, her suicide. B█'s father, John Herndon; her younger minor brothers, J█ "M█" H█ and T█ P█ H█; and her Estate are Plaintiffs in this action, all domiciled in California, asserting wrongful-death and survivor claims against Netflix both in their capacities as individuals (and/or individual-representatives of the Estate) and in their capacities as class-representatives on behalf of all others similarly situated. The survivorship claims are asserted by the Estate and/or John Herndon. The wrongful-death claims are asserted by B█'s younger minor brothers, J█ "M█" H█ and T█ P█ H█.

9. **Defendant.** Netflix is a corporate entity domiciled and at-home in the State of California. Netflix's tortious acts and omissions caused, or at least substantially contributed to, B█'s suicide and substantial harms, including death, to many other children.

- 4 -

Complaint

### III. JURISDICTION & VENUE

10. **Jurisdiction.** This action arises under California causes of action. This Court has subject-matter jurisdiction. (See Code Civ. Proc. § 410.10.) Netflix maintains its principal place of business in Los Gatos, California. Netflix also maintains systemic, continuous and substantial contacts with California consumers in the form of offering membership subscriptions to its content-streaming service. Netflix's activities in California are and were highly interactive, systemic and continuous so as to support a finding of general, all-purpose jurisdiction in this Court. (See Code Civ. Pro. § 410.10.)

11. **Venue.** Netflix's principal office is in Los Gatos, California, in Santa Clara County and, on information and belief, substantially all of the tortious acts occurred there. Thus, this Court is a proper venue. (See Code Civ. Pro § 395, subd. b.)

### IV. STATEMENT OF FACTS

**A.  After the novel <u>Thirteen Reasons Why</u> was published, Netflix adapted it into a startingly graphic streaming show.**

12. In October 2007, Jay Asher's novel <u>Thirteen Reasons Why</u> ("Novel") was published. The Novel takes readers through transcripts of fictional audiotapes recorded by its main character, Hannah Baker, before her suicide. Each of the Novel's thirteen fictional transcripts gives an anecdote addressed to another character who Baker partially blamed for causing her suicide. The Novel was a hit, making the New York Times' young-adult best-seller list a few times. (Rich, *A Story of a Teenager's Suicide Quietly Becomes a Best Seller*, The New York Times (Mar. 9, 2009).)

13. Years later, Netflix purchased the rights for a television show that had been adapted from the Novel ("Show"). Part of the business case for adapting the Novel into the Show was that the Novel already had a "huge following" and "huge fan base" so the Show was expected to attract younger audiences. (Rochlin, *Selena Gomez (and Others) on Adapting 'Thirteen Reasons Why' for Netflix*, The New York Times (Mar. 22, 2017).)

14. As with the Novel, the Show features "broken friendships, a fatal auto accident" and "startlingly naturalistic depictions of rape and suicide." Yet Netflix's adaptation of the Novel into thirteen hours of streaming content made several significant changes. (Hale, *Review: '13 Reasons Why' She Killed Herself, Drawn Out on Netflix*, The New York Times (Mar. 30, 2017).)

15. One difference between the Novel and the Show is pacing. The Novel is quick-paced and, as a reviewer notes, "stylistically economical[.]" By contrast, the Show "demands that you listen to a suicide note for thirteen hours, while the suicide in question is built up as the grand climax[.]" (Tolentino, *"13 Reasons Why" Makes a Smarmy Spectacle of Suicide*, The New Yorker (May 10, 2017).)

16. Perhaps the most drastic difference between the Novel and the Show is how they depict the main character Hannah Baker's suicide:

> [The Show's creators] decided to depict Hannah's suicide in "unflinching" detail." In the book, she swallows pills. In the show, she saws vertically at her forearms with razor blades, sobbing and screaming in an overflowing, pinkish tub.

(Tolentino, *"13 Reasons Why" Makes a Smarmy Spectacle of Suicide*, The New Yorker (May 10, 2017).)

17. Ultimately, Netflix removed this graphic, three-minute-long scene from the Show in July 2019 after years of public outcry that the scene "glorified suicide." (Watson, *Who has died in 13 Reasons Why?*, Express Online (June 12, 2020).)

**B.   Netflix's widespread dissemination of its <u>Thirteen Reasons Why</u> Show was successful but concerning.**

18. When it was released on Netflix's streaming platform in March 2017, the Show was a huge hit. It was especially popular with younger viewers, a key demographic in Netflix's sights as it was trying to maintain its streaming dominance.

19. Yet the Show's release was also marred by controversy. The positive buzz in some circles was stained by other views that the show glorified suicide and was morally irresponsible. (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

20. One major concern was that this unsuitable content was being "watched by young people on phones or laptops without the awareness of their parents." (Rosman, *Netflix Triggers Online Debate With a Show About Teen Suicide, '13 Reasons Why,'* The New York Times, Apr. 19, 2017).)

21. Nonetheless, the Show's broad exhibition was a cultural event. Twitter debates ignited. Parents were concerned. Teenagers imitated the Show in a variety of ways. Some painted their fingernails to imitate the Show. One high-school student recorded thirteen cassette tapes when asking a classmate to prom. (Rosman, *Netflix Triggers Online Debate With a Show About Teen Suicide, '13 Reasons Why'*, The New York Times (Apr. 19, 2017).)

**C. Netflix is *not* being sued for its creation, dissemination, exhibition, advertisement, or other similar promotion of its Show, Thirteen Reasons Why.**

22. The above allegations in paragraphs 12-21 are provided for background and context but are expressly *not* the basis of why Netflix is being sued.

23. Specifically, Netflix is *not* being sued because it created a Show of questionable morality that arguably glorifies teenage suicide. It is *not* being sued because it disseminated, *i.e.*, publicly broadcasted, the Show by offering it for public consumption. It is *not* being sued because it publicly exhibited this content, advertised it generally to the public, or similarly promoted it. Netflix is *not* being sued for its creation, dissemination, exhibition, advertisement, or similar promotion of its Show.

24. Rather, the bases of the claims against Netflix stem from something else: (1) Netflix's failure to adequately warn of its Show's, *i.e.*, its product's, dangerous features and (2) Netflix's use of its trove of individualized data about its users to specifically target vulnerable children and manipulate them into watching content that was deeply harmful to them—despite dire warnings about the likely and foreseeable consequences to such children. Both are detailed below.

**D.  Experts warned Netflix in advance that its Show, <u>Thirteen Reasons Why</u>, would kill children but Netflix gave no adequate warning to viewers of this risk.**

25. When the Show was in production, its creators consulted several mental-health professionals.

26. Contrary to the creators' unexamined hypothesis that depicting the ugliness and brutality of suicide would somehow deter teenage suicides, the consensus of suicide-prevention experts warns of just the opposite effect—the potential for suicide-contagion effects upon impressionable viewers.  Depicting suicide as the Show does to children would likely result in deaths.  Netflix was warned about this risk in advance but did not heed guidelines about how to warn of suicide-related content. (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

27. Specifically, Dr. Dan Reidenberg, the executive director of a nonprofit suicide-prevention organization, Suicide Awareness Voices of Education, reviewed the Show about a month or so *before* its release.  Netflix had asked for Dr. Reidenberg's guidance.  Dr. Reidenberg advised Netflix to cancel the release but was told by Netflix that it "wasn't an option." "They made that very clear to me," Dr. Reidenberg later told the press.  (Eisenstadt, *'13 Reasons Why' is a hit, but suicide expert told Netflix not to release series*, Syracuse.com (Apr. 26, 2017).)

28. Dr. Reidenberg's concerns were not just about uncomfortable feelings and content.  He was worried that the Show itself would *cause* suicides in impressionable children and lead to their deaths if they watched it.  (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

29. Nor was Dr. Reidenberg a lone dissenting voice in the scientific community.  Well before Netflix released the Show, it was well-known in the scientific community that depictions of suicide can themselves *cause* suicide in vulnerable populations:

> Mental illness is not a communicable disease, but there's a strong body of evidence that suicide is still contagious.  Publicity surrounding a suicide has been repeatedly and definitively linked to a subsequent increase in suicide, *especially among young people.*

(*E.g.*, Sanger-Katz, *The Science Behind Suicide Contagion*, The New York Times (Aug. 13, 2014) (emphasis added).)

