BLANCA F. YOUNG (State Bar No. 217533)
blanca.young@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

JENNIFER L. BRYANT (State Bar No. 293371)
jennifer.bryant@mto.com
CORY M. BATZA (State Bar No. 318612)
cory.batza@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

Attorneys for NETFLIX, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| THE ESTATE OF B.H., JOHN HERNDON, J.H., a minor, T.H., a minor, on behalf of themselves and all other similarly situated,<br><br>    Plaintiffs,<br><br>    vs.<br><br>NETFLIX, INC.,<br><br>    Defendant. | Case No. 4:21-cv-06561-YGR<br><br>**DEFENDANT'S NOTICE OF MOTIONS AND [1] SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE, CAL. CODE OF CIV. PROC. § 425.16, OR, IN THE ALTERNATIVE, [2] MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[*Filed concurrently with [Proposed] Order*]<br><br>Date: October 12, 2021<br>Time: 2:00 p.m.<br>Ctrm: 1<br>Judge: Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

**Page**

INTRODUCTION........................................................................................................1

PLAINTIFFS' ALLEGATIONS...................................................................................3

ARGUMENT ..............................................................................................................5

I.     The Complaint Should Be Stricken Under California's Anti-SLAPP Statute ..........5

    A.    Plaintiffs' Claims Arise from Acts in Furtherance of the Right to Free Speech in Connection with a Public Issue .............................................6

        1.    Plaintiffs' Claims Arise from Conduct in Furtherance of Speech ............................................................................................6

        2.    The Challenged Conduct is in Connection with an Issue of Public Interest ........................................................................10

    B.    Plaintiffs Cannot Demonstrate a Probability of Prevailing on Any Claims .....................................................................................................11

        1.    The Complaint Has Fatal Procedural Flaws.....................................11

            (a)    The Negligence and Strict Liability Claims Are Time-Barred ............................................................................11

            (b)    Decedent's Brothers Lack Standing To Bring A Wrongful Death Claim ............................................................12

        2.    Plaintiffs' Claims Fail as a Matter of State Law .............................13

            (a)    Plaintiffs' Strict Liability Claim Fails Because 13 Reasons Why Is Not a "Product" .........................................13

            (b)    Plaintiffs' Negligence and Wrongful Death Claims Fail Because Netflix Did Not Owe Plaintiffs a Duty ..........15

            (c)    Plaintiffs Cannot Plausibly Allege Netflix Caused Plaintiffs' Harm ..................................................................18

        3.    The First Amendment Bars All of Plaintiffs' Claims ......................19

            (a)    Plaintiffs' Claims Attack Speech That Is Protected by the First Amendment .............................................................19

            (b)    The Challenged Speech Does Not Constitute Incitement ........................................................................21

                 (i)    Plaintiffs Do Not And Cannot Allege The Requisite Specific Intent To Incite ..........................22

# TABLE OF CONTENTS
### (Continued)

Page

(ii)    Plaintiffs Do Not Plausibly Allege A
Reasonable Likelihood Of Imminent Harm ............22

II.    Alternatively, the Complaint Should Be Dismissed With Prejudice For
Failure to State a Claim for Relief under Rule 12(b)(6) .........................................24

CONCLUSION .................................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Bose Corp. v. Consumers Union of U.S., Inc.*,
 466 U.S. 485 (1984) ...................................................................................................21

*Brandenburg v. Ohio*,
 395 U.S. 444 (1969) ..........................................................................................21, 22, 23

*Brown v. Entm't Merchs. Ass'n*,
 564 U.S. 786 (2011) ...................................................................................................20

*Cohen v. Cowles Media Co.*,
 501 U.S. 663 (1991) ...................................................................................................19

*Connick v. Myers*,
 461 U.S. 138 (1983) ...................................................................................................21

*Davidson v. Time Warner, Inc.*,
 1997 WL 405907 (S.D. Tex. Mar. 3, 1997) ......................................................15, 17

*Doe v. Gangland Prods., Inc.*,
 730 F.3d 946 (9th Cir. 2013) ..................................................................................7, 9

*Dougherty v. City of Covina*,
 654 F.3d 892 (9th Cir. 2011) ...................................................................................24

*Erznoznik v. City of Jacksonville*,
 422 U.S. 205 (1975) ...................................................................................................20

*Forsyth v. Motion Picture Assoc. of Am., Inc.*,
 2016 WL 6650059 (N.D. Cal. Nov. 10, 2016) ........................................................9

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc. ("GLAAD")*,
 742 F.3d 414 (9th Cir. 2014) ..........................................................................6, 9, 11

*Herceg v. Hustler Magazine, Inc.*,
 814 F.2d 1017 (5th Cir. 1987) .................................................................................23

*Hess v. Indiana*,
 414 U.S. 105 (1973) .............................................................................................22, 23

*Hilton v. Hallmark Cards*,
 599 F.3d 894 (9th Cir. 2010) .....................................................................................6

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*,
 515 U.S. 557 (1995) ...............................................................................................8, 19

DEF.'S SPECIAL MOT. TO STRIKE PURSUANT TO ANTI-SLAPP STATUTE AND MOT. TO DISMISS

## **TABLE OF AUTHORITIES**
### (Continued)

**Page(s)**

*ITN Flix, LLC v. Hinojosa*,
    2019 WL 3562669 (C.D. Cal. Aug. 6, 2019) ............................................................10

*James v. Meow Media, Inc.*,
    300 F.3d 683 (6th Cir. 2002) ................................................................... 1, passim

*James v. Meow Media, Inc.*,
    90 F. Supp. 2d 798 (W.D. Ky. 2000), *aff'd*, 300 F.3d 683 (6th Cir. 2002) ..............................17

*Jian Zhang v. Baidu.com Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ......................................................................9

*Jones v. Cate*,
    2016 WL 282699 (E.D. Cal. Jan. 26, 2016) ............................................................19

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ......................................................................................7

*King v. United States*,
    756 F. Supp. 1357 (E.D. Cal. 1990) ....................................................................19

*Leadsinger, Inc. v. BMG Music Publ'g*,
    512 F.3d 522 (9th Cir. 2008) ............................................................................24

*Medrano v. Kern Cty. Sheriff's Officer*,
    921 F. Supp. 2d 1009 (E.D. Cal. 2013) ................................................................12

*Metabolife Int'l, Inc. v. Wornick*,
    264 F.3d 832 (9th Cir. 2001) ..............................................................................6

*Metabolife Int'l, Inc. v. Wornick*,
    72 F. Supp. 2d 1160 (S.D. Cal. 1999), *aff'd in part, rev'd in part on other*
    *grounds*, 264 F.3d 832 ..................................................................................8

*Miami Herald Pub. Co. Tornillo*,
    418 U.S. 241 (1974) ......................................................................................9

*Monteiro v. Tempe Union High Sch. Dist.*,
    158 F.3d 1022 (9th Cir. 1998) ............................................................................2

*New York Times Co. v. Sullivan*,
    376 U.S. 254 (1964) ..................................................................................3, 20

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*,
    471 U.S. 1 (1986) ........................................................................................8

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,*
    890 F.3d 828 (9th Cir. 2018) ................................................................6

*Sanders v. Acclaim Ent., Inc.,*
    188 F. Supp. 2d 1264 (D. Colo. 2002) ..............................14, 16, 17, 21

*Spence v. Washington,*
    418 U.S. 405 (1974) .............................................................................8

*Stanley v. Georgia,*
    394 U.S. 557 (1969) ...........................................................................19

*Stoddard-Nunez v. City of Hayward,*
    2015 WL 6954963 (N.D. Cal. Nov. 10, 2015) ..................................12

*Todd v. Lovecruft,*
    2020 WL 60199 (N.D. Cal. Jan. 6, 2020) ...........................................6

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ...........................................................................19

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.,*
    190 F.3d 963 (9th Cir. 1999) ...............................................................6

*Vernon v. City of L.A.,*
    27 F.3d 1385 (9th Cir. 1994) .............................................................11

*Watters v. TSR, Inc.,*
    904 F.2d 378 (6th Cir. 1990) ..................................................14, 17, 18

*Wilson v. Midway Games, Inc.,*
    198 F. Supp. 2d 167 (D. Conn. 2002) ..............................14, 21, 22, 23

*Winter v. G.P. Putnam's Sons,*
    938 F.2d 1033 (9th Cir. 1991) ......................................................13, 14

*Young v. Am. Mini Theatres,*
    427 U.S. 50 (1976) .............................................................................19

*Zamora v. CBS,*
    480 F. Supp. 199 (S.D. Fla. 1979) ...............................................17, 21

**STATE CASES**

*Bill v. Superior Court,*
    137 Cal. App. 3d 1002 (1982) .................................................. 1, passim

1

## **TABLE OF AUTHORITIES**
### (Continued)

2

**Page(s)**

3

*Birmingham v. Fodor's Travel Publ'ns, Inc.*,
4
    73 Haw. 359 (1992)...............................................................................................14

5

*Brooks v. Eugene Burger Mgmt. Corp.*,
    215 Cal. App. 3d 1611 (1989)............................................................................14
6

*Equilon Enters. v. Consumer Cases, Inc.*,
7
    29 Cal.4th 53 (2002)...........................................................................................10

