Gregory Keenan (*pro hac vice* forthcoming)
DIGITAL JUSTICE FOUNDATION
81 Stewart Street
Floral Park, New York 11001
(516) 633-2633
gregory@digitaljusticefoundation.org

Andrew Grimm (*pro hac vice* forthcoming)
DIGITAL JUSTICE FOUNDATION
15287 Pepperwood Drive
Omaha, Nebraska 68154
(531) 210-2381
andrew@digitaljusticefoundation.org

Ryan Hamilton (SBN 291349)
HAMILTON LAW LLC
5125 South Durango, Suite C
Las Vegas, Nevada 89113
(702) 818-1818
ryan@hamlegal.com

*Attorneys for Plaintiffs*[1]

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| THE ESTATE OF ISABELLA "BELLA" HERNDON, JOHN HERNDON, J.H., *a minor*, T.H., *a minor*,<br><br>*on behalf of themselves and all others similarly situated,*<br><br>         *Plaintiffs,*<br><br>    v.<br><br>NETFLIX INC.,<br>         *Defendant.* | Case No. 4:21-cv-6561-YGR<br><br>**Amended**[2] **Complaint for**<br>  • **Failure to Adequately Warn,**<br>  • **Wrongful Death, and**<br>  • **Negligence.**<br><br>**<u>CLASS ACTION</u>**<br><br>**[DEMAND FOR JURY TRIAL]** |

---

[1] Additional counsel are listed on the following page.
[2] This Amended Complaint is hereby amended from the original as authorized by Rule 15(a)(1)(B).

Rory Stevens (admission forthcoming)
LAW OFFICE OF RORY L. STEVENS
4303 Southwest Cambridge Street
Seattle, Washington 98136
(206) 850-4444
rorylawstevensesq@gmail.com

Megan Verrips (*pro hac vice* forthcoming)
INFORMATION DIGNITY ALLIANCE
P.O. Box 8684
101 Southwest Madison Street
Portland, Oregon 97207
(925) 330-0359
megan@informationdignityalliance.org

James D. Banker (SBN 317242)
DIGITAL JUSTICE FOUNDATION
210 Flamingo Road, #424
Las Vegas, Nevada 89169
(714) 722-5658
jimbanker@gmail.com

*Attorneys for Plaintiffs*

Plaintiffs—the Estate of Isabella "Bella" Herndon and natural persons John Herndon, her successor in interest, J.H., a minor, and T.H., a minor, her statutory beneficiaries—on behalf of themselves and on behalf of all others similarly situated, hereby make class-action allegations as follows:

## I. NATURE OF THE CASE

1. In April 2017, child suicides spiked. This wave of suicides came as a surprise to most. Teachers, politicians, journalists, hospital staff, psychiatric experts, suicide-prevention advocates, and, most of all, heartbroken families of the victims themselves were all shocked as the number of child deaths mounted.

2. But these suicides were not entirely unforeseen. One entity had been made aware that these deaths could and would assuredly happen if it did not change its course of action: Defendant Netflix Inc. and its pertinent subsidiaries (collectively "Netflix").

3. Netflix should have been able to foresee this spike in child suicides because its tortious actions and omissions caused these deaths and it was warned as much in advance. Yet Netflix proceeded anyway, prioritizing its own strategy goals of market dominance in the youth demographic over the lives and well-being of vulnerable populations it knew would suffer—and die—if it did not provide greater warnings and take reasonable, common-sense steps to avoid using its data in a reckless manner that harmed children.

4. In March of 2017, Netflix released a show, Thirteen Reasons Why ("Show") via its paywalled streaming and content-delivery products. Before that, however, it had been warned by experts backed by decades of empirical research that child suicides and other profound psychological harm would occur if certain impressionable youths were targeted and not warned of the health risks inherent in viewing the Show.

5. Netflix had been put on notice of the risk and concrete prospects of serious, irreparable harm that its Show posed to the most vulnerable of viewers: children. Yet Netflix failed to take reasonable, appropriate, and commonsensical cautionary measures. It failed to warn of known harms and health risks—the very risks that it had been warned about ahead of time.

6.  Instead, it used its sophisticated, targeted recommendation systems to push the Show on unsuspecting and vulnerable children, using its cutting-edge technology.

7.  As children began to die, the experts started to piece the tragedies together.  For example, years after the Show's release, the National Institute of Mental Health associated the 28.9% increase in the child-suicide rate during the month of April 2017 with Netflix's Show—a child-suicide spike that could have been avoided had Netflix taken basic moral responsibilities to warn and to not target its most vulnerable viewers.

8.  Yet, even after empirical researchers repeatedly identified the profound human cost of Netflix's decisions, Netflix still did not meaningfully warn about the dangers of its Show, and did not moderate its algorithms to avoid targeting vulnerable children.  Instead, Netflix dug its heels in for years, choosing a path of callous resistance to the realities of hundreds of children whose deaths Netflix had tortiously caused.

## II. PARTIES

9.  **Plaintiffs.**  Decedent Isabella "Bella" Herndon was a natural person domiciled in the State of California.  She died as a result of the tortious acts and omissions of Netflix that caused, or at least substantially contributed to, her suicide.  Bella's father, John Herndon, her successor in interest; her younger minor brothers, J.H. and T.H., her statutory beneficiaries; and her Estate are Plaintiffs in this action, all domiciled in California, asserting wrongful-death and survivor claims against Netflix both in their capacities as individuals (and/or individual-representatives of the Estate) and in their capacities as class-representatives on behalf of all others similarly situated.  The survivorship claims are asserted by the Estate and/or John Herndon, her successor in interest.  The wrongful-death claims are asserted by Bella's younger minor brothers, J.H. and T.H, her statutory beneficiaries.