30. Netflix failed to warn of these health risks.  Netflix included some advisories but these advisories have been woefully inadequate because they do not reasonably warn of the risk that the Show could cause suicide.  Some of its advisories were only added a month after the Show's release—well after an anticipated millions of children had viewed the Show. (Andrews, Netflix's *'13 Reasons Why' gets more trigger warnings. Critics say it glamorizes teen suicide*, Washington Post (May 1, 2017).)  To many experts, Netflix's advisories came as too little too late.  (*See* Grunberger, '*13 Reasons Why' warning is a start, experts say, but they want more*, CNN (Apr. 5, 2018).)

31. Even as of the filing of this Complaint, none of Netflix's advisories meaningful warn that the Show itself could cause suicide.  Instead, they use vague language that a reasonable person would think merely indicates mature subject matter, rather than a real risk of genuine harm.

Complaint

32. As of today, the Show displays the following advisory before the beginning of the first season:

> Hi, I'm Dylan Minette and I play Clay Jensen. I'm Katherine Langford and I play Hannah Baker. I'm Justin Prentice, I play Bryce Walker. I'm Alisha Boe, I play Jessica Davis.
>
> Thirteen Reasons Why is a fictional series that tackles tough real-world issues taking a look at sexual assault, substance abuse, suicide and more. By shedding a light on these difficult topics, we hope our show can help viewers start a conversation. But if you are struggling with these issues yourself this series may not be right for you or you may want to watch it with a trusted adult.
>
> And if you ever feel you need someone to talk with, reach out to a parent, a friend, a school counselor or an adult you trust call a local help line or go to 13ReasonsWhy.info. Because the minute you start talking about it, it gets easier.

Among other problems, this advisory does not warn that viewing the Show could itself *cause* suicide, suicidal ideation, *etc.*

33. Instead, it merely suggests that there are mature themes depicted and that the presence of a trusted adult might be desirable. There is no clear indication of the foreseeable harms, rather than a suggestion that the themes may be emotional or psychologically difficult.

34. Likewise, as of today, the Show's thirteenth episode displays a cursory advisory placard that reads as follows: "The following episode contains graphic depictions of suicide and violence, which some viewers may find disturbing. It is intended for mature audiences. Viewer discretion is advised." This generic language is insufficient to warn reasonable viewers that the episode is not merely mature-themed but that watching it could cause or contribute to suicide or suicidal ideations.

35. Worse, not all of these advisories existed at the time of the Show's release, when Netflix began targeting the Show to vulnerable users and populations. And, the fundamental problem is that these advisories fail to discuss the foreseeable risk of concrete harm to vulnerable persons. By comparison, prescription-drug labels warn of concrete risks of side effects. Cigarette-warning labels indicate risk of health effects from smoking cigarettes, not merely that "discretion is advised."

36. Here, without more express warnings, no reasonable person would be aware of the genuine and real health risks posed by the Show to vulnerable viewers. Without adequate warnings, Netflix did not permit its subscribers and families to make genuinely informed choices upfront about whether the Show's content is right for them, their family, or their children.

37. Moreover, experts were troubled that Netflix's content suggested that seeking help for suicidal ideation is fruitless and useless whereas committing suicide may be a source of individual agency. (Todd, *Here's What 7 Mental Health Experts Really Think About '13 Reasons Why,'* SELF (May 9, 2018).) Netflix failed to give any warning or advisory about how seeking help can improve outcomes and avoid significant self-harm or suicide. Thus, Netflix failed to warn that some of its themes would inhibit impressionable and vulnerable viewers from seeking professional help for their suicidal ideation.

38. Furthermore, Netflix's pre-season advisory is inadequate because it fails to indicate where the most dangerous content appears in the Show. The Show becomes dramatically more graphic over the course of its first season without another warning until episode nine. Thus, the warning at the beginning of the Show followed by comparatively tame episodes would leave a reasonable parent unaware and with no easy way to figure out where the most harmful content would be found and when and how to avoid that content.

39. Netflix failed to warn of the dangers of its Show in another way. Netflix gave no indication of any of the warning signs associated with a high risk for suicide. By no means did Netflix frame its advisories in a way that a vulnerable child or parent would have gleaned any further understanding of the psychological differences between an intense emotional reaction to disturbing content and dangerous signs of suicidal ideation.

40. To this day, Netflix gives no such meaningful warning that its content can cause suicides in vulnerable children. Netflix decided to give no serious warning that its content could kill, despite having been put on notice of this risk in advance of releasing its Show.

Complaint

### E. Netflix's failure to adequately warn harmed and caused the death of many children.

41. The tragic and significant costs of Netflix's decision not to adequately warn began to appear almost immediately after Netflix released the Show.

42. Without any meaningful warnings, families and children were largely unaware of the major health risks posed by watching the Show. They were not warned about an extremely dangerous product that was being targeted at their children.

43. At first, the indications of Netflix's role in the spike in child suicides was anecdotal. Then, scientists and empiricists started demonstrating empirically that widespread harm to children came from Netflix's inadequate warnings and targeting of vulnerable kids.

44. One alarming story came shortly after the Show's release. A school superintendent in Florida, reported that counselors, teachers, and principals reported over a dozen cases of very concerning behavior by children—a significant spike in "youth at-risk behavior *at the elementary and middle school levels* to include self-mutilation, threats of suicide, and multiple Baker Act incidents." (Strauss, *Schools superintendent: Students are harming themselves and citing '13 Reasons Why*, Washington Post (Apr. 29, 2017) (emphasis added).)

45. Such a result was not unforeseeable. As one leading psychiatric researcher stated: "Research shows us that the more obvious, florid, dramatic, and explicit the portrayal is as disturbing as it is to most of us, there's the potential that for some people who see it, who are really struggling with something, this winds up being in some way strangely appealing." (Grady, *Critics say 13 Reasons Why has artistic merit. Suicide prevention experts say it's dangerous*, Vox.com (June 9, 2017).)

46. Empirical research followed. It confirmed what the educators, parents, and counselors were seeing on the ground. There was a significant spike in suicides in April 2017 following the Show's release without adequate warning and with significant targeting at children. The number of Internet searches for how to commit suicide spiked at the same time that fewer children were seeking help from crisis-suicide-prevention services that connect children to mental-health resources and help avoid suicide. (Thompson et al, *Crisis Text Line use*

*following the release of Netflix series 13 Reasons Why Season 1: Time-series analysis of help-seeking behavior in youth*, 14 Preventive Medicine Reports (June 2019).)

47. Researchers also identified that the spike in hospital admissions at a children's hospital for children suffering from self-harm stemmed from the release of the Show on Netflix's streaming service. (Cooper et al., *Suicide Attempt Admissions From a Single Children's Hospital Before and After the Introduction of Netflix Series 13 Reasons Why*, 63 Journal of Adolescent Health 688 (Dec. 2018).)

48. Subsequent research has again and again confirmed similar empirical effects on suicide rates in the United States closely correlated to the release of the Show (without adequate warnings and targeted at children). (Bridge et al., *Association Between the Release of Netflix's 13 Reasons Why and Suicide Rates in the United States: An Interrupted Time Series Analysis*, 59 Journal of the American Academy of Child & Adolescent Psychiatry 236 (Feb. 2020); Niederkrotenthaler et al., *Association of Increased Youth Suicides in the United States With the Release of 13 Reasons Why*, 76 Journal of the American Medical Association – Psychiatry 933 (May 29, 2019).)

49. The effect was not merely domestic. For example, similar devastating impacts were identified in Canada. (*E.g.*, Sinyoir et al., *Suicides in Young People in Ontario Following the Release of "13 Reasons Why,"* 64 Canadian Journal of Psychiatry (Aug. 21, 2019).) Even empirical research sponsored and paid for by Netflix indicated troubling trends with respect to the effects of Netflix's failure to warn and targeting sizeable portions of child viewers.

50. All in all, the consensus of empirical research is clear: Netflix's tortious acts and omissions caused hundreds of deaths and thousands of suicide attempts.

51. Netflix's tortious acts caused tragedies with respect to many children, including decedent B██ H██████. Netflix released the Show on March 31, 2017. On information and belief, Netflix made no attempt to avoid recommending and targeting the Show, without adequate warning to vulnerable persons, such as B██ H██████ herself. Moreover, on information and belief, Netflix made no attempt to avoid manipulating users, including minors such as B██ H██████, to watch the Show.

52. And, Netflix treated B███ H█████ according to its typical practices of monitoring users' activities and manipulating their viewing decisions via sophisticated, targeted recommendation algorithms. That is, Netflix used its data about B███ H█████ to recommend the show to her, to manipulate her into watching it.