8

*Byers v. Edmondson*,
9
    826 So.2d 551 (La. Ct. App. 2002) .....................................................................23

10

*Calvillo-Silva v. Home Grocery*,
    19 Cal. 4th 714 (1998)........................................................................................15

11

*Church of Scientology v. Wollersheim*,
12
    42 Cal. App. 4th 628 (1996)...............................................................................10

13

*Daniel v. Wayans*,
14
    8 Cal. App. 5th 367 (2017)...................................................................................6

15

*DeFilippo v. Nat'l Broad. Co., Inc.*,
    446 A.2d 1036 (R.I. 1982) ..................................................................................21
16

*FilmOn Inc. v. DoubleVerify Inc.*,
17
    7 Cal.5th 133 (2019)...........................................................................................10

18

*Fox Searchlight Pictures, Inc. v. Paladino*,
    89 Cal. App. 4th 294 (2001).................................................................................7
19

20

*Gregorian v. Nat'l Convenience Stores, Inc.*,
    174 Cal. App. 3d 944 (1985)..........................................................................15, 16

21

*Guglielmi v. Spelling-Goldberg Prods.*,
22
    25 Cal. 3d 860 (1979).............................................................................................7

23

*Hunter v. CBS Broadcasting, Inc.*,
24
    221 Cal. App. 4th 1510 (2013)..............................................................................7

25

*Ingels v. Westwood One Broad. Servs., Inc.*,
    129 Cal App. 4th 1050 (2005).............................................................................11

26

*Kronemyer v. Internet Movie Data Base, Inc.*,
27
    150 Cal. App. 4th 941 (2007)................................................................................8

28

1

**TABLE OF AUTHORITIES**
**(Continued)**

2

**Page(s)**

3

*Lattimore v. Dickey,*
   239 Cal. App. 4th 959 (2015)...................................................................................15

4

5

*Lewis v. Reg'l Ctr. of the East Bay,*
   174 Cal. App. 3d 350 (1985)...................................................................................13

6

*Martinez v. Metabolife Int'l, Inc.,*
   113 Cal. App. 4th 181 (2003).....................................................................................7

7

8

*Mayo v. White,*
   178 Cal. App. 3d 1083 (1986).................................................................................13

9

10

*McCollum v. CBS, Inc.,*
   202 Cal. App. 3d 989 (1988)........................................................................ 1, passim

11

*Modisette v. Apple Inc.,*
   30 Cal. App. 5th 136 (2018)...................................................................................18

12

13

*Nally v. Grace Cmty. Church of the Valley,*
   47 Cal. 3d. 278 (1998).............................................................................................18

14

15

*Navellier v. Sletten,*
   29 Cal. 4th 82 (2002).................................................................................................7

16

*Nelson v. Cty. of Los Angeles,*
   113 Cal. App. 4th 783 (2003)............................................................................12, 13

17

18

*Nygard, Inc. v. Uusi-Kerttula,*
   159 Cal. App. 4th 1027 (2008).................................................................................10

19

20

*Olivia N. v. Nat'l Broad. Co.,*
   126 Cal. App. 3d 488 (1981)........................................................................1, 19, 20

21

*Pierson v. Sharp Mem'l Hosp.,*
   216 Cal. App. 3d 340 (1989)...................................................................................13

22

23

*Pooshs v. Philip Morris USA, Inc.,*
   51 Cal. 4th 788 (2011).............................................................................................11

24

25

*Rivera v. First DataBank, Inc.,*
   187 Cal. App. 4th 709 (2010).....................................................................................8

26

*Rosales v. Battle,*
   113 Cal. App. 4th 1178 (2003).................................................................................12

27

28

### TABLE OF AUTHORITIES
**(Continued)**

**Page(s)**

*Rowland v. Christian,*
    69 Cal. 2d 108 (1968) .................................................................15, 16, 18

*Sakiyama v. AMF Bowling Centers, Inc.,*
    110 Cal. App. 4th 398 (2003).............................................................15, 16

*Scott v. Thompson,*
    184 Cal. App. 4th 1506 (2010)................................................................12

*Tamkin v. CBS Broad., Inc.,*
    193 Cal. App. 4th 133 (2011)................................................................9, 10

*Tate v. Canonica,*
    180 Cal. App. 2d 898 (1960).....................................................................18

*Wang v. Wal-Mart Real Estate Bus. Tr.,*
    153 Cal. App. 4th 790 (2007).....................................................................8

*Way v. Boy Scouts of Am.,*
    856 S.W.2d 230 (Tex. Ct. App. 1993) ......................................................17

*Widdoss v. Huffman,*
    62 Pa. D. & C. 4th 251 (Com. Pl. 2003) .................................................17

*Yakubowicz v. Paramount Pictures Corp.,*
    536 N.E.2d 1067 (Mass. 1981) ...............................................................23

**STATE STATUTES**

Cal. Code Civ. Proc. § 312 ........................................................................12

Cal. Code Civ. Proc. § 335.1 ..............................................................11, 13

Cal. Code Civ. Proc. § 377.32 ..................................................................12

Cal. Code Civ. Proc. § 377.60 ..................................................................12

Cal. Code Civ. Proc. § 425.16 ......................................................2, 6, 8, 10

Cal. Prob. Code § 6402 .............................................................................12

**FEDERAL RULES**

Fed. R. Civ. P. 11 ......................................................................................22

Fed. R. Civ. P. 12 ............................................................................. 3, passim

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

**CONSTITUTIONAL PROVISIONS**

First Amendment ......................................................................................... 1, passim

**OTHER AUTHORITIES**

Restatement (Third) of Torts § 19 cmt. a (1998) ...........................................14

**NOTICE OF MOTIONS AND MOTIONS**

PLEASE TAKE NOTICE that on October 12, 2021, at 2:00 p.m., or as soon thereafter as this matter may be heard, in Courtroom 1, United States Courthouse, 1301 Clay Street, Fourth Floor, Oakland, CA 94612, before the Honorable Yvonne Gonzalez Rogers, Defendant Netflix, Inc. ("Netflix") will, and hereby does, move the Court (1) to strike the Complaint in its entirety pursuant to California's anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16 *et seq.*, or (2) to dismiss the Complaint, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

The grounds for the Motions are that (1) the Complaint targets activity protected under the anti-SLAPP statute, and Plaintiffs cannot meet their burden of establishing a probability of success as to any of their claims; and (2) Plaintiffs in all events have failed to plausibly allege any claim for relief.

These Motions are based upon this Notice of Motions and Motions, the attached Memorandum of Points and Authorities, any papers filed in reply, all other papers and records on file in this matter, and any other materials or argument the Court may receive at or before the hearing on these Motions.

**ISSUES TO BE DECIDED**

1.      Whether Plaintiffs' Complaint should be stricken under California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16 *et seq.*

2.      Whether all of Plaintiffs' claims should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs lost their family member, B.H., to suicide.  More than four years later, Plaintiffs filed this action seeking to hold Netflix responsible for her death because it disseminated an acclaimed, award-winning fictional television series, *13 Reasons Why*.  Based on the *New York Times* bestselling young adult novel, *13 Reasons Why* grappled with the issue of teen suicide and depicted a lead character taking her own life.  Plaintiffs have suffered an unimaginable loss.  But this lawsuit is fundamentally misguided.  The First Amendment and numerous state law grounds bar these claims.

*13 Reasons Why* is not the first work to tell a story about teen suicide.  The subject has been explored in countless literary works, motion pictures, and TV shows—everything from *Romeo and Juliet* to *Dead Poets Society*.  And this is not the first lawsuit that has claimed that the parties who brought stories to the public are to blame, and should be held legally liable, for suicides and other tragic events.  Courts, however, have repeatedly rejected such suits.  *See, e.g.*, *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 994, 1002 (1988) (dismissing claims that Ozzy Osbourne's music caused teenager to kill himself:  "courts have been universally reluctant to impose tort liability upon any public media for self-destructive or tortious acts alleged to have resulted from a publication or broadcast") (collecting cases)); *Bill v. Superior Court*, 137 Cal. App. 3d 1002, 1005 (1982) (rejecting claims that the motion picture *Boulevard Nights* attracted members of the public who were "prone to violence" and was responsible for shooting of someone outside the theater); *Olivia N. v. Nat'l Broad. Co.*, 126 Cal. App. 3d 488, 492 (1981) (dismissing action claiming that "artificial rape" scene in the movie *Born Innocent* caused assailants to attack plaintiff in similar manner); *James v. Meow Media, Inc.*, 300 F.3d 683, 687 (6th Cir. 2002) (dismissing claim that violence in video games, movies, and internet sites "desensitized" high school student to violence and was the cause of him shooting and killing other students).  These cases, and legions of others applying settled First Amendment and tort law principles, compel the dismissal of Plaintiffs' claims here.