10. **Defendant.**  Netflix is a corporate entity domiciled and at-home in the State of California.  Netflix's tortious acts and omissions caused, or at least substantially contributed to, Bella's suicide and substantial harms, including death, to many other children.

### III. JURISDICTION & VENUE

11. **Jurisdiction.**  This action arises under California causes of action.  The Superior Court of California, County of Santa Clara, has subject-matter jurisdiction.  (See Code Civ. Proc. § 410.10.)  Netflix maintains its principal place of business in Los Gatos, California. Netflix also maintains systemic, continuous and substantial contacts with California consumers in the form of offering membership subscriptions to its paywalled steaming and content-delivery product.  Netflix's activities in California are and were highly interactive, systemic and continuous so as to support a finding of general, all-purpose jurisdiction in the Superior Court of California, County of Santa Clara.  (See Code Civ. Pro. § 410.10.)  Since this case's initial filing in California Superior Court, Netflix has removed this case to federal court under the Class Action Fairness Act ("CAFA").  See 28 U.S.C. § 1332(d).  Yet, the composition of the proposed classes are, on information and belief, such that that a mandatory or discretionary exception to CAFA's jurisdictional grant applies.  See 28 U.S.C. § 1332(d)(3)-(4).  In any event, Netflix has insufficiently justified, pleaded, and/or proven the jurisdiction of a federal court to hear this case.  E.g., 28 U.S.C. § 1332(d)(5)(B).

12. **Venue.**  Netflix's principal office is in Los Gatos, California, in Santa Clara County and, on information and belief, substantially all of the tortious acts stemmed from acts that occurred there.  Thus, either the California Superior Court, County of Santa Clara, or the United States District Court for the Northern District of California is a proper venue, contingent upon the determination whether federal CAFA jurisdiction lies.  (See Code Civ. Pro § 395, subd. b.)  See 28 U.S.C. § 1391(b)(2).

13. **Intradistrict Assignment.**  Ordinarily, a case arising out of events or omissions that occurred in Santa Clara County, California, and that gave rise to the claims are bar would be assigned to the San Jose Division.  Civil L.R. 3-2(c), 3-2(e).  This case, however, was reassigned to the Oakland Division of this Court pursuant to the Caseload Balancing Pilot Program.  Dkt. 14.

# IV. STATEMENT OF FACTS

**A. After the novel <u>Thirteen Reasons Why</u> was published, Netflix adapted it into a startlingly graphic streaming show.**

14. In October 2007, Jay Asher's novel <u>Thirteen Reasons Why</u> ("Novel") was published.  The Novel takes readers through transcripts of fictional audiotapes recorded by its main character, Hannah Baker, before her suicide.  Each of the Novel's thirteen fictional transcripts gives an anecdote addressed to another character who Baker partially blamed for causing her suicide.  The Novel was a hit, making the New York Times' young-adult best-seller list a few times.  (Rich, *A Story of a Teenager's Suicide Quietly Becomes a Best Seller*, The New York Times (Mar. 9, 2009).)

15. Years later, Netflix purchased the rights for a television show that had been adapted from the Novel ("Show").  Part of the business case for adapting the Novel into the Show was that the Novel already had a "huge following" and "huge fan base" so the Show was expected to attract younger audiences.  (Rochlin, *Selena Gomez (and Others) on Adapting 'Thirteen Reasons Why' for Netflix*, The New York Times (Mar. 22, 2017).)

16. As with the Novel, the Show features "broken friendships, a fatal auto accident" and "startlingly naturalistic depictions of rape and suicide."  Yet Netflix's adaptation of the Novel into thirteen hours of streaming content made several significant changes.  (Hale, *Review: '13 Reasons Why' She Killed Herself, Drawn Out on Netflix*, The New York Times (Mar. 30, 2017).)

17. One difference between the Novel and the Show is pacing.  The Novel is quick-paced and, as a reviewer notes, "stylistically economical[.]"  By contrast, the Show "demands that you listen to a suicide note for thirteen hours, while the suicide in question is built up as the grand climax[.]"  (Tolentino, *"13 Reasons Why" Makes a Smarmy Spectacle of Suicide*, The New Yorker (May 10, 2017).)

18. Perhaps the most drastic difference between the Novel and the Show is how they depict the main character Hannah Baker's suicide:

> [The Show's creators] decided to depict Hannah's suicide in "unflinching" detail."  In the book, she swallows pills.  In the show, she saws vertically at her forearms with razor blades, sobbing and screaming in an overflowing, pinkish tub.

(Tolentino, *"13 Reasons Why" Makes a Smarmy Spectacle of Suicide*, The New Yorker (May 10, 2017).)

19. Ultimately, Netflix removed this graphic, three-minute-long scene from the Show in July 2019 after years of public outcry that the scene "glorified suicide."  (Watson, *Who has died in 13 Reasons Why?*, Express Online (June 12, 2020).)

**B.  Netflix's widespread dissemination of its <u>Thirteen Reasons Why</u> Show was successful but concerning.**

20. When it was released on Netflix's paywalled streaming platform in March 2017, the Show was a huge hit.  It was especially popular with younger viewers, a key demographic in Netflix's sights as it was trying to maintain its streaming dominance.

21. Yet the Show's release was also marred by controversy.  The positive buzz in some circles was stained by other views that the show glorified suicide and was morally irresponsible. (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

22. One major concern was that this unsuitable content was being "watched by young people on phones or laptops without the awareness of their parents."  (Rosman, *Netflix Triggers Online Debate With a Show About Teen Suicide, '13 Reasons Why,'* The New York Times, Apr. 19, 2017).)