53. Yet, Netflix gave B███ and her family no warning that watching the Show could cause suicide and suicidal ideation. Netflix gave B███ no warning of the known health risks associated with viewing the Show. And, Netflix gave B███ no warning of what the danger signs would be if she began suffering those health risks. In sum, Netflix never provided a warning of the health risks of watching the Show when using sophisticated, targeted recommendation systems to manipulate the viewing behaviors of minors and to push its dangerous product, *i.e.*, the Show, on minors, such as B███ H█████.

**F. Netflix used unprecedented levels of data collection, algorithmic data processing, and analytical insights to precisely target some of the most vulnerable members in society with traumatic content that had no adequate warning.**

54. It cannot be emphasized enough that what Netflix did was entirely different than merely put a book on library bookshelves or put a show on TV. A Netflix engineering director put it best when describing Netflix's capabilities with respect to its users in 2013:

> *We know what you played, searched for, or rated, as well as the time, date, and device. We even track user interactions such as browsing or scrolling behavior.*

(Vanderbilt, *The Science Behind the Netflix Algorithms That Decide What You'll Watch Next, Wired* (Aug. 7, 2013) (interview with Netflix's engineering director, Xavier Amtraiain, describing how "**how they control what you watch**" (emphasis added)).)

55. As of 2013, several years before Netflix released the Show on its steaming services, its recommendation engine and algorithms already controlled and actively manipulated the vast majority of what its users decide to watch such that "75 percent of viewer activity is driven by" Netflix's targeted recommendation systems. (*Ibid.*)

56. Netflix helps users find shows or movies with minimal effort by utilizing algorithms to personalize the user experience.  Netflix's algorithms achieve these personalized recommendations by considering factors like viewing history, time of day a user watches, devices watched on, how long a viewer watches, and information about the titles watched.  (Netflix, *How Netflix's Recommendations System Works*, Netflix Help Center (last accessed Apr. 30, 2021).)

57. Netflix has access to nearly limitless data about its users through its online streaming service.  Netflix feeds this information into the Netflix Recommender System, *i.e.*, a series of algorithms that personalize the viewer experience to improve Netflix's viewer retention rate.  Netflix achieves 80% of its stream time utilizing its Recommender System.  (Chong, *Deep Dive into Netflix's Recommender System*, towards data science (Apr. 30, 2020).)

58. Indeed, there is no reason to believe that Netflix treated B██ H█████ any differently, or any of the children targeted and manipulated in watching the Show, than the rest of the users on Netflix's platform.

59. In accordance with Netflix's practices, Netflix watched B██'s browsing and scrolling behavior, tracking them so that Netflix could manipulate and control what content she would watch on the Netflix streaming service.  In accordance with Netflix's practices, Netflix watched the time, date, and devices on which B██ used Netflix's streaming services, tracking them so that Netflix could manipulate and control what content she would watch on the Netflix streaming service.

60. Netflix is, in fact proud of its ability to control what its viewers will watch:



**Tweet**

Netflix ✓ @netflix · Aug 8, 2013  ···
About 75% of Netflix viewing is driven by the recommendation algorithm:
wired.com/underwire/2013... via @WIRED

💬 28    🔁 64    ♡ 68    ⬆

61. Given that Netflix itself estimates that "75 percent of viewer activity is driven" by Netflix's sophisticated, targeted recommendation systems, it is likely that Netflix successfully manipulated B███ Herndon's viewing selections when she used Netflix's streaming services. Netflix targeted and manipulated B███'s viewing choices, and thereby exposed her to the dangerous health risks associated with watching the Show.

62. After watching the Show during the month of April, B███ experienced emotional and psychological distress and harm.

**G. Only after hundreds of children died and after thousands were harmed did Netflix removed its most gratuitous scene of violent suicide, having never warned of the harm it could cause while targeting children directly with that content.**

63. After the Show was released without warning and targeted to vulnerable populations, mental health experts worried that the failure to warn coupled with the "graphic depiction of Hannah's suicide might function as a how-to guide." (Grady, *13 Reasons Why takes a voyeuristic lens to rape and suicide, with complicated results*, Vox.com (May 1, 2017).)

64. After the empirical evidence of widespread harm mounted; after report after report of tragedy for families and children; after child-welfare and suicide-prevention advocates and experts expressed their outrage, Netflix removed the scene that was causing the most harm from the Show.

65. Ultimately, Netflix simply decided to remove its most dangerous content, having never meaningfully warned of the health risks:

> The original, nearly three-minute-long scene — which is no longer available on Netflix — aired midway through the season one finale. It depicted breakout star Katherine Langford's Hannah assessing her life in the mirror before she is depicted sitting in a bathtub, tear on her cheek, taking a razor blade to her left wrist and piercing the skin. The camera then holds on the character as she shrieks in pain as blood gushes from an increasingly long cut that extends nearly up to her elbow. Hannah is then seen gasping for air as her breathing ultimately slows and bloodstained water tips out of the tub. Not long after, Hannah's mother (Kate Walsh) discovers her daughter's lifeless body in the blood-filled tub. Male lead Dylan Minnette provides voiceover during the entire scene as he tells the school's guidance counselor (played by Derek Luke) precisely what happened to Hannah.

1

[...]

2

3

4

The new scene, which has been updated on the Netflix site, features Hannah looking at herself in the mirror before cutting to her parents' reaction to her suicide. There is no longer any depiction of the character taking a razor blade to her wrists and the immediate aftermath.

5

6

(Goldberg, *Netflix Alters Graphic '13 Reasons Why' Suicide Scene After Controversy, The Hollywood Reporter* (July 15, 2019).)

7    66. The damage of Netflix's years-long refusal to warn and targeting of children had already

8

been done. As one example, on April 28, 2017, ▮ "B▮" H▮ fell victim to

9

suicide. B▮ H▮ fell victim to the very health risk that medical experts and suicide-

10

prevention experts had warned Netflix about regarding the Show. B▮ H▮ was one of

11

many suicides predicted before the Show's release. B▮ H▮ was a victim of the well-

12

documented, unnatural 28.9% spike in child suicides that occurred after the Show's debut

13

specifically during the month of April 2017.

14    67. B▮ H▮ was laid to rest at the age of 16 at Saint Charles Borromeo Church in

15

Livermore, California on May 15, 2017.

16

17

18

19

20

21

22

23

24

25

26

27

28

# V. CLASS ACTION ALLEGATIONS

68. The claims asserted herein are appropriate for resolution through a class action. Not only are the claims susceptible for class resolution, but it is also important that they are adjudicated on a class basis, both because the claims require expertise and the members of the class have, on information and belief, faced significant challenges accessing legal representation. It is at least known that the Herndon family has faced significant barriers to legal representation.

   a. As an initial matter, there are complexities to the case that are significant. The claims involve issues of suicide, suicidal ideation, psychological trauma, as well as larger questions about teenage psychology underlying population awareness of warning signs of suicide and interpretation of advisories, *etc.* These complex issues are better resolved through a class vehicle rather than burdening each class member and their individualized counsel (if they are able to retain one) with extensive litigation and re-litigation on those questions.

   b. What is more, there is substantial technological and algorithmic complexity of Netflix's targeting, recommendation, and manipulation activities—requiring certain levels of expertise and dedication to meaningfully understand. Again, these complexities weigh in strong favor of class resolution because requiring individual plaintiffs to discover the essential issues, comprehend them, try them, *etc.*, would be extraordinarily expensive and consume significant amounts of time.

   c. Finally, the Herndons have faced substantial barriers to finding any lawyer who was both willing and able to represent them in this case. In all likelihood, so have the remaining members of the classes. There have been very real access-to-counsel issues for aggrieved families suffering from Netflix's tortious actions.

These reasons favoring class adjudication run the gamut: abstract questions of justice and fairness; pragmatic synergies and efficiencies in the conduct of the litigation and discovery, and the harsh realities of access to law for public-interest cases in contemporary society for everyday Americans. All favor class adjudication.

69. Here, as a result of Netflix's inadequate warnings, Netflix caused the death of an estimated hundreds, possibly a thousand, children who committed suicide since the release of the Show, with their many survivors, heirs, *etc.*, holding viable claims. Beyond those who died, there are many more who suffered substantial trauma at the hands of callous business decisions that prioritized reaching certain business milestones over the safety of Netflix's customers. In this situation, the technology is a double-edge sword. Although it permitted the targeting and manipulation of very vulnerable persons, it also permits the class to be ascertained with greater ease. Thus, the classes are both ascertainable and numerous.