California's anti-SLAPP statute provides a means for early dismissal of suits such as this

DEF.'S SPECIAL MOT. TO STRIKE PURSUANT TO ANTI-SLAPP STATUTE AND MOT. TO DISMISS

that target conduct "in furtherance of [a] person's right of petition or free speech under the United States or California Constitution in connection with a public issue." Cal. Code Civ. Proc. § 425.16.  Plaintiffs' Complaint targets exactly that.  *13 Reasons Why* is protected expression under the First Amendment.  The Complaint cites numerous articles about *13 Reasons Why* and its subject matter, demonstrating that the speech is in "connection with a public issue." *Id.*  Plaintiffs insist that their claims are not based on the content of *13 Reasons Why*, but on an alleged "failure to warn" or breach of a purported duty to protect "vulnerable populations" from the content.  *See, e.g.*, Compl. ¶ 3.  But without the Complaint's allegations that the show's content is "dangerous," Plaintiffs' theories fall apart.  Not only do those theories strike at the free expression embodied in the show, they target Netflix's conduct "in furtherance" of the distribution of the show, and therefore bring this lawsuit squarely within the ambit of the anti-SLAPP statute.

Again, this is not a new means of trying to avoid the First Amendment.  Other plaintiffs have similarly said their suits were about a "failure to warn" or "failure to protect" and not an attack on content.  The legal result has been no different.  Courts have held that plaintiffs cannot circumvent the First Amendment by "substitut[ing] labels for reality." *Bill*, 137 Cal. App. 3d at 1009 (rejecting "failure to warn" and fraud claims premised on alleged duty to warn of movie's violent content); *McCollum*, 202 Cal. App. 3d at 995–96, 1006 (First Amendment barred "negligence," "product liability," and "intentional misconduct" claims based on alleged "intentional dissemination of Osbourne's record music with the alleged knowledge that it would result in self-destructive reactions among certain individuals").  As in these well-settled precedents, Plaintiffs' "failure to warn" and "failure to protect" claims are inextricably bound to Plaintiffs' claim that *13 Reasons Why* is "dangerous content," or "content [that] could kill." Compl. ¶¶ 40, 65.  Regardless of the labels Plaintiffs use, their claims are based on the content Netflix disseminated.

If allowed to proceed, Plaintiffs' suit would have profound chilling effects on free expression. *See, e.g.*, *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1029 (9th Cir. 1998) ("[C]omplaints based on speech protected by the First Amendment have far-ranging and deleterious effects, and the mere threat of civil liability can cause potential defendants to 'steer far

wider of the unlawful zone.'").  Creators obligated to shield certain viewers from expressive works that depict suicide would inevitably censor themselves to avoid the threat of liability.  This would "dampen[] the vigor and limit the variety of public debate." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964).  In such a landscape, a long line of creative works—classic staples like *Anna Karenina*, *Antigone*, *The Awakening*, *Madame Bovary*, and *The Bell Jar*, as well as countless modern works like *Dear Evan Hansen*, *The Perks of Being a Wallflower*, *Wristcutters: A Love Story*, and *The Virgin Suicides*—would be at risk.  The First Amendment does not permit such a result.

Under the anti-SLAPP statute, Plaintiffs must show a probability of prevailing or the Complaint must be stricken.  They cannot do so, for a number of independent reasons.  The First Amendment bars their claims, certainly.  But there are several other grounds for dismissal.  A two-year statute of limitations bars the claims.  Decedent's siblings lack standing to sue for wrongful death.  And, as a number of cases have previously held, Plaintiffs cannot plausibly allege core elements of their tort claims—duty, causation, or a basis for strict liability.  Even setting aside the anti-SLAPP statute, any of these grounds would mandate dismissal under Rule 12(b)(6).  Whatever path the Court chooses to take, the result is clear:  the Complaint must be dismissed with prejudice.

## **PLAINTIFFS' ALLEGATIONS**

Netflix offers a video streaming service to its members, who subscribe to the Netflix service for a monthly fee.  Compl. ¶ 10.[1]  In March 2017, Netflix released to its subscribers the

---

[1] For purposes of its anti-SLAPP and 12(b)(6) Motions, Netflix's arguments do not challenge Plaintiffs' factual allegations.  But to be clear, the inflammatory allegation that *13 Reasons Why* caused widespread harm to children is false.  Research refutes that there was any statistically significant increase in teen suicide after the release of *13 Reasons Why*.  *See, e.g.*, Bethany Ao, *Netflix series "13 Reasons Why" did not increase number of teen suicides, study finds*, Phila. Inquirer (Jan. 16, 2020), https://www.inquirer.com/health/13-reasons-why-suicide-teens-penn-20200115.html.  Similarly, although not germane to the resolution of the Motions, Plaintiffs point to Netflix's website to describe Netflix's recommendations.  That website directly refutes Plaintiffs' claim that the recommendation algorithm uses subjective or demographic information to target young, vulnerable people.  *See* Compl. ¶ 56 (citing How Netflix's Recommendations System Works, https://help.netflix.com/en/node/100639 (last visited Aug. 31, 2021)).  It does not.

first season of *13 Reasons Why*, adapted from a bestselling young-adult novel by Jay Asher. *See id.* ¶¶ 12–13. The fictional series tackles real-world social issues affecting young people, including sexual assault, substance abuse, and suicide. *See id.* ¶¶ 12–14, 32. The episodes in the first season follow 13 cassette tapes that high school student Hannah Baker left behind after committing suicide. *See id.* The tapes detail the 13 reasons why she took her own life. *See id.* The Complaint alleges that in telling Hannah's story, the show's creators took a "naturalistic" approach in an effort to de-romanticize and deter teenage suicide. *See id.* ¶¶ 14, 26. Plaintiffs acknowledge that prior to the show's release, Netflix sought the advice of mental health experts, *see id.* ¶¶ 25–28, and that, from the outset, Netflix has included various advisory warnings with the show, *see id.* ¶¶ 30–34.

Plaintiffs allege that B.H. watched *13 Reasons Why* and later "experienced emotional and psychological distress and harm." *Id.* ¶ 62. On April 28, 2017, she passed away from suicide. *Id.* ¶ 66. More than four years later, decedent's estate, her father (John Herndon), and her two brothers (J.H. and T.H.), brought this putative class action against Netflix. Decedent's estate and her father assert two survival claims for strict liability and negligence (*id.* ¶¶ 73, 82), while her brothers assert a claim for wrongful death (*id.* ¶ 78).

The gravamen of Plaintiffs' Complaint is that *13 Reasons Why* "glorified suicide" and caused decedent to take her own life. *See* Compl. ¶¶ 17, 63–66. Plaintiffs take issue not only with the general subject of suicide addressed in the show, which they claim can cause suicidal ideation and suicide (*see, e.g., id.* ¶¶ 26, 29, 37), but also with specific choices the creators made about how to depict the main character's suicide and the overall dramatic style and pace of the show. *See, e.g., id.* ¶¶ 16–17 (alleging that the show's creators "decided to depict Hannah's suicide in 'unflinching detail'" in a "graphic, three-minute-long scene"), *id.* ¶¶ 14–15, 38 (contrasting the pace and style of the show with the "quick-paced" "economical" "styl[e]" of the book, and alleging the show "becomes dramatically more graphic over the course of its first season" without warning "where the most dangerous content appears"). Based on their contention that the show

---

Rigorous parental controls are available to Netflix's account holders, who may decide for themselves what content is appropriate for their families.

1   contains "dangerous content" and "content that could kill" (*id.* ¶¶ 38, 65, 40), Plaintiffs allege

2   (1) Netflix's content-advisory warnings were inadequate, and (2) Netflix should have taken steps

3   to ensure the show was not recommended to "vulnerable populations."  Compl. ¶ 3; *see also, e.g.*,

4   *id.* ¶ 24; *id.* ¶ 74 (strict liability); ¶ 79 (wrongful death); ¶ 81 (negligence).

5          Plaintiffs' claims depend on the content of *13 Reasons Why*.  *See id.* ¶¶ 20, 22–23.  Again

6   and again, the Complaint links its failure-to-warn and failure-to-protect theories of liability to the

7   actual content of the show:  its "depiction of suicide" (*see, e.g.*, *id.* ¶ 26, 29–30, 63), its "dramatic

8   and explicit portrayal" (*id.* ¶ 45), the "themes" that allegedly "inhibit[ed] impressionable and

9   vulnerable viewers from seeking professional help" (*id.* ¶ 37), "content suggest[ing] that seeking

10  help for suicide is fruitless" (*id.*), and other allegedly "dangerous content" (*id.* ¶¶ 38–39, 64–65).

11  The Complaint alleges that the show's "disturbing content" triggered a duty for Netflix to warn

12  about a risk of suicide and to "frame its advisories in a way" to help viewers distinguish between

13  "intense emotional reaction[s]" and "dangerous signs of suicidal ideation."  *Id.* ¶ 39.  Similarly,

14  the Complaint alleges that Netflix should have ensured that its recommendation system did not

15  offer *13 Reasons Why* to "the most vulnerable members in society" because of the show's

16  "traumatic content."  *Id.*, Section F at p. 14.

17                          **ARGUMENT**

18         Plaintiffs' misguided suit should be dismissed.  The Complaint is subject to California's

19  anti-SLAPP statute because it targets conduct in furtherance of Netflix's right to free speech, and

20  Plaintiffs cannot demonstrate a probability of prevailing on any of their claims for numerous

21  independent reasons:  (1) the claims are procedurally barred, (2) Plaintiffs do not and cannot

22  plausibly plead the essential elements of their claims under state law, and (3) the First Amendment

23  precludes Plaintiffs from imposing tort liability on Netflix for disseminating an expressive work

24  Plaintiffs deem "dangerous."  Even if the anti-SLAPP statute did not apply, the Complaint should

25  be dismissed with prejudice under Rule 12(b)(6) based on these same fatal procedural and

26  substantive flaws.