23. Nonetheless, the Show's broad exhibition was a cultural event.  Twitter debates ignited. Parents were concerned.  Teenagers imitated the Show in a variety of ways.  Some painted their fingernails to imitate the Show.  One high-school student recorded thirteen cassette tapes when asking a classmate to prom.  (Rosman, *Netflix Triggers Online Debate With a Show About Teen Suicide, '13 Reasons Why'*, The New York Times (Apr. 19, 2017).)

**C.** **Netflix is *not* being sued for its creation, dissemination, exhibition, advertisement, or other similar promotion of its Show, <u>Thirteen Reasons Why</u>.**

24. The above allegations in paragraphs 14-23 are provided for background and context but are expressly *not* the basis of why Netflix is being sued.

25. Specifically, Netflix is *not* being sued because it created a Show of questionable morality that arguably glorifies teenage suicide.  It is *not* being sued for any dissemination of, *i.e.*, public broadcast of, the Show or for the offering of the Show for public consumption.  It is *not* being sued for any public exhibition of this content, for any public advertisement of it generally to the public, or other similar promotion of the Show to the public.  Netflix is simply *not* being sued for its creation, dissemination, exhibition, advertisement, or similar promotion of its Show.

26. Rather, the bases of the claims against Netflix stem from something else: (1) Netflix's failure to adequately warn of its Show's, *i.e.*, its product's, dangerous features and (2) Netflix's use of its trove of individualized data about its users to specifically target vulnerable children and manipulate them into watching content that was deeply harmful to them—despite dire warnings about the likely and foreseeable consequences to such children. Both are detailed below.

**D.** **Experts warned Netflix in advance that its Show, <u>Thirteen Reasons Why</u>, would kill children but Netflix gave no adequate warning to viewers of this risk.**

27. When the Show was in production, its creators consulted several mental-health professionals.

28. Contrary to the creators' unexamined hypothesis that depicting the ugliness and brutality of suicide would somehow deter teenage suicides, the consensus of suicide-prevention experts warns of just the opposite effect—the potential for suicide-contagion effects upon impressionable viewers.  Depicting suicide as the Show does to children would likely result in deaths.  Netflix was warned about this risk in advance but did not heed guidelines about how to warn of suicide-related content.  (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

29.   Specifically, Dr. Dan Reidenberg, the executive director of a nonprofit suicide-prevention organization, Suicide Awareness Voices of Education, reviewed the Show about a month or so *before* its release.  Netflix had asked for Dr. Reidenberg's guidance.  Dr. Reidenberg advised Netflix to cancel the release but was told by Netflix that it "wasn't an option." "They made that very clear to me," Dr. Reidenberg later told the press.  (Eisenstadt, *'13 Reasons Why' is a hit, but suicide expert told Netflix not to release series*, Syracuse.com (Apr. 26, 2017).)

30.   Dr. Reidenberg's concerns were not just about uncomfortable feelings and content.  He was worried that the Show itself would *cause* suicides in impressionable children and lead to their deaths if they watched it.  (Gilbert, *What Went Wrong With 13 Reasons Why?*, The Atlantic (May 4, 2017).)

31.   Nor was Dr. Reidenberg a lone dissenting voice in the scientific community.  Well before Netflix released the Show, it was well-known in the scientific community that depictions of suicide can themselves *cause* suicide in vulnerable populations:

> Mental illness is not a communicable disease, but there's a strong body of evidence that suicide is still contagious.  Publicity surrounding a suicide has been repeatedly and definitively linked to a subsequent increase in suicide, *especially among young people*.

(*E.g.*, Sanger-Katz, *The Science Behind Suicide Contagion*, The New York Times (Aug. 13, 2014) (emphasis added).)

32.   Netflix failed to warn of these health risks.  Netflix included some advisories but these advisories have been woefully inadequate because they do not reasonably warn of the risk that the Show could cause suicide.  Some of its advisories were only added a month after the Show's release—well after an anticipated millions of children had viewed the Show. (Andrews, Netflix's *'13 Reasons Why' gets more trigger warnings. Critics say it glamorizes teen suicide*, Washington Post (May 1, 2017).)  To many experts, Netflix's advisories came as too little too late.  (*See* Grunberger, '*13 Reasons Why' warning is a start, experts say, but they want more*, CNN (Apr. 5, 2018).)

33. Even as of the filing of the original Complaint in this case, none of Netflix's advisories meaningful warn that the Show itself could cause suicide.  Instead, they use vague language that a reasonable person would think merely indicates mature subject matter, rather than a real risk of genuine harm.

34. As of the filing of the original Complaint, the Show displayed the following advisory before the beginning of the first season:

> Hi, I'm Dylan Minette and I play Clay Jensen.  I'm Katherine Langford and I play Hannah Baker.  I'm Justin Prentice, I play Bryce Walker.  I'm Alisha Boe, I play Jessica Davis.
>
> <u>Thirteen Reasons Why</u> is a fictional series that tackles tough real-world issues taking a look at sexual assault, substance abuse, suicide and more.  By shedding a light on these difficult topics, we hope our show can help viewers start a conversation.  But if you are struggling with these issues yourself this series may not be right for you or you may want to watch it with a trusted adult.
>
> And if you ever feel you need someone to talk with, reach out to a parent, a friend, a school counselor or an adult you trust call a local help line or go to 13ReasonsWhy.info.  Because the minute you start talking about it, it gets easier.

Among other problems, this advisory does not warn that viewing the Show could itself *cause* suicide, suicidal ideation, *etc*.

35. Instead, it merely suggests that there are mature themes depicted and that the presence of a trusted adult might be desirable.  There is no clear indication of the foreseeable harms, rather than a suggestion that the themes may be emotional or psychologically difficult.