70. Common questions of law and fact predominate here. The central thread throughout is Netflix's tortious actions and omissions, both its decisions not to adequately warn and to target and manipulate vulnerable persons. Nearly every legal and factual question in the case appears, at this juncture, susceptible for class-wide adjudication. Therefore, there exists a well-defined community of interest that would be highly impracticable absent class adjudication.

71. Having lost a sibling to suicide as a result of Netflix's failure to provide adequate warning, T█ and M████ H████ have claims typical of the class of plaintiffs who may assert a wrongful death claim for having lost a family member. T██ and M████ H████ may adequately represent this class. Having lost a minor child to suicide as a result of Netflix's failure to provide adequate warning, John Herndon has claims typical of class of plaintiffs who may still assert a survival action. John Herndon may adequately represent this class.

72. The claims here meet the requirements for class-adjudication. In fact, a number of compelling reasons militate in favor of class-certification.

# VI. CAUSES OF ACTION

## First Cause of Action
## Strict Liability—Failure To Warn

73. PLAINTIFFS, the Estate of decedent I███████ "B███" H██████ and decedent's surviving father, John Herndon, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated.  These allegations expressly include the clarifications about what is not the bases of these claims.  See ¶¶ 12-21.

74. Netflix manufactured, distributed and/or sold a product, *i.e.*, its Show, Thirteen Reasons Why, and continues to do so. This cause of action does not arise from Netflix's manufacture or creation of the Show, but rather from its targeted distribution of the Show to vulnerable children as well as its sale of the Show without adequate warnings, as part of a subscription package on its streaming service.

75. The Show posed serious health risks that were known to or reasonably knowable by Netflix. Indeed, such health risks had been brought to Netflix's attention prior to the Show's release. The foreseeable health risks of such behavior have been extensively documented by the medical, scientific, and suicide-prevention communities.

76. Ordinary consumers would not have recognized or been aware of the health risks absent an adequate warning. Ordinary consumers would not recognize or be aware of these health risks even after viewing Netflix's later-added advisories.  The advisories merely suggest potential discomfort that may result from mature themes and give no indication of the known health risks caused by the Show.

77. Netflix failed to adequately warn children and their families of the health risks of viewing its Show. As a result of the lack of adequate warning, decedent B██ H██████ and those similarly situated to her were tortiously harmed. Children viewers targeted by Netflix and their adult parents/guardians were not informed that watching the Show could cause or contribute to suicide or suicidal ideations.

WHEREFORE, the aforementioned PLAINTIFFs demand judgment against Defendant Netflix for whatever amount to be determined by a jury after trial, including but not limited to compensatory damages, such as, medical bills, lost wages, lost earning capacity, and pain and suffering and, if applicable, punitive damages, costs, fees, and all other possible relief.  To the extent permissible, declaratory relief is also sought.

**Second Cause of Action**
**Wrongful Death**

78. PLAINTIFFS, decedent B██ H████'s brothers, J███ "M████" H████ and T██ P███ H████, both minors, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated.  These allegations expressly include the clarifications about what is not the bases of these claims.  See ¶¶ 12-21.

79. As a direct, proximate, and legal result of Netflix's negligent and intentional acts and omissions, B██ and those similarly situated died.  Netflix caused these deaths through its tortious, negligent, and/or reckless behaviors, including through the tortious targeting of vulnerable persons with the Show, manipulating their viewing behaviors, and without providing fair warning of the health risks associated with the Show.  As a direct, proximate, and legal result of Netflix's failure to warn, decedents suffered injuries that resulted in their deaths.  As a direct, proximate, and legal result of Netflix's tortious acts of targeting dangerous materials at vulnerable populations, Netflix caused decedents' deaths.

80. As a direct, legal, and proximate result of Netflix's negligent and intentional acts and omissions, aforementioned Plaintiffs have suffered a loss of love, companionship, comfort, affection, society, solace, training and/or moral support and are entitled to damages pursuant to Code of Civil Procedure § 377.60, *et seq*.

WHEREFORE, the aforementioned PLAINTIFFs demand judgment against Defendant Netflix and are entitled to recover wrongful death damages pursuant to California Code of Civil Procedure §377.61, including but not limited to, both economic and non economic compensatory damages, such as: the loss of financial support the decedent would have contributed to the family, the loss of

- 21 -
Complaint

gifts or benefits plaintiff would have expected to receive from decedent, funeral and burial expenses, the reasonable value of household service decedent would have provided, as well as, a loss of love, companionship, comfort, affection, society, solace, training and/or moral support. To the extent permissible, declaratory relief is also sought.

### Third Cause of Action
### Negligence

81. As a direct, proximate, and legal result of Netflix's negligent and intentional acts and omissions, B███ and those similarly situated died. Netflix caused these deaths through its tortious, negligent, and/or reckless behaviors, including through the tortious targeting of vulnerable persons with the Show, manipulating their viewing behaviors, and without providing fair warning of the health risks associated with the Show. As a direct, proximate, and legal result of Netflix's failure to warn, decedents suffered injuries that resulted in their deaths. As a direct, proximate, and legal result of Netflix's tortious acts of targeting dangerous materials at vulnerable populations, Netflix caused decedents' deaths.

82. PLAINTIFFS, the Estate of decedent I███ "B███" H███ and decedent's surviving father, John Herndon, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated. These allegations expressly include the clarifications about what is not the bases of these claims. See ¶¶ 12-21.

83. Defendant Netflix negligently, carelessly, and/or recklessly failed to warn of the health risks associated with viewing the Show. Such health risks had been brought to Netflix's attention prior to the Show's release. The foreseeable health risks of such behavior have been extensively documented by the medical, scientific, and suicide-prevention communities. Nevertheless, Netflix did not provide adequate or reasonable warnings of the health risks associated with viewing the Show.

84. Defendant Netflix negligently, carelessly, and/or recklessly specifically targeted the show to vulnerable populations, including decedent B███ H███ and those similarly situated.

85. Defendants Netflix's negligent, carless, and/or reckless conduct and omissions caused and/or significantly contributed to the death of decedent B██ H████ and those similarly situated.

86. As a direct and legal result of the said wrongful conduct and/or omissions of Defendant Netflix, Plaintiffs suffered substantial harm.

WHEREFORE, PLAINTIFFS demand judgment against DEFENDANT Netflix for whatever for whatever amount to be determined by a jury after trial, including but not limited to punitive damages, economic compensatory damages, and/or non-economic compensatory damages.  To the extent permissible, declaratory relief is also sought.

## VII. DEMAND FOR TRIAL BY JURY

87. Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: April 30, 2021

Respectfully submitted,

*/s/ Ryan Hamilton*
Ryan Hamilton (Bar No. 291349)
HAMILTON LAW LLC
5125 South Durango, Suite C
Las Vegas, Nevada 89113
(702) 818-1818
ryan@hamlegal.com

Gregory Keenan (*pro hac vice* forthcoming)
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
gregory@digitaljusticefoundation.org

Andrew Grimm (*pro hac vice* forthcoming)
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
andrew@digitaljusticefoundation.org

Rory Stevens (*pro hac vice* forthcoming)
LAW OFFICE OF RORY L. STEVENS
4303 Southwest Cambridge Street
Seattle, Washington 98136
(206) 850-4444
rorylawstevensesq@gmail.com

Megan Verrips (*pro hac vice* forthcoming)
INFORMATION DIGNITY ALLIANCE
P.O. Box 8684
101 Southwest Madison Street
Portland, Oregon 97207
(925) 330-0359
megan@informationdignityalliance.org

James D. Banker (Bar No. 317242)
DIGITAL JUSTICE FOUNDATION
701 Pennsylvania Avenue Northwest, Apt. 1003
Washington, District of Columbia 20004
(714) 722-5658
jimbanker@gmail.com

*Attorneys for Plaintiffs*

Complaint

**SUM-100**

# SUMMONS
## *(CITACION JUDICIAL)*

E-FILED
6/29/2021 9:01 AM
Clerk of Court
Superior Court of CA,
County of Santa Clara
21CV382518
Reviewed By: A. Rodriguez
Envelope: 6743842

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*

Netflix, Inc.