27  I.   **The Complaint Should Be Stricken Under California's Anti-SLAPP Statute**

28         California's anti-SLAPP statute provides for the "early dismissal of meritless first

1    amendment cases aimed at chilling expression through costly, time-consuming litigation."

2    *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).  Because the anti-SLAPP

3    statute serves vital, substantive state interests, its protections apply to state law claims in federal

4    court.  *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999).

5    Consistent with the statute's explicit direction (Cal. Code Civ. Proc. § 425.16(a)), federal courts

6    construe the anti-SLAPP statute broadly.  *Greater L.A. Agency on Deafness, Inc. v. Cable News*

7    *Network, Inc. ("GLAAD")*, 742 F.3d 414, 421 (9th Cir. 2014).

8           An anti-SLAPP motion involves a two-step inquiry:  (1) the defendant must make a

9    threshold showing that each challenged claim arises from protected activity; if the defendant

10   makes that showing, then (2) the burden shifts to the plaintiff to demonstrate a probability of

11   prevailing on each of the challenged claims.  *Id.* at 422.  Where, as here, an anti-SLAPP motion is

12   based on a complaint's facial legal deficiencies, the motion is "treated in the same manner as a

13   motion under Rule 12(b)(6)."  *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.*

14   *Progress*, 890 F.3d 828, 833–34 (9th Cir. 2018).  The motion must be granted "when a plaintiff

15   presents an insufficient legal basis for his or her claims."  *Id.*

16          **A.**      **Plaintiffs' Claims Arise from Acts in Furtherance of the Right to Free Speech**
                        **in Connection with a Public Issue**
17

18          At step one, the defendant must make a prima facie showing that the asserted claims arise

19   from protected activity.  Here, the protected activity is any "act . . . [1] in furtherance of [a]

20   person's right of petition or free speech under the United States or California Constitution [2] in

21   connection with a public issue."  Cal. Code Civ. Proc. § 425.16(b)(1).  Plaintiffs' claims satisfy

22   both elements.

23                      1.      Plaintiffs' Claims Arise from Conduct in Furtherance of Speech

24          Whether the challenged activity is "in furtherance" of speech has been "interpreted…

25   rather loosely," *Hilton v. Hallmark Cards*, 599 F.3d 894, 903–04 (9th Cir. 2010), and "[t]he

26   defendant's burden on this step 'is not a particularly demanding one,'" *Todd v. Lovecruft*, 2020

27   WL 60199, at *11 (N.D. Cal. Jan. 6, 2020) (quoting *Daniel v. Wayans*, 8 Cal. App. 5th 367, 387

28   (2017)).  The first prong sweeps broadly to capture more than just speech that is "constitutionally

1   protected under the First Amendment as a matter of law." *Fox Searchlight Pictures, Inc. v.*

2   *Paladino*, 89 Cal. App. 4th 294, 305 (2001).  Conduct that *advances* or *assists* expressive activity

3   also "qualifies as a form of protected activity" under the statute.  *Hunter v. CBS Broadcasting,*

4   *Inc.*, 221 Cal. App. 4th 1510, 1521 (2013).

5        "[T]he form of the plaintiff's cause of action" does not control whether this prong is met.

6   *Navellier v. Sletten*, 29 Cal. 4th 82, 92 (2002).  Rather, the analysis turns on the "*activity* that gives

7   rise to [the] asserted liability—and whether that activity constitutes protected speech or

8   petitioning." *Id.* (emphasis in original).  Courts therefore look to the "*principal thrust* or

9   *gravamen*" of the claim.  *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App. 4th 181, 188 (2003)

10  (emphasis in original).  This standard is generally satisfied where "but for" the defendant's

11  speech-related activity, the claim would have no basis.  *See, e.g., Doe v. Gangland Prods., Inc.*,

12  730 F.3d 946, 955 (9th Cir. 2013) (citing *Navellier*, 29 Cal. 4th at 90) (concluding producers of

13  documentary television series had met their burden under first step because "[b]ut for the

14  [television] broadcast and [their] actions in connection with that broadcast, [p]laintiff would have

15  no reason to sue").

16       Plaintiffs' theories of liability plainly arise from acts in furtherance of Netflix's right to

17  free speech.

18       ***Plaintiffs' failure-to-warn theory*** arises from speech because it is directly premised on the

19  content of the show itself.[2]  The gravamen of the failure-to-warn claim is that *13 Reasons Why* is

20  "dangerous" and that the show's "dangerous features"— i.e., *its content*—gave rise to a purported

21  duty to warn.  *See, e.g.*, Compl. ¶ 24.  Section D of the Complaint, which details Plaintiffs' failure

22  to warn theory, repeatedly references the show's "depictions," "content," and "themes" in

23  asserting that Netflix should have provided different or additional warnings.  *Id.* ¶¶ 26, 29, 36–40.

24       Plaintiffs cannot avoid the anti-SLAPP statute by labeling Netflix's expressive conduct a

25  _____

26  [2] The show, of course, is expressive speech at the heart of the First Amendment's protections.
    *See, e.g., Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 865 (1979) (Bird, C.J.,
27  concurring) ("[W]hether exhibited in theaters or on television, a film is a medium which is
    protected by the constitutional guarantees of free expression."); *Joseph Burstyn, Inc. v. Wilson*,
28  343 U.S. 495, 501–02 (1952) ("It cannot be doubted that motion pictures are a significant medium
    for the communication of ideas.").

"dangerous feature" or a "health risk."  *See, e.g.*, *Wang v. Wal-Mart Real Estate Bus. Tr.*, 153 Cal. App. 4th 790, 801–02 (2007) ("It is well-established that a plaintiff will not avoid the application of the anti-SLAPP statute by disguising the pleading as a 'garden variety' tort claim if the basis of the alleged liability is predicated on protected speech or conduct.").  *Bill v. Superior Court* is instructive.  There, the plaintiff alleged that the defendant had a duty to warn about a movie's alleged tendency to attract violence-prone viewers.  The court held that such a claim implicated the First Amendment, and could not be separated from a claim against the content of the film itself.  *See* 137 Cal. App. 3d at 1007–08.  The same is true here.  "[I]t is precisely because of the [show's] content, and for no other reason," that Plaintiffs allege Netflix owed a duty to warn.  *Id.*

Plaintiffs' allegation that Netflix's content required additional warnings thus squarely targets acts in furtherance of speech.  *See* Cal. Code Civ. Proc. § 425.16(e)(3) (defining such acts to include "any written or oral statement or writing made in a place open to the public or a public forum"); *Metabolife Int'l, Inc. v. Wornick*, 72 F. Supp. 2d 1160, 1165 (S.D. Cal. 1999), *aff'd in part, rev'd in part on other grounds*, 264 F.3d 832 ("[A] widely disseminated television broadcast . . . is undoubtedly a public forum.").[3]

**Plaintiffs' failure-to-protect theory** is premised on Netflix's recommendations system, which displays an array of suggested titles to members.  Compl. ¶ 56.  The recommendations system, and the display of suggested titles, is speech.  It evinces "[a]n intent to convey a particularized message," *Spence v. Washington*, 418 U.S. 405, 410–11 (1974)—namely, a message about what shows and movies a viewer might choose from to watch.  *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 570 (1995) ("[T]he

---

[3] Moreover, the failure-to-warn claim also implicates Netflix's free speech right to make its own decisions about what to say—and what not to say—about the show.  Such decisions are, of course, a well-settled, fundamental part of the constitutional right of free speech.  *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573–74 (1995) ("[O]ne who chooses to speak may also decide 'what not to say'") (quoting *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 471 U.S. 1, 16 (1986)); *Kronemyer v. Internet Movie Data Base, Inc.*, 150 Cal. App. 4th 941, 947 (2007) (defendant's refusal to list plaintiff's name in credits was an act in furtherance of the defendant's free speech right not to speak); *see also Rivera v. First DataBank, Inc.*, 187 Cal. App. 4th 709, 715 (2010) (complaint challenging adequacy of suicide warning in Paxil pamphlet arose from publisher's exercise of free speech).

presentation of an edited compilation of speech generated by other persons" falls "squarely within the core of First Amendment security."); *Forsyth v. Motion Picture Assoc. of Am., Inc.*, 2016 WL 6650059, at *2 (N.D. Cal. Nov. 10, 2016) (holding movie ratings are protected speech because they "speak generally to the content of movies and their suitability for different audiences").  The recommendations fall within the well-recognized right to exercise "editorial control and judgment."  *Miami Herald Pub. Co. Tornillo*, 418 U.S. 241, 258 (1974).  Plaintiffs allege that the recommendations here are different because they are dictated by an algorithm.  *See, e.g.*, Compl. ¶ 54.  But the fact that the recommendations "may be produced algorithmically" makes no difference to the analysis.  *See Jian Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 438–39 (S.D.N.Y. 2014).  "After all, the algorithms themselves were written by human beings, and they 'inherently incorporate . . . engineers' judgments . . . .'"  *Id.* (internal citation omitted).  The recommendations generated are "much like many other familiar editorial judgments," such as "the guidebook writer's judgments about which attractions to mention and how to display them, and Matt Drudge's judgments about which stories to link and how prominently to feature them."  *Id.*