36. Likewise, as of the filing of the original Complaint, the Show's thirteenth episode displays a cursory advisory placard that reads as follows: "The following episode contains graphic depictions of suicide and violence, which some viewers may find disturbing.  It is intended for mature audiences. Viewer discretion is advised."  This generic language is insufficient to warn reasonable viewers that the episode is not merely mature-themed but that watching it could cause or contribute to suicide or suicidal ideations.

37. Worse, not all of these advisories existed at the time of the Show's release, when Netflix began targeting the Show to vulnerable users and populations.

38. And, the fundamental problem is that these advisories fail to discuss the foreseeable risk of concrete harm to vulnerable persons. By comparison, prescription-drug labels warn of concrete risks of side effects.  Cigarette-warning labels indicate risk of health effects from smoking cigarettes, not merely that "discretion is advised."  Other television programs responsibly warn about the risks to persons with epilepsy from flashing lights, *etc.*  Netflix made no meaningful warning of the health risks associated with its Show.

39. Here, without more express warnings, no reasonable person would be aware of the genuine and real health risks posed by the Show to vulnerable viewers.  Without adequate warnings, Netflix did not permit its subscribers and families to make genuinely informed choices upfront about whether the Show's content is right for them, their family, or their children.

40. Moreover, experts were troubled that Netflix's content suggested that seeking help for suicidal ideation is fruitless and useless whereas committing suicide may be a source of individual agency.  (Todd, *Here's What 7 Mental Health Experts Really Think About '13 Reasons Why,'* SELF (May 9, 2018).)  Netflix failed to give any warning or advisory about how seeking help can improve outcomes and avoid significant self-harm or suicide.  Thus, Netflix failed to warn that some of its themes would inhibit impressionable and vulnerable viewers from seeking professional help for their suicidal ideation.

41. Furthermore, Netflix's pre-season advisory is inadequate because it fails to indicate where the most dangerous content appears in the Show.  The Show becomes dramatically more graphic over the course of its first season without another warning until episode nine.  Thus, the warning at the beginning of the Show followed by comparatively tame episodes would leave a reasonable parent unaware and with no easy way to figure out where the most harmful content would be found and when and how to avoid that content.

42. Netflix failed to warn of the dangers of its Show in another way.  Netflix gave no indication of any of the warning signs associated with a high risk for suicide.  By no means did Netflix frame its advisories in a way that a vulnerable child or parent would have gleaned any further understanding of the psychological differences between an intense emotional reaction to disturbing content and dangerous signs of suicidal ideation.

43. Up to the filing of the original Complaint, Netflix still gave no such meaningful warning that its content can cause suicides in vulnerable children.  Netflix decided to give no serious warning that its content could kill, despite having been put on notice of this risk in advance of releasing its Show.

**E.  Netflix's failure to adequately warn harmed and caused the death of many children.**

44. The tragic and significant costs of Netflix's decision not to adequately warn began to appear almost immediately after Netflix released the Show.

45. Without any meaningful warnings, families and children were largely unaware of the major health risks posed by watching the Show.  They were not warned about an extremely dangerous product that was being targeted at their children.

46. At first, the indications of Netflix's role in the spike in child suicides was anecdotal.  Then, scientists and empiricists started demonstrating that widespread harm to children came from Netflix's inadequate warnings and targeting of vulnerable kids.

47. One alarming story came shortly after the Show's release.  A school superintendent in Florida, reported that counselors, teachers, and principals reported over a dozen cases of very concerning behavior by children—a significant spike in "youth at-risk behavior *at the elementary and middle school levels* to include self-mutilation, threats of suicide, and multiple Baker Act incidents."  (Strauss, *Schools superintendent: Students are harming themselves and citing '13 Reasons Why*, Washington Post (Apr. 29, 2017) (emphasis added).)

48. Such a result was not unforeseeable.  As one leading psychiatric researcher stated: "Research shows us that the more obvious, florid, dramatic, and explicit the portrayal is as disturbing as it is to most of us, there's the potential that for some people who see it, who are really struggling with something, this winds up being in some way strangely appealing." (Grady, *Critics say 13 Reasons Why has artistic merit. Suicide prevention experts say it's dangerous*, Vox.com (June 9, 2017).)

49. Empirical research followed.  It confirmed what the educators, parents, and counselors were seeing on the ground.  There was a significant spike in suicides in April 2017 following the Show's release without adequate warning and with significant targeting at children.  The number of Internet searches for how to commit suicide spiked at the same time that fewer children were seeking help from crisis-suicide-prevention services that connect children to mental-health resources and help avoid suicide.  (Thompson et al, *Crisis Text Line use following the release of Netflix series 13 Reasons Why Season 1: Time-series analysis of help-seeking behavior in youth*, 14 Preventive Medicine Reports (June 2019).)

50. Researchers also identified that the spike in hospital admissions at a children's hospital for children suffering from self-harm stemmed from the release of the Show on Netflix's paywalled streaming and content-delivery products.  (Cooper et al., *Suicide Attempt Admissions From a Single Children's Hospital Before and After the Introduction of Netflix Series 13 Reasons Why*, 63 Journal of Adolescent Health 688 (Dec. 2018).)

51. Subsequent research has again and again confirmed similar empirical effects on suicide rates in the United States closely correlated to the release of the Show (without adequate warnings and targeted at children).  (Bridge et al., *Association Between the Release of Netflix's 13 Reasons Why and Suicide Rates in the United States: An Interrupted Time Series Analysis*, 59 Journal of the American Academy of Child & Adolescent Psychiatry 236 (Feb. 2020); Niederkrotenthaler et al., *Association of Increased Youth Suicides in the United States With the Release of 13 Reasons Why*, 76 Journal of the American Medical Association – Psychiatry 933 (May 29, 2019).)