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
The Estate of I█████ "B███" H█████, John Herndon, J█████
"M██████" H█████, *a minor,* T██ P████ H█████, *a minor.*

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| | |
|---|---|
| The name and address of the court is:<br>*(El nombre y dirección de la corte es):* Superior Court of California, County of Santa Clara, 191 North First Street, San Jose, CA 95113 | CASE NUMBER: *(Número del Caso):*<br>**21CV382518** |

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is: *(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Ryan A. Hamilton, Esq., 5125 South Durango Drive, Suite C, Las Vegas, Nevada 89113

| DATE: ~~June 22, 2021~~ 6/29/2021 9:01 AM | Clerk of Court | Clerk, by | A. Rodriguez | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of *(specify):*

3. [x] on behalf of *(specify):* Netflix Inc.
   under: [x] CCP 416.10 (corporation)   [ ] CCP 416.60 (minor)
   [ ] CCP 416.20 (defunct corporation)   [ ] CCP 416.70 (conservatee)
   [ ] CCP 416.40 (association or partnership)   [ ] CCP 416.90 (authorized person)
   [ ] other *(specify):*
4. [ ] by personal delivery on *(date):*

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

Code of Civil Procedure §§ 412.20, 465
*www.courts.ca.gov*

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA  95113-1090**

**Electronically Filed**
**by Superior Court of CA,**
**County of Santa Clara,**
**on 7/7/2021 12:54 PM**
**Reviewed By: R. Walker**

TO:     FILE COPY

RE:          The Estate of ▮     "B▮" H▮     , et al. v. Netflix, Inc.
CASE NUMBER:     **21CV382518**

**Case #21CV382518**
**Envelope: 6795313**

## ORDER DEEMING CASE COMPLEX AND STAYING DISCOVERY
## AND RESPONSIVE PLEADING DEADLINE

WHEREAS, the Complaint was filed by Plaintiffs **THE ESTATE OF IS▮     "B▮" H▮     **
("Plaintiff"), et al. in the Superior Court of California, County of Santa Clara, on **April 30, 2021** and reassigned on July 2, 2021 to Department **1** (Complex Civil Litigation), the **Honorable Sunil R. Kulkarni** presiding, pending a ruling on the complexity issue;

IT IS HEREBY ORDERED that:

The Court determines that the above-referenced case is **COMPLEX** within the meaning of California Rules of Court 3.400.  The matter remains assigned, for all purposes, including discovery and trial, to Department  1 (Complex Civil Litigation), the **Honorable Sunil R. Kulkarni**  presiding.

The parties are directed to the Court's local rules and guidelines regarding electronic filing and to the Complex Civil Guidelines, which are available on the Court's website.

Pursuant to California Rules of Court, Rule 3.254, the creation and maintenance of the Master Service List shall be under the auspices of (1) Plaintiff **THE ESTATE OF ▮     "B▮" H▮     **, as the first-named party in the Complaint, and (2) the first-named party in each Cross-Complaint, if any.

Pursuant to Government Code section 70616(c), each party's complex case fee is due within ten (10) calendar days of this date.

Plaintiff shall serve a copy of this Order on all parties forthwith and file a proof of service within seven (7) days of service.

Any party objecting to the complex designation must file an objection and proof of service within ten (10) days of service of this Order.  Any response to the objection must be filed within seven (7) days of service of the objection. The Court will make its ruling on the submitted pleadings.

The Case Management Conference remains set for **September 9, 2021 at 2:30 p.m. in Department 1** and all counsel are ordered to attend by **CourtCall**.

Counsel for all parties are ordered to meet and confer in person at least 15 days prior to the First Case Management Conference and discuss the following issues:

1. Issues related to recusal or disqualification;
2. Issues of law that, if considered by the Court, may simplify or further resolution of the case, including issues regarding choice of law;
3. Appropriate alternative dispute resolution (ADR), for example, mediation, mandatory settlement conference, arbitration, mini-trial;
4. A plan for preservation of evidence and a uniform system for identification of documents throughout the course of this litigation;
5. A plan for document disclosure/production and additional discovery; which will generally be conducted under court supervision and by court order;

6. Whether it is advisable to address discovery in phases so that information needed to conduct meaningful ADR is obtained early in the case (counsel should consider whether they will stipulate to limited merits discovery in advance of certification proceedings), allowing the option to complete discovery if ADR efforts are unsuccessful;

7. Any issues involving the protection of evidence and confidentiality;

8. The handling of any potential publicity issues;

Counsel for Plaintiff is to take the lead in preparing a Joint Case Management Conference Statement to be filed 5 calendar days prior to the First Case Management Conference, and include the following:

1. a brief objective summary of the case;

2. a summary of any orders from prior case management conferences and the progress of the parties' compliance with said orders;

3. significant procedural and practical problems that may likely be encountered;

4. suggestions for efficient management, including a proposed timeline of key events; and

5. any other special consideration to assist the court in determining an effective case management plan.

To the extent the parties are unable to agree on the matters to be addressed in the Joint Case Management Conference Statement, the positions of each party or of various parties should be set forth separately and attached to this report as addenda. The parties are encouraged to propose, either jointly or separately, any approaches to case management they believe will promote the fair and efficient handling of this case. The Court is particularly interested in identifying potentially dispositive or significant threshold issues the early resolution of which may assist in moving the case toward effective ADR and/or a final disposition.

**STAY ON DISCOVERY AND RESPONSIVE PLEADING DEADLINE** Pending further order of this Court, the service of discovery and the obligation to respond to any outstanding discovery is stayed. However, Defendant(s) shall file a Notice of Appearance for purposes of identification of counsel and preparation of a service list. The filing of such a Notice of Appearance shall be without prejudice to the later filing of a motion to quash to contest jurisdiction. Parties shall not file or serve responsive pleadings, including answers to the complaint, motions to strike, demurrers, motions for change of venue and cross-complaints until a date is set at the First Case Management Conference for such filings and hearings.

This Order is issued to assist the Court and the parties in the management of this "Complex" case through the development of an orderly schedule for briefing and hearings. This Order shall not preclude the parties from continuing to informally exchange documents that may assist in their initial evaluation of the issues presented in this Case.

Plaintiff shall serve a copy of this Order on all the parties in this matter forthwith.

SO ORDERED.

Date:  July 7, 2021

Hon. **Sunil R. Kulkarni**
Judge of the Superior Court

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.

-----
Updated on 3/11/21.

2

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA**
**191 N. FIRST STREET**
**SAN JOSE, CA  95113-1090**

FILED

July 2, 2021

Clerk of The Court
Superior Court of CA
County of Santa Clara
21CV382518

By:  rwalker

TO:    FILE COPY

RE:              The Estate of ▮▮▮▮▮ B▮▮ H▮▮▮▮▮, et al. v. Netflix, Inc.
CASE NUMBER:    21CV382518

## ORDER AND NOTICE OF REASSIGNMENT OF CASE

A review of the above-referenced matter has determined that the Complaint was filed as a proposed class action. Accordingly, reassignment to the Complex Division is appropriate and this matter shall be, and is, reassigned for all purposes, including discovery, law & motion, settlement conference, and trial, to **Department 1** (Complex Civil Litigation), the **HONORABLE SUNIL R. KULKARNI** presiding.

The Case Management Conference is reset from September 7, 2021 to **September 9, 2021 at 2:30 p.m. in Department 1**.

Please contact the Complex Civil Litigation Department, (408) 882-2286, if you have any questions.

Signed: 7/2/2021 11:20 AM

Date Issued:  July 2, 2021 _____              _____

                                                  Honorable Beth McGowen
                                                  Civil Supervising Judge

---

If you, a party represented by you, or a witness to be called on behalf of that party need an accommodation under the American with Disabilities Act, please contact the Court Administrator's office at (408) 882-2700, or use the Court's TDD line, (408) 882-2690 or the Voice/TDD California Relay Service, (800) 735-2922.

# SANTA CLARA COUNTY SUPERIOR COURT
# ALTERNATIVE DISPUTE RESOLUTION
# INFORMATION SHEET

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

### What is ADR?
ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

### What are the advantages of choosing ADR instead of litigation?
ADR can have a number of advantages over litigation:

- **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

- **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

- **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

- **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

- **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

### What are the main forms of ADR offered by the Court?
**Mediation** is an informal, confidential, flexible and non-binding process in the mediator helps the parties to understand the interests of everyone involved, and their practical and legal choices. The mediator helps the parties to communicate better, explore legal and practical settlement options, and reach an acceptable solution of the problem. The mediator does not decide the solution to the dispute; the parties do.