Even if there were some question about the recommendations themselves constituting protected speech (and there is not), the claim would still trigger the first prong of the anti-SLAPP statute.  "By its terms, [the anti-SLAPP statute] includes not merely actual exercises of free speech rights but also *conduct that furthers such rights*."  *Doe*, 730 F.3d at 953 (citation omitted) (emphasis added).  "An act is in furtherance of the right of free speech if the act helps to advance that right or assists in exercise of that right."  *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 143 (2011).  The suggestion that a viewer watch a show falls within the broad scope of conduct in furtherance of the right to free speech.  The subject of the recommendation—*13 Reasons Why*—is itself protected speech, and the recommendations facilitate Netflix's protected distribution and dissemination of that speech.  *See id.* (acts that "help[] to advance or assist in the . . . broadcasting of an episode of a popular television show" constitute activity in furtherance of speech); *GLAAD*, 742 F.3d at 422–24 (editorial decision to forgo captioning for online videos was an act "in furtherance of" CNN's reporting and delivering of the news); *Forsyth*, 2016 WL 6650059, at *2 ("Movie ratings are . . . 'in furtherance of free speech,' because movies themselves are a form of

free speech, and the ratings help advance that free speech by giving potential audiences an indication of a movie's content or suitability.").

Finally, like Plaintiffs' failure-to-warn theory, Plaintiffs' recommendation theory cannot be separated from Plaintiffs' allegation that the underlying content is "dangerous": the entire premise of the claim is that Netflix had a duty to identify which viewers are "vulnerable," and ensure that the algorithm does not recommend *13 Reasons Why* (or other content Plaintiffs deem unsuitable) to such viewers.

2.   The Challenged Conduct is in Connection with an Issue of Public Interest

Plaintiffs' claims also target Netflix's free-speech activities "in connection with a public issue or an issue of public interest."  Cal. Code Civ. Proc. § 425.16(e)(4).  The public-interest requirement is broadly construed.  *See id.* § 425.16(a).  Any issue "in which the public takes an interest" will suffice, *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042–43 (2008), so long as there is "some degree of closeness" between that public issue and the challenged conduct, *FilmOn Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133, 150 (2019).  This standard clearly encompasses the facts of this case.

The Complaint makes clear on its face that *13 Reasons Why* has been the subject of substantial public discourse.  *See, e.g.*, Compl. ¶ 13 (describing the source material's "huge following" and citing coverage of the show in *The New York Times*); *id.* ¶ 21 (describing the show as "a cultural event").  The large number of interested viewers and the public discourse surrounding the show are sufficient to satisfy the public interest requirement.  *See ITN Flix, LLC v. Hinojosa*, 2019 WL 3562669, at *4 (C.D. Cal. Aug. 6, 2019) (public interest requirement was satisfied where film was broadly released on over 2500 screens and thus "directly affected a large number of people"); *Tamkin*, 193 Cal. App. 4th at 144 (public was demonstrably interested in the broadcast of an episode of *CSI: Crime Scene Investigation* given the episode's ratings and various discussions of the episode online); *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 651 (1996), *disapproved on other grounds by Equilon Enters. v. Consumer Cases, Inc.*, 29 Cal.4th 53 (2002) (speech about Church of Scientology was in connection with issue of public interest given size of Church's membership and its extensive media coverage).

The fact that *13 Reasons Why* tackles real-world topics of widespread public interest such as teen suicide, sexual assault, and substance abuse further confirms that it is contributing to the public conversation on issues of public concern.  *See* Compl. ¶ 32 (alleging the show opens with an advisory that states:  "By shedding a light on these difficult topics, we hope our show can help viewers start a conversation."); *see, e.g.*, *Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal App. 4th 1050, 1064 (2005) (call-in radio talk show was matter of public interest because it "address[ed] subjects of interest to the public at large").

**B.      Plaintiffs Cannot Demonstrate a Probability of Prevailing on Any Claims**

Because step one is satisfied, Plaintiffs must "demonstrate[] a probability of prevailing on the merits" of their strict liability, negligence, and wrongful death claims.  *GLAAD*, 742 F.3d at 422.  Plaintiffs cannot meet this standard for multiple reasons.  In addition to being barred by the First Amendment, Plaintiffs' claims fail under state law:  (1) two claims (negligence and strict liability) are time-barred, and the plaintiffs on the third claim (wrongful death) have no standing to bring it; (2) all three claims fail under substantive principles of California law.  Deferring to the principle of constitutional avoidance, we discuss the state law grounds for dismissal before addressing the First Amendment.  *See Vernon v. City of L.A.*, 27 F.3d 1385, 1391–92 (9th Cir. 1994) (under the constitutional avoidance doctrine, courts "avoid adjudication of federal constitutional claims when alternative state grounds are available").

1.      The Complaint Has Fatal Procedural Flaws

(a)   *The Negligence and Strict Liability Claims Are Time-Barred*

Plaintiffs' negligence and strict liability claims are both subject to a two-year statute of limitations.  *See* Cal. Code Civ. Proc. § 335.1.  That they are survival claims, brought by decedent's estate and her father, does not extend the limitations period.  *See id.* § 377.20(a) ("Except as otherwise provided by statute, a cause of action for or against a person is not lost by reason of the person's death, but survives subject to the applicable limitations period.").

The two-year limitations period began to run once the claim "accrued," meaning when the claim was "'complete with all of its elements'—those elements being wrongdoing, harm, and causation."  *Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 797 (2011) (citation omitted); *see*

1    Cal. Code Civ. Proc. § 312.  Here, accrual occurred no later than April 28, 2017, when decedent

2    passed away.  *See* Compl. ¶ 66.  The limitations period expired two years later, April 28, 2019.

3    Plaintiffs did not file this lawsuit until April 30, 2021—two years too late.  Plaintiffs' strict

4    liability and negligence claims must be dismissed as time-barred.[4]

5                          *(b)   Decedent's Brothers Lack Standing To Bring A Wrongful Death Claim*

6              The claim for wrongful death is brought by decedent's two brothers (Compl. ¶ 78), but

7    they lack standing.

8              In California, only those persons specified in the wrongful death statute, Cal. Code Civ.

9    Proc. § 377.60, have standing.  *See Scott v. Thompson*, 184 Cal. App. 4th 1506, 1510 (2010).

10   "[S]tanding among multiple claimants is determined by statutory rank," and is limited to "persons

11   who, because of their relation to the deceased, are presumed to be injured by his [or her] death."

12   *Nelson v. Cty. of Los Angeles*, 113 Cal. App. 4th 783, 789 & n.6 (2003).  Under § 377.60, when an

13   individual dies without any "surviving spouse, domestic partner, children, [or] issue of deceased

14   children," standing is conferred on "the persons . . . who would be entitled to the property of the

15   decedent by intestate succession."  *See Rosales v. Battle*, 113 Cal. App. 4th 1178, 1185 (2003)

16   ("'heirs' refers to those individuals who may inherit by intestate succession under California

17   law").

18             Section 6402 of the Probate Code sets forth the chain of intestate succession.  Where, as

19   here, a decedent has no children, the parents are first in the line of succession.  *See* Cal. Prob.

20   Code § 6402(b).  That means decedent's father—and not her siblings—has standing to sue for

21   wrongful death.  *See, e.g.*, *Scott*, 184 Cal. App. 4th at 1510 (granting defendants' summary

22   judgment motion "[b]ecause California's wrongful death statute vests priority and exclusive

23   standing in a decedent's surviving parent over a surviving sibling"); *Medrano v. Kern Cty.*

24   *Sheriff's Officer*, 921 F. Supp. 2d 1009, 1018 (E.D. Cal. 2013) (dismissing decedent's brothers'

25

26   ─────────────────
     [4] John Herndon's failure to execute and file an affidavit showing that he is the decedent's
27   successor in interest (or even allege such facts) is another, separate basis for dismissing the
     survival claims.  *See* Cal. Code Civ. Proc. § 377.32; *Stoddard-Nunez v. City of Hayward*, 2015
28   WL 6954963, at *5 (N.D. Cal. Nov. 10, 2015) (dismissing survival claims where plaintiff failed to
     allege facts showing he had standing to bring claims as successor in interest).

1  wrongful death claim where plaintiffs did not allege that the decedent had no surviving issue or

2  parents).

3        Decedent's father has brought no wrongful death claim.  *See* Compl. ¶ 78.  Nor could he.

4  Wrongful death has the same two-year statute of limitations as the strict liability and negligence

5  claims, so lapsed two years before Plaintiffs filed suit.  *See* Cal. Code Civ. Proc. § 335.1.

6  Decedent's father cannot assign or renounce his statutorily prescribed rights to give decedent's

7  brothers (whose claims would otherwise be tolled until they reached the age of 18) the right to sue

8  for wrongful death instead.  *See, e.g.*, *Lewis v. Reg'l Ctr. of the East Bay*, 174 Cal. App. 3d 350,

9  354–55 (1985); *Mayo v. White*, 178 Cal. App. 3d 1083, 1090 (1986).  Nor does the failure of

10  decedent's father to bring a timely claim for wrongful death confer standing on her brothers.