52. The effect was not merely domestic.  For example, similar devastating impacts were identified in Canada.  (*E.g.*, Sinyoir et al., *Suicides in Young People in Ontario Following the Release of "13 Reasons Why*," 64 Canadian Journal of Psychiatry (Aug. 21, 2019).)  Even empirical research sponsored and paid for *by Netflix* indicated troubling trends with respect to the effects of Netflix's failure to warn and targeting sizeable portions of child viewers.

53. All in all, the consensus of empirical research is clear: Netflix's tortious acts and omissions foreseeably caused hundreds of deaths and thousands of suicide attempts.

54. Netflix's tortious acts caused tragedies with respect to many children, including decedent Bella Herndon.  Netflix released the Show on March 31, 2017.  On information and belief, Netflix made no attempt to avoid recommending and targeting the Show, without adequate warning to vulnerable persons, such as Bella Herndon herself.  Moreover, on information and belief, Netflix made no attempt to avoid manipulating users, including minors such as Bella Herndon, to watch the Show.

55. And, Netflix treated Bella Herndon according to its typical practices of monitoring users' activities and manipulating their viewing decisions via sophisticated, targeted recommendation algorithms on its paywalled content-delivery products. That is, Netflix used its data about Bella Herndon to recommend the show to her, to manipulate her into watching it.

56. Yet, Netflix gave Bella and her family no warning that watching the Show could cause suicide and suicidal ideation.  Netflix gave Bella no warning of the known health risks associated with viewing the Show.  And, Netflix gave Bella no warning of what the danger signs would be if she began suffering those health risks.  In sum, Netflix never provided a warning of the health risks of watching the Show when using sophisticated, targeted recommendation systems to manipulate the viewing behaviors of minors and to push its dangerous product, *i.e.*, the Show, on minors, such as Bella Herndon.

**F.   Netflix used unprecedented levels of data collection, algorithmic data processing, and analytical insights to precisely target some of the most vulnerable members in society with traumatic content that had no adequate warning.**

57. It cannot be emphasized enough that what Netflix did was entirely different than merely put a book on library bookshelves or put a show on TV.  A Netflix engineering director put it best when describing the capabilities that Netflix already had in 2013, over three years before the Show's release:

> *We know what you played, searched for, or rated, as well as the time, date, and device. We even track user interactions such as browsing or scrolling behavior.*

(Vanderbilt, *The Science Behind the Netflix Algorithms That Decide What You'll Watch Next, Wired* (Aug. 7, 2013) (interview with Netflix's engineering director, Xavier Amtraiain, describing how "**how they control what you watch**" (emphasis added)).)

58. As of 2013, several years before Netflix released the Show via its steaming and content-delivery products, its recommendation engine and algorithms already controlled and actively manipulated the vast majority of what its users decide to watch such that "75 percent of viewer activity is driven by" Netflix's targeted recommendation systems.  (*Ibid.*)

59. Netflix helps users find shows or movies with minimal effort by utilizing algorithms to personalize the user experience.  Netflix's algorithms achieve these personalized recommendations by considering factors like viewing history, time of day a user watches, devices watched on, how long a viewer watches, and information about the titles watched.  (Netflix, *How Netflix's Recommendations System Works*, Netflix Help Center (last accessed Apr. 30, 2021).)

60. Netflix has access to nearly limitless data about its users through its paywalled streaming and content-delivery products.  Netflix feeds this information into the Netflix Recommender System, *i.e.*, a series of algorithms that personalize the viewer experience to improve Netflix's viewer retention rate.  Netflix achieves 80% of its stream time utilizing its Recommender System.  (Chong, *Deep Dive into Netflix's Recommender System*, towards data science (Apr. 30, 2020).)

61. Indeed, there is no reason to believe that Netflix treated Bella Herndon any differently, or any of the children targeted and manipulated in watching the Show, than the rest of the users on Netflix's platform.

62. In accordance with Netflix's practices, Netflix watched Bella's browsing and scrolling behavior, tracking them so that Netflix could manipulate and control what content she would watch via Netflix's paywalled streaming and content-delivery products.  In accordance with Netflix's practices, Netflix watched the time, date, and devices on which Bella used Netflix's streaming products, tracking them so that Netflix could manipulate and control what content she would watch on the Netflix platform.

63. Netflix is, in fact proud of its ability to control what its viewers will watch:



64. Given that Netflix itself estimates that "75 percent of viewer activity is driven" by Netflix's sophisticated, targeted recommendation systems, it is likely that Netflix successfully manipulated Bella Herndon's viewing selections when she used Netflix's streaming and content-delivery products.  Netflix targeted and manipulated Bella's viewing choices, and thereby exposed her to the dangerous health risks associated with watching the Show, proximately causing the resultant harms to her, including her death by suicide.  The targeting of the Show at her, and others similarly situated, caused foreseeable—indeed, foreseen—harms to her and their well-being, health, life, and limb.

65. After watching the Show during the month of April, Bella experienced emotional and psychological distress and harm.

**G. Only after hundreds of children died and after thousands were harmed did Netflix removed its most gratuitous scene of violent suicide, having never warned of the harm it could cause while targeting children directly with that content.**

66. After the Show was released without warning and targeted to vulnerable populations, mental health experts worried that the failure to warn coupled with the "graphic depiction of Hannah's suicide might function as a how-to guide."  (Grady, *13 Reasons Why takes a voyeuristic lens to rape and suicide, with complicated results*, Vox.com (May 1, 2017).)

67. As the empirical evidence of widespread harm mounted; as reports of tragedy for families and children alike accumulated; after child-welfare and suicide-prevention advocates and experts expressed their outrage, Netflix removed one scene of dangerous content from the Show.  Yet Netflix has not, on information and belief, limited the scope of its targeting of the Show at vulnerable children and has not added adequate warnings.