Mediation may be appropriate when:
- The parties want a non-adversary procedure
- The parties have a continuing business or personal relationship
- Communication problems are interfering with a resolution
- There is an emotional element involved
- The parties are interested in an injunction, consent decree, or other form of equitable relief

**Neutral evaluation**, sometimes called "Early Neutral Evaluation" or "ENE", is an informal process in which the evaluator, an experienced neutral lawyer, hears a compact presentation of both sides of the case, gives a non-binding assessment of the strengths and weaknesses on each side, and predicts the likely outcome. The evaluator can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:
- The parties are far apart in their view of the law or value of the case
- The case involves a technical issue in which the evaluator has expertise
- Case planning assistance would be helpful and would save legal fees and costs
- The parties are interested in an injunction, consent decree, or other form of equitable relief

*-over-*

**Arbitration** is a less formal process than a trial, with no jury. The arbitrator hears the evidence and arguments of the parties and then makes a written decision. The parties can agree to binding or non-binding arbitration. In binding arbitration, the arbitrator's decision is final and completely resolves the case, without the opportunity for appeal. In non-binding arbitration, the arbitrator's decision could resolve the case, without the opportunity for appeal, unless a party timely rejects the arbitrator's decision within 30 days and requests a trial. Private arbitrators are allowed to charge for their time.

Arbitration may be appropriate when:
- The action is for personal injury, property damage, or breach of contract
- Only monetary damages are sought
- Witness testimony, under oath, needs to be evaluated
- An advisory opinion is sought from an experienced litigator (if a non-binding arbitration)

**Civil Judge ADR** allows parties to have a mediation or settlement conference with an experienced judge of the Superior Court. Mediation is an informal, confidential, flexible and non-binding process in which the judge helps the parties to understand the interests of everyone involved, and their practical and legal choices. A settlement conference is an informal process in which the judge meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations. The request for mediation or settlement conference may be made promptly by stipulation (agreement) upon the filing of the Civil complaint and the answer. There is no charge for this service.

Civil Judge ADR may be appropriate when:
- The parties have complex facts to review
- The case involves multiple parties and problems
- The courthouse surroundings would be helpful to the settlement process

**Special masters and referees** are neutral parties who may be appointed by the court to obtain information or to make specific fact findings that may lead to a resolution of a dispute.
Special masters and referees can be particularly effective in complex cases with a number of parties, like construction disputes.

**Settlement conferences** are informal processes in which the neutral (a judge or an experienced attorney) meets with the parties or their attorneys, hears the facts of the dispute, helps identify issues to be resolved, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations.
Settlement conferences can be effective when the authority or expertise of the judge or experienced attorney may help the parties reach a resolution.

*What kind of disputes can be resolved by ADR?*
Although some disputes must go to court, almost any dispute can be resolved through ADR. This includes disputes involving business matters; civil rights; collections; corporations; construction; consumer protection; contracts; copyrights; defamation; disabilities; discrimination; employment; environmental problems; fraud; harassment; health care; housing; insurance; intellectual property; labor; landlord/tenant; media; medical malpractice and other professional negligence; neighborhood problems; partnerships; patents; personal injury; probate; product liability; property damage; real estate; securities; sports; trade secret; and wrongful death, among other matters.

*Where can you get assistance with selecting an appropriate form of ADR and a neutral for your case, information about ADR procedures, or answers to other questions about ADR?*

*Contact:*
Santa Clara County Superior Court
ADR Administrator
408-882-2530

**ALTERNATIVE DISPUTE RESOLUTION INFORMATION SHEET**
**CIVIL DIVISION**

EFS-020

| ATTORNEY OR PARTY WITHOUT ATTORNEY: | STATE BAR NO.: | FOR COURT USE ONLY |

ATTORNEY OR PARTY WITHOUT ATTORNEY:       STATE BAR NO.:

NAME: Blanca F. Young (SBN 217533); Jennifer L. Bryant (293371); Cory Batza (318612)

FIRM NAME: Munger, Tolles & Olson LLP

STREET ADDRESS: 350 South Grand Avenue, Fiftieth Floor

CITY: Los Angeles      STATE: CA     ZIP CODE: 90071

TELEPHONE NO.: (213) 683-9100      FAX NO.: (213) 687-3702

E-MAIL ADDRESS: blanca.young@mto.com; jennifer.bryant@mto.com; cory.batza@mto.com

ATTORNEY FOR (name): Netflix, Inc.

**FOR COURT USE ONLY**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF** Santa Clara

STREET ADDRESS: 191 N. 1st Street

MAILING ADDRESS:

CITY AND ZIP CODE: San Jose, California 95113

BRANCH NAME:

**Envelope: 7118418**

PLAINTIFF/PETITIONER: The Estate of I█████ "B███" H█████ et. al.

DEFENDANT/RESPONDENT: Netflix, Inc.

OTHER:

CASE NUMBER:
21CV382518

JUDICIAL OFFICER:
Hon. Sunil R. Kulkarni

**PROPOSED ORDER (COVER SHEET)**

DEPT:
001

---

**NOTE:** This cover sheet is to be used to electronically file and submit to the court a proposed order. The proposed order sent electronically to the court must be in PDF format and must be attached to this cover sheet. In addition, a version of the proposed order in an editable word-processing format must be sent to the court at the same time as this cover sheet and the attached proposed order in PDF format are filed.

1. Name of the party submitting the proposed order:

    Netflix, Inc.

2. Title of the proposed order:

    Stipulation and [Proposed] Order

3. The proceeding to which the proposed order relates is:

    a. Description of proceeding: First Case Management Conference

    b. Date and time: September 9, 2021 @ 2:30 p.m.

    c. Place: Dept. 001

4. The proposed order was served on the other parties in the case.

---

Blanca F. Young
_____
(TYPE OR PRINT NAME)

▶   /s/ Blanca F. Young
_____
(SIGNATURE OF PARTY OR ATTORNEY)

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
EFS-020 [Rev. February 1, 2017]

**PROPOSED ORDER (COVER SHEET)**
**(Electronic Filing)**

Cal. Rules of Court,
rules 2.252, 3.1312
www.courts.ca.gov

**EFS-020**

| CASE NAME:<br>The Estate of █████ "B██" H████████ v. Netflix, Inc. | CASE NUMBER:<br>21CV382518 |

## PROOF OF ELECTRONIC SERVICE
### *PROPOSED ORDER*

1. I am at least 18 years old and **not a party to this action.**

   a. My residence or business address is *(specify):*

   b. My electronic service address is *(specify):*

2. I electronically served the *Proposed Order (Cover Sheet)* with a proposed order in PDF format attached, and a proposed order in an editable word-processing format as follows:

   a. On *(name of person served) (If the person served is an attorney, the party or parties represented should also be stated.):*

   b. To *(electronic service address of person served):*

   c. On *(date):*

   ☐ Electronic service of the *Proposed Order (Cover Sheet)* with the attached proposed order in PDF format and service of the proposed order in an editable word-processing format on additional persons are described in an attachment.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
(TYPE OR PRINT NAME OF DECLARANT)

▶

_____
(SIGNATURE OF DECLARANT)

**PROPOSED ORDER (COVER SHEET)**<br>**(Electronic Filing)**

**Envelope: 7118418**

1  BLANCA F. YOUNG (State Bar No. 217533)
   blanca.young@mto.com
2  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, Twenty-Seventh Floor
3  San Francisco, CA 94105-2907
   Telephone: (415) 512-4000
4  Facsimile: (415) 512-4077

5  JENNIFER L. BRYANT (State Bar No. 293371)
   Jennifer.Bryant@mto.com
6  CORY M. BATZA (State Bar No. 318612)
   Cory.Batza@mto.com
7  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue
8  Fiftieth Floor
   Los Angeles, California 90071-3426
9  Telephone:    (213) 683-9100
   Facsimile:    (213) 687-3702
10

11 Attorneys for NETFLIX, INC.

12                SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                          COUNTY OF SANTA CLARA

14

15 THE ESTATE OF ███████ "B█████"          Case No. 21CV382518
16 H███████, JOHN HERNDON, J███████
   "M█████" H████████, a minor, T█████     **STIPULATION AND [PROPOSED]**
17 P█████ H████████, a minor, on behalf of **ORDER**
   themselves and all others similarly situated,
18                                           Judge:   Hon. Sunil R. Kulkarni
                   Plaintiff,                Dept.:   001
19
          vs.
20
   NETFLIX, INC.,
21
                   Defendant.
22

23

24

25

26

27

28

Plaintiffs the Estate of ███ "B██" H███, John Herndon, J██ "M████"
H████, a minor, and T██ P██ H████, a minor ("Plaintiffs"), and Defendant Netflix, Inc.
("Netflix") (collectively referred to herein as "the Parties"), by and through their respective
attorneys of record, submit the following stipulation:

1.    WHEREAS, on April 30, 2021, Plaintiffs filed this putative class action, on behalf
of themselves and all others similarly situated;

2.    WHEREAS, on July 7, 2021, this Court issued its Order Deeming Case Complex
and Staying Discovery and Responsive Pleading Deadline ordering the Parties "to meet and confer
in person at least 15 days prior to the First Case Management Conference";

3.    WHEREAS, in light of the ongoing global pandemic, the Parties respectfully
request that the meet and confer prior to the First Case Management Conference take place
remotely via videoconference.