11  "[T]he right to sue for wrongful death damages is strictly a creature of statute," and the statute

12  limits that right to those with priority in the chain of intestate succession—here, decedent's father.

13  *See Nelson*, 113 Cal. App. 4th at 789 & n.6 (collecting cases).

14                2.    <u>Plaintiffs' Claims Fail as a Matter of State Law</u>

15        Apart from these fundamental procedural defects, all of Plaintiffs' claims also fail under

16  well-established principles of state law.

17              *(a)  Plaintiffs' Strict Liability Claim Fails Because* 13 Reasons Why *Is Not*

18                *a "Product"*

19        Plaintiffs allege that *13 Reasons Why* is a product, and that therefore the failure-to-warn

20  claim is subject to strict liability.  Compl. ¶ 74.  As a matter of law, strict liability for failure to

21  warn applies only to tangible "products."  *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th

22  Cir. 1991); *Pierson v. Sharp Mem'l Hosp.*, 216 Cal. App. 3d 340, 345 (1989) ("A product is a

23  physical article which results from a manufacturing process and is ultimately delivered to a

24  consumer.").  No tangible product is at issue here.  And, as the Ninth Circuit has squarely held,

25  products liability law does not embrace "ideas and expression."  *Winter*, 938 F.2d at 1034 (9th Cir.

26

27

28

1    1991) (holding products liability law did not apply to *The Encyclopedia of Mushrooms*).[5]

2    Because products liability law is "focused on the tangible world," it is ill equipped to

3    handle the "delicate issues" that arise in connection with the "unique characteristics of ideas and

4    expression." *Winter*, 938 F.2d at 1034–36 ("We place a high priority on the unfettered exchange

5    of ideas.  We accept the risk that words and ideas have wings we cannot clip and which carry them

6    we know not where.  The threat of liability without fault . . . could seriously inhibit those who

7    wish to share thoughts and theories.").  As a result, every court to confront this question has

8    reached the same conclusion as the Ninth Circuit and rejected strict liability claims based on the

9    expressive content in books, movies, or other media.  *Id.* at 1036 ("We know of no court that has

10   chosen the path to which the plaintiffs point.") (collecting cases); *accord Watters v. TSR, Inc.*, 904

11   F.2d 378, 381 (6th Cir. 1990) ("As far as we have been able to ascertain, . . . the doctrine of strict

12   liability has never been extended to words or pictures."); *Birmingham v. Fodor's Travel Publ'ns,*

13   *Inc.*, 73 Haw. 359, 373–75 (1992) (plaintiff had no claim for relief based on strict/product liability

14   because Fodor's travel guide was not a "product").

15   Numerous courts have specifically rejected the theory advanced by Plaintiffs here—the

16   proposition that media is a "product" subject to strict liability if it is alleged to have caused a

17   personal injury.  *See, e.g.*, *James*, 300 F.3d at 701 (affirming dismissal of product liability claim

18   on the ground that video games, movies, and internet transmissions alleged to have incited

19   violence were not "products"); *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1278–79 (D.

20   Colo. 2002) (holding victims of school shooting had no strict liability claim against manufacturers

21   and distributors of violent video games and movies because "intangible thoughts, ideas, and

22   expressive content are not 'products' as contemplated by strict liability doctrine"); *Wilson v.*

23   *Midway Games, Inc.*, 198 F. Supp. 2d 167, 173 (D. Conn. 2002) (holding Mortal Kombat was not

24   a 'product' that could give rise to a product liability claim, noting that "[c]ourts that have

25   addressed the proposition that 'inciting' media speech is a 'product' for the purposes of strict

26

27   ─────────────────────
     [5] "[I]t is for the court to determine as a matter of law whether something is, or is not, a product."

28   Restatement (Third) of Torts § 19 cmt. a (1998); *accord Brooks v. Eugene Burger Mgmt. Corp.*, 215 Cal. App. 3d 1611, 1626 (1989).

liability have rejected it) (collecting cases); *Davidson v. Time Warner, Inc.*, 1997 WL 405907, at *14 (S.D. Tex. Mar. 3, 1997) (holding ideas contained in Tupac Shakur song recording were not a product because "products liability theory does not encompass the *content* of a publication").

This uniform precedent compels dismissal of Plaintiffs' strict liability claim with prejudice.

### (b)   Plaintiffs' Negligence and Wrongful Death Claims Fail Because Netflix Did Not Owe Plaintiffs a Duty

The "*sine qua non* of any negligence action is, of course, the existence of a duty of care owed by the alleged wrongdoer to the person injured." *Gregorian v. Nat'l Convenience Stores, Inc.*, 174 Cal. App. 3d 944, 948 (1985). Plaintiffs' negligence claim falls apart at this threshold element—as does their derivative wrongful death claim.[6]

Whether a plaintiff is owed a duty is a threshold question that can be decided as a matter of law. *See, e.g.*, *McCollum*, 202 Cal. App. 3d at 1004; *Bill*, 137 Cal. App. 3d at 1009. The imposition of a duty "is the court's expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection." *Sakiyama v. AMF Bowling Centers, Inc.*, 110 Cal. App. 4th 398, 405 (2003). Courts use the policy considerations inherent in the duty analysis to serve "as a gatekeeper for the otherwise extremely broad concept of negligence." *James*, 300 F.3d at 692. Under California law, duty can be established through either the multi-factor duty analysis set forth in *Rowland v. Christian*, 69 Cal. 2d 108 (1968),[7] or by establishing the existence of a "special relationship." Under either test, Netflix owed no duty to the decedent.

---

[6] The elements of a wrongful death action are "the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs." *Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (2015) (citation omitted). Here, the alleged underlying torts consist of the strict liability failure to warn claim (which fails as a matter of law for the reasons set forth above) and the negligence claim (which fails for the reasons set forth below). While the Complaint includes passing allegations that the claim is also premised on "intentional acts and omissions" (Compl. ¶ 79), Plaintiffs do not plead the elements of any intentional tort—nor could they.

[7] *Superseded in part by statute on other grounds as stated in Calvillo-Silva v. Home Grocery*, 19 Cal. 4th 714, 721–23 (1998).

1    The factors balanced in the *Rowland* analysis include "the foreseeability of harm to the

2    plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection

3    between the defendant's conduct and the injury suffered, the moral blame attached to the

4    defendant's conduct, the policy of preventing future harm, [and] the extent of the burden to the

5    defendant and consequences to the community of imposing a duty." *Rowland*, 69 Cal. 2d at 112–

6    13. Although foreseeability is a "primary consideration" in this analysis, foreseeability is not

7    "synonymous with duty." *Sakiyama*, 110 Cal. App. 4th at 407 (citation omitted). Rather, "policy

8    considerations may dictate a cause of action should not be sustained no matter how foreseeable the

9    risk." *Id.* (citation omitted). Ultimately, then, foreseeability is "an elastic factor." *McCollum*, 202

10   Cal. App. 3d at 1004 (citation omitted). "[I]n cases where the burden of preventing future harm is

11   great, a high degree of foreseeability may be required." *Id.* (citation omitted).

12   The multi-factor *Rowland* analysis, and its underlying foreseeability inquiry, is a pure

13   question of law when "there is no room for a reasonable difference of opinion." *Gregorian*, 174

14   Cal. App. 3d at 948. There can be no reasonable difference of opinion here—recognizing a duty

15   on the facts alleged would "stretch the concepts of foreseeability and ordinary care to lengths that

16   would deprive them of all normal meaning." *Watters*, 904 F.2d at 381. This is especially so

17   because of the chilling effects that would ensue from recognizing such a duty. *See id.* ("The only

18   practicable way of [e]nsuring [media] could never reach a 'mentally fragile' individual would be

19   to refrain from selling it at all."). The countervailing First Amendment concerns mean a "high

20   degree of foreseeability" is necessary to impose a duty here. *McCollum*, 202 Cal. App. 3d at

21   1004; *accord Bill*, 137 Cal. App. 3d at 1013.

22   Plaintiffs' allegation that Netflix was warned there was a "potential for suicide-contagion

23   effects upon impressionable viewers" (*see, e.g.*, Compl. ¶ 26) does not establish the requisite "high

24   degree of foreseeability" to give rise to a legal duty. *See Sanders*, 188 F. Supp. 2d at 1272 ("A

25   speculative possibility . . . is not enough to create a legal duty.") Suicide is a "too idiosyncratic"

26   reaction to a television series for Netflix—or, for that matter, any other distributor of suicide-

27   related content—to have reasonably anticipated. *See James*, 300 F.3d at 693. As courts have

28   recognized, committing violence is "simply too far a leap" from watching violence play out on

1    screen.  *See, e.g.*, *id.*

2          Courts have thus consistently held that violence, including self-harm or suicide, is not a

3    foreseeable consequence of the distribution of artistic works.  *See, e.g.*, *McCollum*, 202 Cal. App.