68. Netflix has removed some dangerous content from the Show after more and more children that Netflix had targeted died:

> The original, nearly three-minute-long scene — which is no longer available on Netflix — aired midway through the season one finale.  It depicted breakout star Katherine Langford's Hannah assessing her life in the mirror before she is depicted sitting in a bathtub, tear on her cheek, taking a razor blade to her left wrist and piercing the skin.  The camera then holds on the character as she shrieks in pain as blood gushes from an increasingly long cut that extends nearly up to her elbow.  Hannah is then seen gasping for air as her breathing ultimately slows and bloodstained water tips out of the tub.  Not long after, Hannah's mother (Kate Walsh) discovers her daughter's lifeless body in the blood-filled tub.  Male lead Dylan Minnette provides voiceover during the entire scene as he tells the school's guidance counselor (played by Derek Luke) precisely what happened to Hannah.

> […]

> The new scene, which has been updated on the Netflix site, features Hannah looking at herself in the mirror before cutting to her parents' reaction to her suicide.  There is no longer any depiction of the character taking a razor blade to her wrists and the immediate aftermath.

(Goldberg, *Netflix Alters Graphic '13 Reasons Why' Suicide Scene After Controversy, The Hollywood Reporter* (July 15, 2019).)

69. The damage of Netflix's years-long refusal to warn and its years-long targeting of children had already been done.  As one example, on April 28, 2017, Isabella "Bella" Herndon fell victim to suicide.  Bella Herndon fell victim to the very health risk that medical experts and suicide-prevention experts had warned Netflix about regarding the Show.  Bella Herndon was one of many suicides predicted before the Show's release.  Bella Herndon was a victim of the well-documented, unnatural 28.9% spike in child suicides that occurred after the Show's debut specifically during the month of April 2017.

70.  Bella Herndon was laid to rest at the age of 16 at Saint Charles Borromeo Church in Livermore, California on May 15, 2017.

# V. CLASS ACTION ALLEGATIONS

71. The claims asserted herein are appropriate for resolution through a class action.  Not only are the claims susceptible for class resolution, but it is also important that they are adjudicated on a class basis, both because the claims require expertise and the members of the class have, on information and belief, faced significant challenges accessing legal representation.  It is at least known that the Herndon family has faced significant barriers to legal representation.

   a.  As an initial matter, there are complexities to the case that are significant.  The claims involve issues of suicide, suicidal ideation, psychological trauma, as well as larger questions about teenage psychology, underlying population awareness of warning signs of suicide, and interpretation of advisories, *etc.*  These complex issues are better resolved through a class vehicle rather than burdening each class member and their individualized counsel (if they are able to retain one) with extensive litigation and re-litigation on those questions.

   b.  What is more, there is substantial technological and algorithmic complexity of Netflix's targeting, recommendation, and manipulation activities—requiring certain levels of expertise and dedication to meaningfully understand.  Again, these complexities weigh in strong favor of class resolution because requiring individual plaintiffs to discover the essential issues, comprehend them, try them, *etc.*, would be extraordinarily expensive and consume significant amounts of time.

   c.  Finally, the Herndons have faced substantial barriers to finding any lawyer who was both willing and able to represent them in this case.   In all likelihood, so have the remaining members of the classes.  There have been very real access-to-counsel issues for aggrieved families suffering from Netflix's tortious actions at issue in this case.

Thus, the reasons favoring class adjudication run the gamut: abstract questions of justice and fairness; pragmatic synergies and efficiencies in the conduct of the litigation and discovery, and the harsh realities of access to law for public-interest cases in contemporary society for everyday Americans.  All favor class adjudication.

72. Here, as a result of Netflix's inadequate warnings, Netflix caused the death of an estimated hundreds, possibly a thousand, children who committed suicide since the release of the Show, with their many survivors, heirs, *etc.*, holding viable claims.  Beyond those who died, there are many more who suffered substantial trauma at the hands of callous business decisions that prioritized reaching certain business milestones over the safety of Netflix's customers and their loved ones.  In this situation, the technology is a double-edge sword.  Although it permitted the targeting and manipulation of very vulnerable persons, it also permits the class to be ascertained with greater ease.  Thus, the classes are both ascertainable and numerous.

73. Common questions of law and fact predominate here.  The central thread throughout is Netflix's tortious actions and omissions, both its intentional failure to adequately warn and intentional strategy to target and manipulate the most vulnerable persons.  Nearly every legal and factual question in the case appears, at this juncture, susceptible for class-wide adjudication.  Therefore, there exists a well-defined community of interest that would be highly impracticable absent class adjudication.

74. Having lost a sibling to suicide as a result of Netflix's failure to provide adequate warning and its negligence, M.H. and T.H. have claims typical of the class of statutory-beneficiary plaintiffs who may assert a wrongful death claim for having lost a family member.  M.H. and T.H. may adequately represent this class.  Having lost a minor child to suicide as a result of Netflix's failure to provide adequate warning, John Herndon has claims typical of class of plaintiffs who may still assert survival action and claims as the successor in interest of the minor decedent.  Thus, John Herndon may adequately represent this class.

75. The claims here meet the requirements for class-adjudication.  In fact, a number of compelling reasons militate in favor of class-certification.