IT IS SO STIPULATED.


DATED:  August 23, 2021          MUNGER, TOLLES & OLSON LLP



By:  /s/ Blanca F. Young
     BLANCA F. YOUNG
Attorneys for Defendant NETFLIX, Inc.


DATED:  August 23, 2021          DIGITAL JUSTICE FOUNDATION, et al.



By:  /s/ Ryan A. Hamilton
     RYAN A. HAMILTON
Attorneys for Plaintiffs THE ESTATE OF ██
"B████" H████, JOHN HERNDON, J██ ██
"M████" HERNDON, a minor, T██ P██ ██
H████, a minor

## [PROPOSED] ORDER

Having reviewed the Parties' Stipulation, above, and good cause appearing therefore, the Court finds that, in light of the ongoing global pandemic, the Parties may meet and confer prior to the First Case Management Conference remotely via videoconference.

IT IS SO ORDERED.

DATED: _____   August 24, 2021

_____
HON. SUNIL R. KULKARNI
JUDGE OF THE SUPERIOR COURT

Generally, the parties can discharge their meet and confer obligations by meeting in person, having a phone call, or having a videoconference. The Court normally will not mandate any particular option.

PROOF OF SERVICE

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Los Angeles, State of California.  My business address is 350 South Grand Avenue, Fiftieth Floor, Los Angeles, CA 90071-3426.

On **August 23, 2021**, I served true copies of the following document(s) described as **STIPULATION AND [PROPOSED] ORDER** on the interested parties in this action as follows:

**SEE ATTACHED SERVICE LIST**

**BY MAIL:**  I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices.  I am readily familiar with the firm's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address Juana.Guevara@mto.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on **August 23, 2021**, at Los Angeles, California.

Juana E. Guevara

1

## SERVICE LIST

2

Gregory Keenan                                          *Attorneys for Plaintiffs*
3   **DIGITAL JUSTICE FOUNDATION**
81 Stewart Street
4   Floral Park, New York 11001
Tel.: (516) 633-2633
5   gregorv@digitaliusticefoundation.org

6   Andrew Grimm
**DIGITAL JUSTICE FOUNDATION**
7   15287 Pepperwood Drive
Omaha, Nebraska 68 1 54
8   Tel.: (531) 210-2381
andrew@digitaliusticefoundation.org
9
Ryan Hamilton
10  **HAMILTON LAW LLC**
5 125 South Durango, Suite C
11  Las Vegas, Nevada 891 13
Tel.: (702) 818-1818
12  rvan@hamlegal.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)*: | FOR COURT USE ONLY |
|---|---|
| Ryan A. Hamilton, Esq. HAMILTON LAW 5125 S. Durango Drive, Suite C Las Vegas, NV 89113 TELEPHONE NO.: (702) 818-1818    FAX NO. *(Optional)*: (702) 974-1139 E-MAIL ADDRESS *(Optional)*: Ryan@HamLegal.com ATTORNEY FOR *(Name)*: Plaintiffs | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
STREET ADDRESS: 191 N. First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose 95113
BRANCH NAME: Downtown Superior Court

| PLAINTIFF/PETITIONER: The Estate of ████ "█" █ █ John Herndon, ████ "M█ █ █ H█ | CASE NUMBER: 21CV382518 |
|---|---|
| DEFENDANT/RESPONDENT: Netflix, Inc. | |
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. [✔] summons
   b. [✔] complaint
   c. [✔] Alternative Dispute Resolution (ADR) package
   d. [✔] Civil Case Cover Sheet *(served in complex cases only)*
   e. [ ] cross-complaint
   f. [✔] other *(specify documents)*: Civil Lawsuit Notice, Order Deeming Case Complex (Emailed to Blanca Young, blanca.young@mto.com, counsel for Netflix, Inc., on July 13, 2021), Order and Notice of Case Reassignment

3. a. Party served *(specify name of party as shown on documents served)*:
      Netflix, Inc.

   b. [✔] Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a)*:
      C T Corporation System, Inc., Registered Agent for Netflix, Inc.

4. Address where the party was served:
   330 N. Brand Blvd., Suite 700, Glendale, CA 91203, 100 Winchester Circle, Los Gatos, California 95032

5. I served the party *(check proper box)*
   a. [ ] **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party  (1) on *(date)*:               (2) at *(time)*:
   b. [ ] **by substituted service.** On *(date)*:          at *(time)*:          I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3)*:

      (1) [ ]  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) [ ]  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) [ ]  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) [ ]  I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date)*:          from *(city)*:          or [ ] a declaration of mailing is attached.

      (5) [ ]  I attach a **declaration of diligence** stating actions taken first to attempt personal service.

| Form Adopted for Mandatory Use Judicial Council of California POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10 |
|---|---|---|

| PLAINTIFF/PETITIONER: | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Netflix, Inc. | 21CV382518 |

5. c. ☑ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):* 07/13/2021     (2) from *(city):* Las Vegas, NV

    (3) ☑ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgment of Receipt.*)* (Code Civ. Proc., § 415.30.)

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. ☐ as an individual defendant.
  b. ☐ as the person sued under the fictitious name of *(specify):*
  c. ☐ as occupant.
  d. ☑ On behalf of *(specify):* Netflix, Inc.
    under the following Code of Civil Procedure section:

    ☑ 416.10 (corporation)     ☐ 415.95 (business organization, form unknown)
    ☐ 416.20 (defunct corporation)     ☐ 416.60 (minor)
    ☐ 416.30 (joint stock company/association)     ☐ 416.70 (ward or conservatee)
    ☐ 416.40 (association or partnership)     ☐ 416.90 (authorized person)
    ☐ 416.50 (public entity)     ☐ 415.46 (occupant)
        ☐ other:

7. **Person who served papers**
  a. Name: Ryan A. Hamilton
  b. Address: 5125 S. Durango Drive, Suite C
  c. Telephone number: (702) 818-1818
  d. **The fee** for service was: $ N/A
  e. I am:
    (1) ☑ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☐ a registered California process server:
      (i) ☐ owner ☐ employee ☐ independent contractor.
      (ii) Registration No.:
      (iii) County:

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: August 25, 2021

Ryan A. Hamilton
  (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)   ▶   _____ (SIGNATURE)

MUNGER, TOLLES & OLSON LLP

RONALD L. OLSON
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
JOHN W. SPIEGEL
DONALD B. VERRILLI, JR.*
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
KATHLEEN M. M'DOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
JEROME C. ROTH
GARTH T. VINCENT
TED DANE
STUART N. SENATOR
MARTIN D. BERN
ROBERT L. DELL ANGELO
JONATHAN E. ALTMAN
KELLY M. KLAUS
DAVID B. GOLDMAN
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
MARK H. KIM
BRETT J. RODDA*
FRED A. ROWLEY JR.
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
ROSEMARIE T. RING
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN

MIRIAM KIM
MISTY M. SANFORD
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP*
JEFFREY Y. WU
LAURA D. SMOLOWE
ANJAN CHOUDHURY
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
E. MARTIN ESTRADA
MATTHEW A. MACDONALD
BRYAN H. HECKENLIVELY
ELAINE J. GOLDENBERG*
MARK R. YOHALEM
GINGER D. ANDERS*
MARGARET G. MARASCHINO
JOHN M. GILDERSLEEVE
ADAM B. WEISS
GEORGE CLAYTON FATHEREE, III
KELLY L.C. KRIEBS
JEREMY A. LAWRENCE
LAURA K. LIN
ACHYUT J. PHADKE
ZACHARY M. BRIERS
JENNIFER M. BRODER
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
ROSE LEDA EHLER
ERIC P. TUTTLE
JOHN W. BERRY
ROBYN K. BACON
JORDAN D. SEGALL
DAVID S. HONG
JONATHAN KRAVIS*
KAREN A. LORANG
JOHN L. SCHWAB
EMILY C. CURRAN-HUBERTY
MATTHEW S. SCHONHOLZ
AIMEE M. CONTRERAS-CAMUA
L. ASHLEY AULL
WESLEY T. L. BURRELL
CRAIG JENNINGS LAVOIE
JENNIFER L. BRYANT
NICHOLAS D. FRAM
JESSICA REICH BARIL
JULIANA M. YEE

JEREMY K. BEECHER
MATTHEW K. DONOHUE
JORDAN X. NAVARRETTE
JOHN B. MAJOR
LAUREN C. BARNETT
C. HUNTER HAYES
TREVOR N. TEMPLETON
SKYLAR B. GROVE
SARAH S. LEE
LAURA M. LOPEZ
MICHAEL C. BAKER
ADELE M. EL-KHOURI*
COLIN A. DEVINE
DANE P. SHIKMAN
LEXI PEACOCK
MAGGIE THOMPSON
SAMUEL H. ALLEN
ALLISON M. DAY
JONATHAN S. MEITZER*
LAUREN M. HARDING
STEPHANIE G. HERRERA
TERESA REED DIPPO
DANIEL BENYAMIN
SARA A. MCDERMOTT
J. MAX ROSEN
RACHEL G. MILLER-ZIEGLER*
ALISON F. KAROL SIGURDSSON
ANNE H. CONLEY
DAVID W. MORESHEAD
ANDRE W. BREWSTER III
TERRA D. LAUGHTON
ROWLEY J. RICE
DAHLIA MIGNOUNA*
SEAN P. BARRY
GINA F. ELLIOTT
BRANDON R. TEACHOUT
LUCAS J. ARTAIZ
USHA CHILUKURI VANCE
TYLER HILTON
VINCENT LING
ALEXANDER S. GORIN
ZARA BARI
BRENDAN B. GANTS*
MARI T. SAIGAL
LAUREN E. ROSS*
BENJAMIN D. BAROKH
ABE DYK
MICHELE C. NIELSEN
APRIL YOUPEE-ROLL
DAVID T. FREENOCK

COBUS VAN DER VEN*
MARIANNA MAO
MEGAN MCCREADIE
RAQUEL E. DOMINGUEZ
OMAR H. NOURELDIN
STEPHEN HYLAS
ARIEL TESHUVA
SHANNON GALVIN AMINRAD
LLOYD MARSHALL
NATALIE KARL
BRANDON MARTINEZ
ANDREW LEWIS
CARRIE E. LITTEN
RUBY J. GARRETT*
BEAU C. TREMITIERE
JAMES R. SALZMANN
ELIZABETH DOUGLAS
SAHIR MALAWI
ROBIN B. GRAY
NICA L. MOORE
JOSEPH MOSES
MICHAEL I. SELVIN
XIAONAN A. YANG
HUNTER V. ARMOUR
NATHANIEL F. SUSSMAN
OLIVER L. BROWN
PAUL E. MARTIN
MATTHEW G. MIYAMOTO
REBECCA L. SCIARRINO
CORY M. BATZA
BRIAN R. BOESSENECKER
AVI REJWAN OVED
ROBERT E. BOWEN
RICHARD T. JOHNSON
GRACE DAVIS FISHER
CALEB W. PEIFFER

OF COUNSEL

ROBERT K. JOHNSON
PATRICK J. CAFFERTY, JR.
PETER A. DETRE
BRAD SCHNEIDER
PETER E. GRATZINGER
JENNY H. HONG
KIMBERLY A. CHI
ADAM R. LAWTON
MICHAEL E. GREANEY
SARAH J. COLE

E. LEROY TOLLES
(1922-2008)

*ADMITTED IN D.C.
ALL OTHERS ADMITTED IN CA

350 SOUTH GRAND AVENUE
FIFTIETH FLOOR
LOS ANGELES, CALIFORNIA 90071-3426
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

———

560 MISSION STREET
TWENTY-SEVENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94105-3089
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

———

601 MASSACHUSETTS AVENUE NW
SUITE 500E
WASHINGTON, D.C. 20001-5369
TELEPHONE (202) 220-1100
FACSIMILE (202) 220-2300

July 28, 2021

Writer's Direct Contact
(213) 683-9293
(213) 683-4093 FAX
Jennifer.Bryant@mto.com

**VIA FEDERAL EXPRESS**

Ryan A. Hamilton, Esq.
Hamilton Law
5125 South Durango Drive, Suite C
Las Vegas, NV 89113

      Re:    *H▬▬ v. Netflix, Inc.*, Case No. 21CV382518

Dear Ryan:

      Enclosed please find the Notice and Acknowledgement of Receipt signed by Blanca Young on behalf of Netflix, Inc. in the above-referenced matter.

      Sincerely yours,

Jennifer L. Bryant

JLB/mg
Encl.

POS-015

| ATTORNEY OR PARTY WITHOUT ATTORNEY:        STATE BAR NO:  291349 | FOR COURT USE ONLY |
|---|---|
| NAME: Ryan A. Hamilton, Esq. <br> FIRM NAME: Hamilton Law <br> STREET ADDRESS: 5125 South Durango Drive, Suite C <br> CITY: Las Vegas      STATE: NV    ZIP CODE: 89113 <br> TELEPHONE NO.: (702) 818-1818      FAX NO.: (702) 974-1139 <br> E-MAIL ADDRESS:  Ryan@HamLegal.com <br> ATTORNEY FOR (Name): The Estate of ▮▮ "B▮" H▮, John Herndon, J▮ "M▮" H▮. <br> Tyler ▮▮ H▮. | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Santa Clara
STREET ADDRESS: 191 North First Street
MAILING ADDRESS:
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior Court (DTS)

Plaintiff/Petitioner: The Estate of ▮▮ "B▮" H▮, John Herndon, J▮ "M▮" H▮
Phillip H▮
Defendant/Respondent: Netflix, Inc.

| NOTICE AND ACKNOWLEDGMENT OF RECEIPT—CIVIL | CASE NUMBER: <br> 21CV382518 |
|---|---|

TO (insert name of party being served): C T Corporation System _____

---

**NOTICE**

The summons and other documents identified below are being served pursuant to section 415.30 of the California Code of Civil Procedure. Your failure to complete this form and return it within 20 days from the date of mailing shown below may subject you (or the party on whose behalf you are being served) to liability for the payment of any expenses incurred in serving a summons on you in any other manner permitted by law.

If you are being served on behalf of a corporation, an unincorporated association (including a partnership), or other entity, this form must be signed by you in the name of such entity or by a person authorized to receive service of process on behalf of such entity. In all other cases, this form must be signed by you personally or by a person authorized by you to acknowledge receipt of summons. If you return this form to the sender, service of a summons is deemed complete on the day you sign the acknowledgment of receipt below.

---

Date of mailing:  July 9, 2021 _____

▶

_____
Ryan A. Hamilton
(TYPE OR PRINT NAME)

(SIGNATURE OF SENDER—MUST NOT BE A PARTY IN THIS CASE)

**ACKNOWLEDGMENT OF RECEIPT**

This acknowledges receipt of (to be completed by sender before mailing):

1. [ x ] A copy of the summons and of the complaint.
2. [ x ] Other (specify):
   Order Deeming Case Complex and Staying Discovery and Responsive Pleading Deadline,
   Order and Notice of Reassignment of Case, Civil Lawsuit Notice

(To be completed by recipient):

Date this form is signed: _____July 28, 2021_____

_____
Blanca F. Young, on behalf of Netflix, Inc.
(TYPE OR PRINT YOUR NAME AND NAME OF ENTITY, IF ANY,
ON WHOSE BEHALF THIS FORM IS SIGNED)

▶

_____
(SIGNATURE OF PERSON ACKNOWLEDGING RECEIPT, WITH TITLE IF
ACKNOWLEDGMENT IS MADE ON BEHALF OF ANOTHER PERSON OR ENTITY)

Page 1 of 1

/ /