4    3d at 1005–06 (holding teen's suicide "was not a reasonably foreseeable risk or consequence of

5    defendants' remote artistic activities"); *Watters*, 904 F.2d at 379, 381 (rejecting plaintiff's

6    argument that the manufacturer of *Dungeons & Dragons* had "duty to warn that the game could

7    cause psychological harm in fragile-minded children" because the plaintiff's son's suicide was not

8    foreseeable); *Sanders*, 188 F. Supp. 2d at 1273 (collecting cases from "[c]ourts around the country

9    [that] have rejected similar claims brought against media or entertainment defendants"); *Way v.

10   Boy Scouts of Am.*, 856 S.W.2d 230 (Tex. Ct. App. 1993), *writ denied* (Oct. 6, 1993) (holding it

11   was not reasonably foreseeable that a 12–year-old boy would accidentally discharge a rifle and die

12   after reading shooting supplement in magazine); *James v. Meow Media, Inc.*, 90 F. Supp. 2d 798,

13   806 (W.D. Ky. 2000), *aff'd*, 300 F.3d 683 (6th Cir. 2002) (granting motion to dismiss negligence

14   claim against creators and distributors of *The Basketball Diaries*, video game distributors, and

15   internet websites; no duty because it was unforeseeable for a minor to murder his classmates).

16         In so holding, courts have expressly recognized that imposing any such duty would inhibit

17   artistic expression in a manner that is incompatible with the First Amendment.  *McCollum*, 202

18   Cal. App. 3d at 1005–06 ("[I]t is simply not acceptable to a free and democratic society to impose

19   a duty upon performing artists to limit and restrict their creativity in order to avoid the

20   dissemination of ideas in artistic speech which may adversely affect emotionally troubled

21   individuals."); *Widdoss v. Huffman*, 62 Pa. D. & C. 4th 251, 256–57 (Com. Pl. 2003) (sustaining

22   demurrer where "the defendants could not properly be found to have violated their duty of

23   reasonable care by exercising protected rights of free speech" in the production, distribution, and

24   exhibition of *The Fast and the Furious*); *Zamora v. CBS*, 480 F. Supp. 199, 206 (S.D. Fla. 1979)

25   (declining to impose a duty on television producers because it would discriminate against them

26   "on the basis of content" and would "give birth to a legal morass" that broadcasters would have

27   difficulty navigating); *Davidson*, 1997 WL 405907, at *12 (concluding the burden to prevent harm

28   resulting from the dissemination of *2Pacalypse Now* would be "enormous[]" and "would result in

the sale of only the most bland, least controversial music").

Plaintiffs fare no better under the other *Rowland* factors:  drawing a "close connection" between decedent's suicide and Netflix's alleged recommendation and failure to warn is impossible given the innumerable other factors that might have influenced the decedent's decision to take her own life; no moral blame can be attached to Netflix's conduct, *see, e.g.*, *Bill*, 137 Cal. App. 3d at 1011; and, as set forth above, recognizing a duty would impose an intolerable burden on society and "have the effect of reducing and limiting artistic expression to only the broadest standard[s] of taste and acceptance and the lowest levels of offense, provocation and controversy," *McCollum*, 202 Cal. App. 3d at 1005–06.  "No case has ever gone so far," and there is "no basis in law or public policy for doing so here."  *Id.* at 1006.

There is likewise no cognizable "special relationship" that could supply a duty here. California courts have recognized a duty to prevent a foreseeable suicide only where a hospital or in-patient facility has "accepted the responsibility to care for and attend to the needs of [a] suicidal patient."  *Nally v. Grace Cmty. Church of the Valley*, 47 Cal. 3d 278, 294–96 (1998).  Under California law, parties owe no such duty outside of the narrow confines of a party who has a *custodial relationship* with a patient.  *See id.* (no duty owed by religious counselors).  Netflix obviously has no such special relationship with those who use its service for entertainment.

### (c)  Plaintiffs Cannot Plausibly Allege Netflix Caused Plaintiffs' Harm

Plaintiffs cannot state a negligence claim for the additional reason that they have not sufficiently alleged the necessary element of causation.  "[W]here the facts are such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact." *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 152 (2018).  Plaintiffs fail to plead proximate causation as a matter of law.

With limited exceptions involving "uncontrollable impulse[s]" and custodial relationships not alleged here, suicide is an intervening, intentional act by the victim that breaks the chain of causation, precluding any tort liability.  *See Tate v. Canonica*, 180 Cal. App. 2d 898, 913–15 (1960); *Watters*, 904 F.2d at 383–84 ("Courts have long been . . . reluctant to recognize suicide as a proximate consequence of a defendant's wrongful act. . . . Tragedies such as this simply defy

1    rational explanation, and courts should not pretend otherwise.").  The lack of proximate causation

2    provides yet another reason why Plaintiffs' claims must be dismissed.  *See, e.g.*, *Jones v. Cate*,

3    2016 WL 282699, at *11 (E.D. Cal. Jan. 26, 2016) (dismissing wrongful death claim on causation

4    grounds where "[n]one of the allegations in the [complaint] state[d] or support[ed] an inference

5    [decedent] was acting under an uncontrollable impulse when he committed suicide"); *King v.*

6    *United States*, 756 F. Supp. 1357, 1361 (E.D. Cal. 1990) (holding decedent's "tragic death had to

7    have involved an additional intervening, independent force—his own intention to kill himself").

8                        3.       The First Amendment Bars All of Plaintiffs' Claims

9                             (a)   *Plaintiffs' Claims Attack Speech That Is Protected by the First*
                                   *Amendment*
10

11            Plaintiffs' suit runs headfirst into a well-settled "overriding constitutional principle":

12    "material communicated by the public media, including fictional material such as the television

13    drama here at issue, is generally to be accorded protection under the First Amendment to the

14    Constitution of the United States."  *Olivia N.*, 126 Cal. App. 3d at 492 (citation omitted); *see also,*

15    *e.g.*, *McCollum*, 202 Cal. App. 3d at 999 ("First Amendment guaranties of freedom of speech and

16    expression extend to all artistic and literary expression, whether in music, concerts, plays, pictures

17    or books.").  This First Amendment protection "extends to [the] communication, to its source and

18    to its recipients."  *Olivia N.*, 126 Cal. App. 3d at 492.

19            Through its own original television and film content, and by "exercising editorial

20    discretion" over its slate of programming, Netflix "engage[s] in and transmit[s] speech."  *See*

21    *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) (citation omitted).  The First

22    Amendment guarantees that the Government may not interfere with this speech, or compel Netflix

23    to "to alter [its] message by including one more acceptable to others," *see Hurley*, 515 U.S. at 581,

24    regardless of whether Netflix's content choices "in someone's eyes are misguided, or even

25    hurtful," *id.* at 574.

26            Similarly, Netflix's subscribers have the First Amendment "right to receive information

27    and ideas, regardless of their social worth."  *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see*

28    *also, e.g.*, *Young v. Am. Mini Theatres*, 427 U.S. 50, 77 (1976) (Powell, J., concurring) ("[T]he

1   central concern of the First Amendment in this area is that there be a free flow from creator to

2   audience of whatever message a film or book might convey.").  This right to receive information

3   extends to minors as well.  *See, e.g.*, *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 795 (2011)

4   ("Minors are entitled to a significant measure of First Amendment protection . . . Speech that is

5   neither obscene as to youths nor subject to some other legitimate proscription cannot be

6   suppressed solely to protect the young from ideas or images." (citation and alteration omitted));

7   *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975) ("In most circumstances, the values

8   protected by the First Amendment are no less applicable when the government seeks to control the

9   flow of information to minors.").

10          Given this First Amendment protection, Netflix's dissemination of *13 Reasons Why* is fully

11   immunized from civil liability here.  *See, e.g.*, *Sullivan*, 376 U.S. at 265, 277 (attaching liability to

12   protected speech violates the First Amendment); *McCollum*, 202 Cal. App. 3d at 1003 (First

13   Amendment "protection is not limited to merely serving as a bar to the prior restraint of

14   [protected] speech, but also prevents the assertion of a claim for civil damages. . . .  The deterrent

15   effect of subjecting the [entertainment] industry to such liability because of their programming

16   choices would lead to a self-censorship which would dampen the vigor and limit and variety of

17   artistic expression."); *Olivia N.*, 126 Cal. App. 3d at 494 ("[T]he chilling effect of permitting

18   negligence actions for a television broadcast is obvious. . . .  Realistically, television networks

19   would become significantly more inhibited in the selection of controversial materials if liability

20   were to be imposed on a simple negligence theory.").

21          Plaintiffs do not avoid the First Amendment's bar on liability by purporting to narrowly

22   target Netflix's recommendations and the adequacy of its viewer advisories.  Because both

23   theories of liability rest on Plaintiffs' allegation that the show is "dangerous," *see supra* at 7–10,

24   they cannot be disentangled from the expressive content embodied in the show and amount to an

25   attempt to punish Netflix for its speech.  The First Amendment does not allow Plaintiffs to use a

26   civil action to achieve that result.  *See, e.g.*, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 675–76

27   n.4 (1991) (explaining the Supreme Court has long held that the law may not be used to punish

28   protected expression by imposing civil liability); *James*, 300 F.3d at 696–97 (rejecting effort to

1    impose tort liability for protected speech that plaintiff alleged "was not sufficiently prevented from

2    reaching minors").