76.  **Proposal of Class Compositions and Proposed Class Definition.**  Based upon the above, Plaintiffs plead the following proposed class definition for two classes:

    a.  *California Negligence and Failure-to-Warn Class*:  All ascertainable California citizens (the harmed minors who survived or their successors in interest on behalf of the decedents who did not) who watched Netflix's Show, in full or in part, and assert that they suffered as a result of Netflix's failure to adequately warn and/or as a result of being negligently targeted and manipulated by Netflix (or its streaming and content-delivery products) to watch the Show.

    b.  *Global Wrongful-Death Class*:  All ascertainable beneficiaries (or their equivalents such as those otherwise legally entitled or with standing to bring claims for wrongful death or an equivalent under their state or national laws) of decedents who watched Netflix's Show, in full or in part, and died as a result of Netflix's failure to adequately warn and/or as a result of being negligently targeted and manipulated by Netflix (or its streaming and content-delivery products) to watch the Show.

77.  A precise determination of the composition of these classes will require discovery from Netflix and correspondence with potential class-members.  Yet, given the ratio of suicide attempts and lesser forms of actionable harm compared to the actual number of suicides in general, it is likely that more than two thirds of the proposed class members of all such proposed classes are California citizens.  It is even more likely that more than one third of the members of all such proposed class members are California citizens.  Cf. 28 U.S.C. § 1332(d)(3)-(4).

# VI. CAUSES OF ACTION

### First Cause of Action
### Strict Liability—Failure To Warn

78. PLAINTIFFS, the Estate of decedent Isabella "Bella" Herndon and decedent's surviving father and successor in interest with standing to assert her survivor claims, John Herndon, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated, as defined in the above class definitions. These allegations expressly include the clarifications about what is not the bases of these claims. Cf. ¶¶ 24-26 (expressly excluding ¶¶ 14-23).

79. Netflix manufactured, distributed and/or sold a product, *i.e.*, paywalled platform and streaming content-delivery systems, recommendation algorithms, and other means of targeting children with its Show, and continues to do so. This cause of action does not arise from Netflix's manufacture or creation of the Show, but rather from its targeting of the Show at vulnerable children and its failure to include adequate warnings, as part of a subscription package on its streaming and content-delivery platform.

80. The Show posed serious health risks that were foreseeable, foreseen, known to and/or reasonably knowable by Netflix. Indeed, such health risks had been brought to Netflix's attention prior to the Show's release by Netflix's own retained experts. The foreseeable health risks of such behavior have been extensively documented by the medical, scientific, and suicide-prevention communities.

81. Ordinary consumers would not have recognized or been aware of the health risks absent an adequate warning. Ordinary consumers would not recognize or be aware of these health risks even after viewing Netflix's later-added advisories. The advisories merely suggest potential discomfort that may result from mature themes and give no indication of the known health risks caused by the Show.

82. Netflix failed to adequately warn children and their families of the health risks of viewing its Show. As a result of the lack of adequate warning, decedent Bella Herndon and those similarly situated to her were tortiously harmed.

83. Children viewers targeted by Netflix and their adult parents/guardians were not informed that watching the Show could cause or contribute to suicide or suicidal ideations.

WHEREFORE, the aforementioned PLAINTIFFs demand judgment against Defendant Netflix for whatever amount to be determined by a jury after trial, including but not limited to compensatory damages, such as, medical bills, lost wages, lost earning capacity, and pain and suffering and, if applicable, punitive damages, costs, fees, and all other possible relief.  To the extent permissible, declaratory relief is also sought.

**Second Cause of Action**
**Wrongful Death**

84. PLAINTIFFS, decedent Bella Herndon's brothers, J.H. and T.S., both minors and her statutory beneficiaries with standing to assert wrongful death claims, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated.  These allegations expressly include the clarifications about what is not the bases of these claims.  Cf. ¶¶ 24-26 (expressly excluding ¶¶ 14-23).

85. As a direct, proximate, and legal result of Netflix's negligent and intentional acts and omissions, Bella and those similarly situated (as defined in the above class definitions) died.  Netflix caused these deaths through its tortious, negligent, and/or reckless behaviors, including through the tortious targeting of vulnerable persons with the Show, manipulating their viewing behaviors, and without providing fair warning of the health risks associated with the Show.  As a direct, proximate, and legal result of Netflix's failure to warn, decedents suffered injuries that resulted in their deaths.  As a direct, proximate, and legal result of Netflix's tortious acts of targeting dangerous materials at vulnerable populations, Netflix caused decedents' deaths.  Netflix had reasonable certainty regarding these deaths.

86. As a direct, legal, and proximate result of Netflix's negligent and intentional acts and omissions, aforementioned Plaintiffs have suffered a loss of love, companionship, comfort, affection, society, solace, training and/or moral support and are entitled to damages pursuant to Code of Civil Procedure § 377.60, *et seq*.

WHEREFORE, the aforementioned PLAINTIFFs demand judgment against Defendant Netflix and are entitled to recover wrongful death damages pursuant to California Code of Civil Procedure §377.61, including but not limited to, both economic and non-economic compensatory damages, such as: the loss of financial support the decedent would have contributed to the family, the loss of gifts or benefits plaintiff would have expected to receive from decedent, funeral and burial expenses, the reasonable value of household service decedent would have provided, as well as, a loss of love, companionship, comfort, affection, society, solace, training and/or moral support.  To the extent permissible, declaratory relief is also sought.

### Third Cause of Action
### Negligence

87. As a direct, proximate, and legal result of Netflix's negligent and intentional acts and omissions, Bella and those similarly situated died.  Netflix caused these deaths through its tortious, negligent, and/or reckless behaviors, including through the tortious targeting of vulnerable persons with the Show, manipulating their viewing behaviors, and without providing fair warning of the health risks associated with the Show.  As a direct, proximate, and legal result of Netflix's failure to warn, decedents suffered injuries that resulted in their deaths.  As a direct, proximate, and legal result of Netflix's tortious acts of targeting dangerous materials at vulnerable populations, Netflix caused decedents' deaths.