3                    (b)   The Challenged Speech Does Not Constitute Incitement

4            While the right to free expression guaranteed by the First Amendment is not absolute, only

5    narrow categories of unprotected speech can be subject to civil liability, such as libel, obscenity,

6    fighting words, and incitement.  *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504

7    (1984).  Nothing remotely resembling any such speech is at issue in this case, and Plaintiffs do not

8    allege otherwise.  To the extent Plaintiffs seek to overcome the First Amendment's protections on

9    an incitement theory, they cannot do so as a matter of well-established law.[8]

10          "[T]he incitement exception" is narrow and "must be applied with extreme care" to avoid

11   chilling effects.  *DeFilippo v. Nat'l Broad. Co., Inc.*, 446 A.2d 1036, 1042 (R.I. 1982) (holding

12   that First Amendment barred wrongful death suit brought against NBC arising from thirteen-year-

13   old's fatal imitation of stunt aired on *The Tonight Show*).  As a result, similar suits alleging that

14   fictional works have incited suicide or other violence have been routinely dismissed on the

15   pleadings as barred by the First Amendment.  *See, e.g.*, *McCollum*, 202 Cal. App. 3d at 1008

16   (affirming dismissal where music did not incite teenager's suicide as a matter of law; concluding

17   "[t]he trial court was thus correct in bringing this action to a prompt end").[9]  The same result

18   should follow here.

19          Speech constitutes unprotected incitement or "fighting words" only if it is (1) "*directed to*

20   inciting or producing *imminent* lawless action," and (2) "*likely to* incite or produce such

21   [imminent] action."  *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (emphasis added).  The

22   _____

23   [8] "The inquiry into the protected status of speech is one of law."  *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983).

24   [9] *See also, e.g.*, *James*, 300 F.3d 683 (affirming dismissal and noting First Amendment problems in action alleging violent video games, movies, and websites caused student to shoot his

25   classmates); *Wilson*, 198 F. Supp. 2d at 182 (holding First Amendment was a complete bar to tort claims in action against manufacturer of violent video games; granting motion to dismiss);

26   *Sanders*, 188 F. Supp. 2d 1264 (holding violent video games were entitled to full First Amendment protection in action brought by family members of teacher killed in Columbine

27   shooting; granting motion to dismiss); *Zamora*, 480 F. Supp. 199 (holding action against network that aired violent programming was barred by First Amendment; granting motion to dismiss).

28

1   Complaint's allegations fall far short of meeting this high bar.

2                   (i)      **Plaintiffs Do Not And Cannot Allege The Requisite Specific Intent To Incite**

3

4   The threshold "directed to inciting" element of the *Brandenburg* test imposes a specific-

5   intent requirement. *See Hess v. Indiana*, 414 U.S. 105, 108–09 (1973). This means the imminent

6   violent response to the speech "must have been a specifically intended consequence" of the

7   speaker. *McCollum*, 202 Cal. App. 3d at 1000–01. Plaintiffs make no allegations in the

8   Complaint that Netflix harbored any such specific intent—nor could they do so consistent with

9   Rule 11.[10]

10   If anything, the Complaint alleges the opposite: the creators of *13 Reasons Why* depicted

11   the "ugliness and brutality of suicide" with the intent to "*deter*" teenage suicides. Compl. ¶ 26

12   (emphasis added). Netflix's advisories at the beginning of the show, and the suicide prevention

13   resources it makes available online at 13ReasonsWhy.info, likewise negate any plausible inference

14   of an intent to incite suicide. *See id.* ¶ 32. The lack of any hint of a specific intent to incite is

15   enough to push the show well beyond the narrow confines of *Brandenburg*.

16                   (ii)     **Plaintiffs Do Not Plausibly Allege A Reasonable Likelihood Of Imminent Harm**

17

18   The content of the show further confirms that it cannot be construed as unprotected

19   incitement. The Complaint alleges only that *13 Reasons Why* depicted suicide—like innumerable

20   other films, television shows, plays, and works of literature that are consumed by teen audiences.

21   At most, Plaintiffs allege that the show "arguably glorifies teenage suicide" (Compl. ¶ 23) and that

22   the creators should have known the show's depiction of the main character's suicide in

23   "unflinching detail" (*id.* ¶ 16) had "the potential for suicide-contagion effects upon impressionable

24   viewers" (*id.* ¶ 26). This is a far cry from the overt encouragement necessary to satisfy the

25   

26   _____

   [10] *See, e.g.*, *James*, 300 F.3d at 698 (affirming district court's dismissal where producers of video games and the film *The Basketball Diaries* "certainly did not 'intend' to produce violent actions

27   by the consumers"); *Wilson*, 198 F. Supp. 2d at 182 (dismissing claim on First Amendment grounds where plaintiff "claim[ed] only that [defendant] intended to addict players [to Mortal

28   Kombat], and knew or should have known that its conduct would bring about harm").

*Brandenburg* test.  The incitement requirements are not satisfied as a matter of law where, as here, the speaker is physically and temporally removed from the viewer and the speech at issue conveys abstract ideas as opposed to overt encouragement.  *See, e.g.*, *McCollum*, 202 Cal. App. 3d at 1001 (speech cannot be punished as incitement if it merely "has a tendency to lead to suicide or other violence" (citing *Hess*, 414 U.S. at 107–09)); *Wilson*, 198 F. Supp. 2d at 182 (same).[11]

*McCollum v. CBS, Inc.*, which involved allegations that a teenager shot himself after listening to Ozzy Osbourne's song "Suicide Solution," is directly on point.  The song at issue there featured lyrics directed to the listener, including the line "get the gun and try it / shoot, shoot, shoot."  202 Cal. App. 3d at 996–97.  In holding plaintiffs' claims were absolutely barred by the First Amendment, the court emphasized that "[m]erely because art may evoke a mood of depression as it figuratively depicts the darker side of human nature does not mean it constitutes a direct 'incitement to imminent violence.'"  *Id.* 1001.

So too here.  Nowhere does the Complaint allege the show included anything that "could be characterized as a command to an immediate suicidal act."  *Id.*  If a song that tells its listeners to "shoot, shoot, shoot" and "may well express a philosophical view that suicide is an acceptable alternative to a life that has become unendurable" does not constitute an imminent incitement to violence as a matter of law (*see id.*), then a television show's depiction of a fictional character's suicide certainly does not.  *13 Reasons Why* "cannot be construed to contain the requisite 'call to action' for [an] elementary reason":  no rational person could mistake the depiction of suicide in a narrative work of fiction "for literal commands or directives to immediate action."  *See id.* at 1002.  "To do so would indulge a fiction which neither common sense nor the First Amendment will permit."  *Id.*  Given the absence of any incitement to imminent lawless action in the show,

---

[11] *See also, e.g.*, *James*, 300 F.3d at 698 (threat of violent reaction to material in video games and film was not "imminent"); *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1021–23 (5th Cir. 1987) (holding "Orgasm of Death" article in *Hustler* could not be construed as incitement, even if the article describes dangerous practice in "glowing terms," expressing doubt that written material could ever constitute incitement); *Byers v. Edmondson*, 826 So.2d 551, 556 (La. Ct. App. 2002) (holding the film *Natural Born Killers* did not satisfy incitement standard because it did "not purport to order or command anyone to perform any concrete action immediately or at any specific time"); *Yakubowicz v. Paramount Pictures Corp.*, 536 N.E.2d 1067, 1071 (Mass. 1981) (reaching same conclusion with respect to the film *The Warriors*).

1   Plaintiffs' claims are absolutely barred by the First Amendment.

2   **II.      Alternatively, the Complaint Should Be Dismissed With Prejudice For Failure to**
       **State a Claim for Relief under Rule 12(b)(6)**
3

4          For the same reasons that Plaintiffs fail to establish a probability of succeeding on the

5   merits as required under the anti-SLAPP statute, they also fail to plausibly state a claim for relief

6   under Rule 12(b)(6).  To the extent the Court holds that this case is not appropriate for dismissal

7   under the anti-SLAPP statute, it should dismiss the Complaint under Rule 12(b)(6).

8          The Complaint's defects are irremediable.  Plaintiffs have no basis for tolling their time-

9   barred claims.  And decedent's brothers cannot plead any facts that would change the statutorily

10  established priority for wrongful death claims.  Nor can they allege a cognizable duty, plead

11  proximate causation, or evade the First Amendment's bar on liability.  Because amendment would

12  be futile, the claims should be dismissed without leave to amend.  *See Dougherty v. City of*

13  *Covina*, 654 F.3d 892, 901 (9th Cir. 2011); *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522,

14  532 (9th Cir. 2008).

15                                  **CONCLUSION**

16         For the foregoing reasons, Plaintiffs' Complaint should be stricken pursuant to the anti-

17  SLAPP statute or, alternatively, dismissed with prejudice.

18

19  DATED:  September 1, 2021              MUNGER, TOLLES & OLSON LLP

20

21

22                                 By:      */s/ Blanca F. Young*
                                          BLANCA F. YOUNG
23                                 Attorneys for NETFLIX, INC.

24

25

26

27

28