88. PLAINTIFFS, the Estate of decedent Isabella "Bella" Herndon and decedent's surviving father and successor in interest with standing to assert these claims, John Herndon, hereby repeat and reallege the paragraphs alleged above, on behalf of themselves and all others similarly situated.  These allegations expressly include the clarifications about what is not the bases of these claims.  Cf. ¶¶ 24-26 (expressly excluding ¶¶ 14-23).

89. Defendant Netflix negligently, carelessly, and/or recklessly failed to warn of the health risks associated with viewing the Show. Such health risks had been brought to Netflix's attention prior to the Show's release.  The foreseeable health risks of such behavior have been extensively documented by the medical, scientific, and suicide-prevention communities.

Nevertheless, Netflix did not provide adequate or reasonable warnings of the health risks associated with viewing the Show.

90. Netflix owed a duty to these class members by virtue of their special relationship as close friends and family of Netflix's paying customers.  Also, harm to these person was readily foreseeable.  Indeed, it was foreseen *by Netflix's own retained experts*—Netflix simply refused to heed their strenuous warnings.  It is nearly certain, documented through numerous empirical and qualitative studies that Netflix caused this harm and that this type of harm results from tortious acts of the kind Netflix undertook.  Netflix's callousness toward the lives of children and their well being is morally blameworthy.  Netflix's ability to add an adequate warning and to tweak its algorithms to avoid most of the harm means that the costs borne of an imposed duty by the common law is quite small.  Protecting some of the most vulnerable in society is of the utmost importance.  Thus, Netflix clearly had a duty to the children who it tortiously harm and foreseeable harmed and Netflix breached this duty through its failure to warn and through its intentional targeting and manipulation activities.

91. Defendant Netflix negligently, carelessly, and/or recklessly specifically targeted the show to vulnerable populations, including decedent Bella Herndon and those similarly situated.

92. Defendants Netflix's negligent, careless, and/or reckless conduct and omissions caused and/or significantly contributed to the death of decedent Bella Herndon and those similarly situated.

93. As a direct and legal result of the said wrongful conduct and/or omissions of Defendant Netflix, Plaintiffs suffered substantial harm.

WHEREFORE, PLAINTIFFS demand judgment against DEFENDANT Netflix for whatever amount to be determined by a jury after trial, including but not limited to punitive damages, economic compensatory damages, and/or non-economic compensatory damages.  To the extent permissible, declaratory relief is also sought.

## VII. DEMAND FOR TRIAL BY JURY

94.  Plaintiffs hereby demand a trial by jury of all issues so triable.  Cf. FRCP 38.


<u>Civil L.R. 3-6(a) Jury-Demand Signature</u>:

<u>/s/ Ryan Hamilton</u>
Ryan Hamilton (SBN 291349)
Hamilton Law LLC
5125 South Durango, Suite C
Las Vegas, Nevada 89113
(702) 818-1818
ryan@hamlegal.com

*Attorney for Plaintiffs*

1    DATED: September 22, 2021                    Respectfully submitted,

2                                                 */s/ Ryan Hamilton*
                                                  Ryan Hamilton (SBN 291349)
3                                                 HAMILTON LAW LLC
                                                  5125 South Durango, Suite C
4                                                 Las Vegas, Nevada 89113
                                                  (702) 818-1818
5                                                 ryan@hamlegal.com

6
                                                  Gregory Keenan (*pro hac vice* forthcoming)
7                                                 DIGITAL JUSTICE FOUNDATION
                                                  81 Stewart Street
8                                                 Floral Park, New York 11001
                                                  (516) 633-2633
9                                                 gregory@digitaljusticefoundation.org

10
                                                  Andrew Grimm (*pro hac vice* forthcoming)
11                                                DIGITAL JUSTICE FOUNDATION
                                                  15287 Pepperwood Drive
12                                                Omaha, Nebraska 68154
                                                  (531) 210-2381
13                                                andrew@digitaljusticefoundation.org

14
                                                  Rory Stevens (admission forthcoming)
15                                                LAW OFFICE OF RORY L. STEVENS
                                                  4303 Southwest Cambridge Street
16                                                Seattle, Washington 98136
                                                  (206) 850-4444
17                                                rorylawstevensesq@gmail.com

18
                                                  Megan Verrips (*pro hac vice* forthcoming)
19                                                INFORMATION DIGNITY ALLIANCE
                                                  P.O. Box 8684
20                                                101 Southwest Madison Street
                                                  Portland, Oregon 97207
21                                                (925) 330-0359
                                                  megan@informationdignityalliance.org
22

23                                                James D. Banker (Bar No. 317242)
                                                  DIGITAL JUSTICE FOUNDATION
24                                                210 Flamingo Road, #42
                                                  Las Vegas, Nevada 89169
25                                                (714) 722-5658
                                                  jimbanker@gmail.com
26

27                                                *Attorneys for Plaintiffs*

28

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that I served the foregoing *AMENDED COMPLAINT* on:

3

4

Ms. Blanca F. Young
MUNGER, TOLLES & OLSON LLP
560 Mission Street,
Twenty Seventh Floor
San Francisco, California 94105
(415) 512-4000
(415) 512-4077 (fax)
blanca.young@mto.com

5

6

7

8

Ms. Jennifer L. Bryant
Ms. Cory M. Batza
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071
(213) 683-9100
(213) 687-3702 (fax)
jennifer.bryant@mto.com
cory.batza@mto.com

9

10

11

12

13

14

15

*Attorneys for Netflix, Inc.*

16

via **electronic filing** in CM/ECF.

17

Dated: September 22, 2021           */s/ Ryan Hamilton*

18

Ryan Hamilton

19

20

21

22

23

24

25

26

27

28