BLANCA F. YOUNG (State Bar No. 217533)
blanca.young@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, CA 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

JENNIFER L. BRYANT (State Bar No. 293371)
jennifer.bryant@mto.com
CORY M. BATZA (State Bar No. 318612)
cory.batza@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Fiftieth Floor
Los Angeles, California 90071-3426
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

Attorneys for NETFLIX, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, OAKLAND DIVISION

| | |
|---|---|
| THE ESTATE OF B.H., JOHN HERNDON, J.H., a minor, T.H., a minor, on behalf of themselves and all other similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>NETFLIX, INC.,<br><br>Defendant. | Case No. 4:21-cv-06561-YGR<br><br>**DEFENDANT'S NOTICE OF MOTIONS AND [1] SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA ANTI-SLAPP STATUTE, CAL. CODE OF CIV. PROC. § 425.16, OR, IN THE ALTERNATIVE, [2] MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>*[Filed concurrently with [Proposed] Order]*<br><br>Date: November 16, 2021<br>Time: 2:00 p.m.<br>Ctrm: 1<br>Judge: Yvonne Gonzalez Rogers |

1

## <u>TABLE OF CONTENTS</u>

2

<u>Page</u>

3

INTRODUCTION .................................................................................................................1

4

PLAINTIFFS' ALLEGATIONS .........................................................................................3

5

ARGUMENT .......................................................................................................................5

6

I. The FAC Should Be Stricken Under California's Anti-SLAPP Statute ...................6

7

  A. Plaintiffs' Claims Arise from Acts in Furtherance of the Right to
8    Free Speech in Connection with a Public Issue .............................................6

9

    1. Plaintiffs' Claims Arise from Conduct in Furtherance of
      Speech ................................................................................................6

10

    2. The Challenged Conduct is in Connection with an Issue of
11      Public Interest...................................................................................10

12

  B. Plaintiffs Cannot Demonstrate a Probability of Prevailing on Any
    Claims............................................................................................................11

13

    1. The FAC Has Fatal Procedural Flaws................................................11

14

      (a) The Negligence and Strict Liability Claims Are
15        Time-Barred .........................................................................11

16      (b) Decedent's Brothers Lack Standing To Bring A
        Wrongful Death Claim ........................................................12

17

    2. Plaintiffs' Claims Fail as a Matter of State Law ...............................14

18

      (a) Plaintiffs' Strict Liability Claim Fails Because 13
19        Reasons Why Is Not a "Product" .......................................14

20      (b) Plaintiffs' Negligence and Wrongful Death Claims
        Fail Because Netflix Did Not Owe Plaintiffs a Duty ..........15

21

      (c) Plaintiffs Cannot Plausibly Allege Netflix Caused
22        Plaintiffs' Harm ...................................................................19

23    3. The First Amendment Bars All of Plaintiffs' Claims .......................20

24      (a) Plaintiffs' Claims Attack Speech That Is Protected by
        the First Amendment ...........................................................20

25

      (b) The Challenged Speech Does Not Constitute
26        Incitement.............................................................................22

27        (i) Plaintiffs Do Not And Cannot Allege The
          Requisite Specific Intent To Incite............................23

28

# **TABLE OF CONTENTS**
## (Continued)

Page

           (ii)      Plaintiffs Do Not Plausibly Allege A
                    Reasonable Likelihood Of Imminent Harm ............. 23

II.     Alternatively, the FAC Should Be Dismissed With Prejudice For Failure to
State a Claim for Relief under Rule 12(b)(6) ........................................................... 25

CONCLUSION ................................................................................................................. 25

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**FEDERAL CASES**

4

*Banks v. Mortimer,*
    2019 WL 4600941 (N.D. Cal. Sept. 23, 2019)........................................................................12

5

*Bell Atlantic Corp. v. Twombly,*
    500 U.S. 544 (2007) ................................................................................................................20

6

*Bose Corp. v. Consumers Union of U.S., Inc.,*
    466 U.S. 485 (1984) ................................................................................................................22

7

8

*Brandenburg v. Ohio,*
    395 U.S. 444 (1969) ..........................................................................................................23, 24

9

10

*Brandt v. Weather Channel, Inc.,*
    42 F. Supp. 2d 1344 (S.D. Fla. 1999)....................................................................................18

11

*Brown v. Entm't Merchs. Ass'n,*
    564 U.S. 786 (2011) ................................................................................................................21

12

13

*Cohen v. Cowles Media Co.,*
    501 U.S. 663 (1991) ................................................................................................................22

14

*Connick v. Myers,*
    461 U.S. 138 (1983) ................................................................................................................22

15

16

*Davidson v. Time Warner, Inc.,*
    1997 WL 405907 (S.D. Tex. Mar. 3, 1997) ....................................................................15, 18

17

18

*Doe v. Gangland Prods., Inc.,*
    730 F.3d 946 (9th Cir. 2013)................................................................................................7, 9

19

*Dougherty v. City of Covina,*
    654 F.3d 892 (9th Cir. 2011) ..................................................................................................25

20

21

*El Dorado Cmty. Serv. Ctr. v. Cty. of Los Angeles,*
    2017 WL 6017297 (C.D. Cal. Jan. 3, 2017)..........................................................................25

22

23

*Erznoznik v. City of Jacksonville,*
    422 U.S. 205 (1975) ................................................................................................................21

24

*Forsyth v. Motion Picture Assoc. of Am., Inc.,*
    2016 WL 6650059 (N.D. Cal. Nov. 10, 2016)....................................................................9, 10

25

26

*Greater L.A. Agency on Deafness, Inc. v. Cable News Network, Inc.,*
    742 F.3d 414 (9th Cir. 2014)..........................................................................................6, 10, 11

27

28

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Herceg v. Hustler Magazine, Inc.*,
  814 F.2d 1017 (5th Cir. 1987) ................................................................................24

*Hess v. Indiana*,
  414 U.S. 105 (1973) ....................................................................................23, 24

*Hilton v. Hallmark Cards*,
  599 F.3d 894 (9th Cir. 2010) ..................................................................................7

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*,
  515 U.S. 557 (1995) ................................................................................8, 9, 21

*ITN Flix, LLC v. Hinojosa*,
  2019 WL 3562669 (C.D. Cal. Aug. 6, 2019) ........................................................10

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) ....................................................................... 1, passim

*James v. Meow Media, Inc.*,
  90 F. Supp. 2d 798 (W.D. Ky. 2000), *aff'd*, 300 F.3d 683 (6th Cir. 2002) ....................18, 22

*Jian Zhang v. Baidu.com Inc.*,
  10 F. Supp. 3d 433 (S.D.N.Y. 2014) ........................................................................9

*Jones v. Cate*,
  2016 WL 282699 (E.D. Cal. Jan. 26, 2016) ............................................................20

*Joseph Burstyn, Inc. v. Wilson*,
  343 U.S. 495 (1952) ................................................................................................7

*King v. United States*,
  756 F. Supp. 1357 (E.D. Cal. 1990) ........................................................................20

*Medrano v. Kern Cty. Sheriff's Officer*,
  921 F. Supp. 2d 1009 (E.D. Cal. 2013) ..................................................................13

*Metabolife Int'l, Inc. v. Wornick*,
  264 F.3d 832 (9th Cir. 2001) ....................................................................................6

*Metabolife Int'l, Inc. v. Wornick*,
  72 F. Supp. 2d 1160 (S.D. Cal. 1999), *aff'd in part, rev'd in part on other
  grounds*, 264 F.3d 832 ............................................................................................8

*Miami Herald Pub. Co. Tornillo*,
  418 U.S. 241 (1974) ................................................................................................9

1

## **TABLE OF AUTHORITIES**
### (Continued)

2

Page(s)

3

*Monteiro v. Tempe Union High Sch. Dist.,*
    158 F.3d 1022 (9th Cir. 1998) ................................................................3

4

5

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964) ................................................................3, 21

6

7

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.,*
    471 U.S. 1 (1986) ................................................................8

8

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress,*
    890 F.3d 828 (9th Cir. 2018) ................................................................6

9

10

*Sanders v. Acclaim Ent., Inc.,*
    188 F. Supp. 2d 1264 (D. Colo. 2002) ................................................15, 17, 18, 22

11

12

*Spence v. Washington,*
    418 U.S. 405 (1974) ................................................................9

13

*Stanley v. Georgia,*
    394 U.S. 557 (1969) ................................................................21

14

15

*Stoddard-Nunez v. City of Hayward,*
    2015 WL 6954963 (N.D. Cal. Nov. 10, 2015) ................................................13

16

17

*Thomas v. Cty. of San Diego,*
    2021 WL 2715086 (S.D. Cal. July 1, 2021) ................................................12

18

*Todd v. Lovecruft,*
    2020 WL 60199 (N.D. Cal. Jan. 6, 2020) ................................................7

19

20

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994) ................................................................20

21

22

*U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.,*
    190 F.3d 963 (9th Cir. 1999) ................................................................6

23

*Vernon v. City of L.A.,*
    27 F.3d 1385 (9th Cir. 1994) ................................................................11

24

25

*Watters v. TSR, Inc.,*
    904 F.2d 378 (6th Cir. 1990) ................................................14, 17, 18, 19

26

*Wilson v. Midway Games, Inc.,*
    198 F. Supp. 2d 167 (D. Conn. 2002) ................................................15, 22, 23, 24

27

28

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*Winter v. G.P. Putnam's Sons*,
   938 F.2d 1033 (9th Cir. 1991)..................................................................14, 18

*Young v. Am. Mini Theatres*,
   427 U.S. 50 (1976) ...........................................................................................21

*Zamora v. CBS*,
   480 F. Supp. 199 (S.D. Fla. 1979).............................................................17, 23

**STATE CASES**

*Bill v. Superior Court*,
   137 Cal. App. 3d 1002 (1982)................................................................. 1, passim

*Birmingham v. Fodor's Travel Publ'ns, Inc.*,
   73 Haw. 359 (1992)..........................................................................................14

*Brooks v. Eugene Burger Mgmt. Corp.*,
   215 Cal. App. 3d 1611 (1989)..........................................................................14

*Byers v. Edmondson*,
   826 So.2d 551 (La. Ct. App. 2002) ..................................................................24

*Church of Scientology v. Wollersheim*,
   42 Cal. App. 4th 628 (1996)............................................................................11

*Daniel v. Wayans*,
   8 Cal. App. 5th 367, 387 (2017)........................................................................7

*DeFilippo v. Nat'l Broad. Co., Inc.*,
   446 A.2d 1036 (R.I. 1982) ...............................................................................22

*FilmOn Inc. v. DoubleVerify Inc.*,
   7 Cal.5th 133 (2019).........................................................................................10

*Fox Searchlight Pictures, Inc. v. Paladino*,
   89 Cal. App. 4th 294 (2001)..............................................................................7

*Gregorian v. Nat'l Convenience Stores, Inc.*,
   174 Cal. App. 3d 944 (1985).......................................................................15, 16

*Guglielmi v. Spelling-Goldberg Prods.*,
   25 Cal. 3d 860 (1979).........................................................................................7

*Hunter v. CBS Broadcasting, Inc.*,
   221 Cal. App. 4th 1510 (2013)...........................................................................7

1

**TABLE OF AUTHORITIES**
(Continued)

2

**Page(s)**

3

*Ingels v. Westwood One Broad. Servs., Inc.*,

4
    129 Cal App. 4th 1050 (2005)................................................................11

5
*Kronemyer v. Internet Movie Data Base, Inc.*,
    150 Cal. App. 4th 941 (2007)................................................................8

6

*Lattimore v. Dickey*,

7
    239 Cal. App. 4th 959 (2015)................................................................15

8
*Lewis v. Reg'l Ctr. of the East Bay*,

9
    174 Cal. App. 3d 350 (1985)................................................................13

10
*Martinez v. Metabolife Int'l, Inc.*,
    113 Cal. App. 4th 181 (2003)................................................................7

11

12
*Mayo v. White*,
    178 Cal. App. 3d 1083 (1986)................................................................13

13
*McCollum v. CBS, Inc.*,

14
    202 Cal. App. 3d 989 (1988)........................................................ 1, passim

15
*Modisette v. Apple Inc.*,
    30 Cal. App. 5th 136 (2018)................................................................19

16
*Nally v. Grace Cmty. Church of the Valley*,

17
    47 Cal. 3d. 278 (1998)................................................................19

18
*Navellier v. Sletten*,

19
    29 Cal. 4th 82 (2002)................................................................7

20
*Nelson v. Cty. of Los Angeles*,
    113 Cal. App. 4th 783 (2003)................................................................12, 13

21
*Nygard, Inc. v. Uusi-Kerttula*,

22
    159 Cal. App. 4th 1027 (2008)................................................................10

23
*Olivia N. v. Nat'l Broad. Co.*,
    126 Cal. App. 3d 488 (1981)................................................................1, 17, 20, 21

24
*Pierson v. Sharp Mem'l Hosp.*,

25
    216 Cal. App. 3d 340 (1989)................................................................14

26
*Pooshs v. Philip Morris USA, Inc.*,

27
    51 Cal. 4th 788 (2011)................................................................12

28

DEF.'S SPECIAL MOT. TO STRIKE PURSUANT TO ANTI-SLAPP STATUTE AND MOT. TO DISMISS FAC

1

## **TABLE OF AUTHORITIES**
### (Continued)

2

**Page(s)**

3

*Rivera v. First DataBank, Inc.*,
    187 Cal. App. 4th 709 (2010)..................................................................8

4

5

*Rosales v. Battle*,
    113 Cal. App. 4th 1178 (2003).............................................................12

6

*Rowland v. Christian*,
    69 Cal. 2d 108 (1968)....................................................................16, 18

7

8

*Sakiyama v. AMF Bowling Centers, Inc.*,
    110 Cal. App. 4th 398 (2003)...............................................................16

9

10

*Scott v. Thompson*,
    184 Cal. App. 4th 1506 (2010).........................................................12, 13

11

12

*Tamkin v. CBS Broad., Inc.*,
    193 Cal. App. 4th 133 (2011)............................................................9, 10

13

*Tate v. Canonica*,
    180 Cal. App. 2d 898 (1960)................................................................19

14

15

*Wang v. Wal-Mart Real Estate Bus. Tr.*,
    153 Cal. App. 4th 790 (2007)................................................................8

16

17

*Way v. Boy Scouts of Am.*,
    856 S.W.2d 230 (Tex. Ct. App. 1993) ...................................................18

18

*Widdoss v. Huffman*,
    62 Pa. D. & C. 4th 251 (Com. Pl. 2003) ...............................................18

19

20

**STATE STATUTES**

21

Cal. Code Civ. Proc. § 312...............................................................................12

22

Cal. Code Civ. Proc. § 335.1.......................................................................11, 13

23

Cal. Code Civ. Proc. § 377.20(a).......................................................................11

24

Cal. Code Civ. Proc. § 377.32...........................................................................12

25

Cal. Code Civ. Proc. § 377.60...........................................................................12

26

Cal. Code Civ. Proc. § 425.16...............................................................2, 6, 8, 10

27

Cal. Prob. Code § 6402....................................................................................12

28

1
2

**TABLE OF AUTHORITIES**
(Continued)

**Page(s)**

3

**FEDERAL RULES**

4

Fed. R. Civ. P. 11 .................................................................................................23

5

Fed. R. Civ. P. 12(b)(6) ...............................................................................3, 4, 6, 25

6

**CONSTITUTIONAL PROVISIONS**

7

First Amendment ............................................................................... 1, passim

8

**OTHER AUTHORITIES**

9

Restatement (Third) of Torts § 19 cmt. a (1998) ........................................14

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

DEF.'S SPECIAL MOT. TO STRIKE PURSUANT TO ANTI-SLAPP STATUTE AND MOT. TO DISMISS FAC

## **NOTICE OF MOTIONS AND MOTIONS**

PLEASE TAKE NOTICE that on November 16, 2021, at 2:00 p.m., or as soon thereafter as this matter may be heard, in Courtroom 1, United States Courthouse, 1301 Clay Street, Fourth Floor, Oakland, CA 94612, before the Honorable Yvonne Gonzalez Rogers, Defendant Netflix, Inc. ("Netflix") will, and hereby does, move the Court (1) to strike Plaintiffs' First Amended Complaint in its entirety pursuant to California's anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16 *et seq.*, or (2) to dismiss Plaintiffs' First Amended Complaint, with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

The grounds for the Motions are that (1) the First Amended Complaint targets activity protected under the anti-SLAPP statute, and Plaintiffs cannot meet their burden of establishing a probability of success as to any of their claims; and (2) Plaintiffs in all events have failed to plausibly allege any claim for relief.

These Motions are based upon this Notice of Motions and Motions, the attached Memorandum of Points and Authorities, any papers filed in reply, all other papers and records on file in this matter, and any other materials or argument the Court may receive at or before the hearing on these Motions.

## **ISSUES TO BE DECIDED**

1.  Whether Plaintiffs' First Amended Complaint should be stricken under California's anti-SLAPP statute, Cal. Civ. Proc. Code § 425.16 *et seq.*

2.  Whether all of Plaintiffs' claims should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **INTRODUCTION**

3          Plaintiffs lost their family member, B.H., to suicide.  More than four years later, Plaintiffs

4    filed this action seeking to hold Netflix responsible for her death because it disseminated an

5    acclaimed, award-winning fictional television series, *13 Reasons Why.*  Based on the *New York*

6    *Times* bestselling young adult novel, *13 Reasons Why* grappled with the issue of teen suicide and

7    depicted a lead character taking her own life.  Plaintiffs have suffered an unimaginable loss.  But

8    this lawsuit is fundamentally misguided.

9          Plaintiffs filed the First Amended Complaint ("FAC") after Netflix moved to dismiss the

10   original complaint on the ground that the First Amendment and numerous state law grounds bar

11   each of Plaintiffs' claims.  ECF No. 16.  The FAC's new allegations fail to remedy any of the

12   prior complaint's incurable defects.  Nor does the FAC offer any new theory for relief.  Rather

13   than rehabilitate Plaintiffs' fatally flawed suit, the FAC confirms the futility of any further leave to

14   amend.

15         *13 Reasons Why* is not the first work to tell a story about teen suicide.  The subject has

16   been explored in countless literary works, motion pictures, songs, and TV shows—everything

17   from *Romeo and Juliet* to *Dead Poets Society*.  And this is not the first lawsuit that has claimed

18   that the media's depiction of suicide and violence is to blame, and should be held legally liable,

19   for real-life suicides and other tragic events.  Courts, however, have repeatedly rejected such suits.

20   *See, e.g.*, *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 994, 1002 (1988) (dismissing claims that

21   Ozzy Osbourne's music caused teenager to kill himself:  "courts have been universally reluctant to

22   impose tort liability upon any public media for self-destructive or tortious acts alleged to have

23   resulted from a publication or broadcast") (collecting cases)); *Bill v. Superior Court*, 137 Cal.

24   App. 3d 1002, 1005 (1982) (rejecting claims that the motion picture *Boulevard Nights* attracted

25   members of the public who were "prone to violence" and was responsible for shooting of someone

26   outside the theater); *Olivia N. v. Nat'l Broad. Co.*, 126 Cal. App. 3d 488, 492 (1981) (dismissing

27   action claiming that "artificial rape" scene in the movie *Born Innocent* caused assailants to attack

28   plaintiff in similar manner); *James v. Meow Media, Inc.*, 300 F.3d 683, 687 (6th Cir. 2002)

1   (dismissing claim that violence in video games, movies, and internet sites "desensitized" high

2   school student to violence and caused him to shoot other students).  These cases, and legions of

3   others applying settled First Amendment and tort law principles, compel the dismissal of

4   Plaintiffs' claims here.

5          California's anti-SLAPP statute provides a means for early dismissal of suits that target

6   conduct "in furtherance of [a] person's right of petition or free speech under the United States or

7   California Constitution in connection with a public issue."  Cal. Code Civ. Proc. § 425.16.

8   Plaintiffs' lawsuit does exactly that.  Without question, *13 Reasons Why* is protected expression

9   under the First Amendment.  And the FAC itself, which is replete with citations to articles about

10  *13 Reasons Why* and its subject matter, makes plain that *13 Reasons Why*'s speech is in

11  "connection with a public issue."  *Id.*  Plaintiffs try to sidestep the anti-SLAPP statute and the First

12  Amendment by insisting that their claims are not based on the content of *13 Reasons Why*, but on

13  an alleged "failure to warn" or breach of a purported duty to protect "vulnerable populations" from

14  the content.  *See, e.g.*, FAC ¶ 3.  But without the allegations that the show's content is

15  "dangerous," Plaintiffs' theories fall apart.  Not only do those theories strike at the free expression

16  embodied in the show, they target Netflix's conduct "in furtherance" of the distribution of the

17  show, and therefore bring this lawsuit squarely within the ambit of the anti-SLAPP statute.

18         Again, this is not a new means of trying to avoid the First Amendment.  Other plaintiffs

19  have similarly said their suits were about a "failure to warn" or "failure to protect" and not an

20  attack on content.  The legal result has been no different.  Courts have held that plaintiffs cannot

21  circumvent the First Amendment by "substitut[ing] labels for reality."  *Bill*, 137 Cal. App. 3d at

22  1009 (rejecting "failure to warn" and fraud claims premised on alleged duty to warn of movie's

23  violent content); *McCollum*, 202 Cal. App. 3d at 995–96, 1006 (First Amendment barred

24  "negligence," "product liability," and "intentional misconduct" claims based on alleged

25  "intentional dissemination of Osbourne's record music with the alleged knowledge that it would

26  result in self-destructive reactions among certain individuals").  As in these well-settled

27  precedents, Plaintiffs' "failure to warn" and "failure to protect" claims are inextricably bound to

28  Plaintiffs' claim that *13 Reasons Why* is "dangerous content," or "content [that] could kill."  FAC

1    ¶¶ 41, 43.  Regardless of the labels, Plaintiffs' claims are based on Netflix's speech.

2         If allowed to proceed, Plaintiffs' suit would have profound chilling effects on free

3    expression.  *See, e.g.*, *Monteiro v. Tempe Union High Sch. Dist.*, 158 F.3d 1022, 1029 (9th Cir.

4    1998) ("[C]omplaints based on speech protected by the First Amendment have far-ranging and

5    deleterious effects, and the mere threat of civil liability can cause potential defendants to 'steer far

6    wider of the unlawful zone.'").  Creators obligated to shield certain viewers from expressive works

7    depicting suicide would inevitably censor themselves to avoid the threat of liability.  This would

8    "dampen[] the vigor and limit the variety of public debate."  *New York Times Co. v. Sullivan*, 376

9    U.S. 254, 279 (1964).  In such a landscape, a long line of creative works—from classics like *Anna*

10   *Karenina*, *Antigone*, *The Awakening*, *Madame Bovary*, and *The Bell Jar*, to countless modern

11   works like *Dear Evan Hansen*, *The Perks of Being a Wallflower*, *Wristcutters: A Love Story*, and

12   *The Virgin Suicides*—would be at risk.  The First Amendment does not permit such a result.

13        Under the anti-SLAPP statute, Plaintiffs must show a probability of prevailing or the FAC

14   must be stricken.  They cannot do so, for a number of independent reasons.  The First Amendment

15   bars their claims, certainly.  But there are several other grounds for dismissal.  A two-year statute

16   of limitations bars the claims.  Decedent's siblings lack standing to sue for wrongful death.  And,

17   as a number of cases have previously held, Plaintiffs cannot plausibly allege core elements of their

18   tort claims—duty, causation, or a basis for strict liability.  Even setting aside the anti-SLAPP

19   statute, any of these grounds would mandate dismissal under Rule 12(b)(6).  Whatever path the

20   Court chooses to take, the result is clear:  the FAC must be dismissed with prejudice.

21                        **PLAINTIFFS' ALLEGATIONS**[1]

22        Netflix offers a video streaming service to its members, who subscribe to the Netflix

23   

24   [1] For purposes of its anti-SLAPP and 12(b)(6) Motions, Netflix's arguments do not challenge
     Plaintiffs' factual allegations.  But to be clear, the inflammatory allegation that *13 Reasons Why*

25   caused widespread harm to children is false.  Research refutes that there was any statistically
     significant increase in teen suicide after the release of *13 Reasons Why*.  *See, e.g.*, Bethany Ao,

26   *Netflix series "13 Reasons Why" did not increase number of teen suicides, study finds*, Phila.
     Inquirer (Jan. 16, 2020), https://www.inquirer.com/health/13-reasons-why-suicide-teens-penn-

27   20200115.html.  Similarly, although not germane to the resolution of the Motions, Plaintiffs' FAC

28   relies on Netflix's website to describe Netflix's recommendations system.  *See* FAC ¶ 59 (citing

service for a monthly fee.  FAC ¶ 11.  In March 2017, Netflix released to its subscribers the first season of *13 Reasons Why*, adapted from a bestselling young-adult novel by Jay Asher.  *See id.* ¶¶ 14–15.  The fictional series tackles real-world social issues affecting young people, including sexual assault, substance abuse, and suicide.  *See id.* ¶¶ 14–16, 34.  The episodes in the first season follow 13 cassette tapes that high school student Hannah Baker left behind after committing suicide.  *See id.*  The tapes detail the 13 reasons why she took her own life.  *See id.*  The FAC alleges that in telling Hannah's story, the show's creators took a "naturalistic" approach in an effort to de-romanticize and deter teenage suicide.  *See id.* ¶¶ 16, 28.  Plaintiffs acknowledge that prior to the show's release, Netflix sought the advice of mental health experts, *see id.* ¶ 27, and that, from the outset, Netflix has included various advisory warnings with the show, *see id.* ¶¶ 32–36.

Plaintiffs allege that B.H. watched *13 Reasons Why* and later "experienced emotional and psychological distress and harm."  *Id.* ¶ 65.  On April 28, 2017, she passed away from suicide.  *Id.* ¶ 69.  More than four years later, decedent's estate, her father (John Herndon), and her two brothers (J.H. and T.H.), brought this putative class action against Netflix.  Decedent's estate and her father assert two survival claims for strict liability and negligence (*id.* ¶¶ 78, 88), while her brothers assert a claim for wrongful death (*id.* ¶ 84).

The gravamen of the FAC is that *13 Reasons Why* "glorified suicide" and caused decedent to take her own life.  *See* Compl. ¶¶ 19, 66–69.  Plaintiffs take issue not only with the general subject of suicide addressed in the show, which they claim can cause suicidal ideation and suicide (*see, e.g., id.* ¶¶ 28, 31, 40), but also with specific choices the creators made about how to depict the main character's suicide and the overall dramatic style and pace of the show.  *See, e.g., id.* ¶¶ 18–19 (alleging that the show's creators "decided to depict Hannah's suicide in 'unflinching detail'" in a "graphic, three-minute-long scene"), *id.* ¶¶ 16–17, 41 (contrasting the pace and style

---

How Netflix's Recommendations System Works, https://help.netflix.com/en/node/100639 (last visited Aug. 31, 2021)).  That website directly refutes Plaintiffs' claim that the recommendation algorithm uses subjective or demographic information to target young, vulnerable people.  It does not.  Rigorous parental controls are available to Netflix's account holders, who may decide for themselves what content is appropriate for their families.

1   of the show with the "quick-paced" "economical" "styl[e]" of the book, and alleging the show

2   "becomes dramatically more graphic over the course of its first season" without warning "where

3   the most dangerous content appears").  Based on their contention that the show contains

4   "dangerous content" and "content [that] could kill" (*e.g.*, *id.* ¶¶ 41, 43, 67), Plaintiffs allege

5   (1) Netflix's content-advisory warnings were inadequate, and (2) Netflix should have taken steps

6   to ensure the show was not recommended to "vulnerable populations."  *See id.* ¶ 3; *see also, e.g.*,

7   *id.* ¶ 26; *id.* ¶ 79 (strict liability); ¶ 85 (wrongful death); ¶ 87 (negligence).

8          Notwithstanding Plaintiffs' protestations to the contrary (*id.* ¶¶ 22–23), Plaintiffs' claims

9   depend on the content of *13 Reasons Why* (*see*, *e.g.*, *id.* ¶ 20).  Again and again, the FAC links its

10  failure-to-warn and failure-to-protect theories of liability to the actual content of the show:  its

11  "depict[ion] of suicide" (*see, e.g.*, *id.* ¶¶ 28, 31, 66), its "dramatic and explicit portrayal" (*id.* ¶ 48),

12  the "themes" that allegedly "inhibit[ed] impressionable and vulnerable viewers from seeking

13  professional help" (*id.* ¶ 40), "content suggest[ing] that seeking help for suicide is fruitless" (*id.*),

14  and other allegedly "dangerous" and "disturbing content" (*id.* ¶¶ 41–42, 67–68).  The FAC alleges

15  that the show's dangerous content triggered a duty for Netflix to warn about a risk of suicide and

16  to "frame its advisories in a way" to help viewers distinguish between "intense emotional

17  reaction[s]" and "dangerous signs of suicidal ideation."  *Id.* ¶ 42.  Similarly, the FAC alleges that

18  Netflix should have ensured that its recommendation system did not offer *13 Reasons Why* to "the

19  most vulnerable members in society" because of the show's "traumatic content."  *Id.*, Section F at

20  p. 14.

21                              **ARGUMENT**

22          Plaintiffs' misguided suit should be dismissed.  Just like the complaint that preceded it, the

23  FAC is subject to California's anti-SLAPP statute because it targets conduct in furtherance of

24  Netflix's right to free speech, and Plaintiffs cannot demonstrate a probability of prevailing on any

25  of their claims for numerous independent reasons:  (1) the claims are procedurally barred,

26  (2) Plaintiffs do not and cannot plausibly plead the essential elements of their claims under state

27  law, and (3) the First Amendment precludes Plaintiffs from imposing tort liability on Netflix for

28  disseminating an expressive work Plaintiffs deem "dangerous."  Even if the anti-SLAPP statute

1  did not apply, the FAC should be dismissed with prejudice under Rule 12(b)(6) based on these

2  same fatal procedural and substantive flaws.

3  **I.       The FAC Should Be Stricken Under California's Anti-SLAPP Statute**

4           California's anti-SLAPP statute provides for the "early dismissal of meritless first

5  amendment cases aimed at chilling expression through costly, time-consuming litigation."

6  *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001).  Because the anti-SLAPP

7  statute serves vital, substantive state interests, its protections apply to state law claims in federal

8  court.  *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999).

9  Consistent with the statute's explicit direction (Cal. Code Civ. Proc. § 425.16(a)), federal courts

10  construe the anti-SLAPP statute broadly.  *Greater L.A. Agency on Deafness, Inc. v. Cable News*

11  *Network, Inc. ("GLAAD")*, 742 F.3d 414, 421 (9th Cir. 2014).

12          An anti-SLAPP motion involves a two-step inquiry:  (1) the defendant must make a

13  threshold showing that each challenged claim arises from protected activity; if the defendant

14  makes that showing, then (2) the burden shifts to the plaintiff to demonstrate a probability of

15  prevailing on each of the challenged claims.  *Id.* at 422.  Where, as here, an anti-SLAPP motion is

16  based on a complaint's facial legal deficiencies, the motion is "treated in the same manner as a

17  motion under Rule 12(b)(6)."  *See Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med.*

18  *Progress*, 890 F.3d 828, 833–34 (9th Cir. 2018).  The motion must be granted "when a plaintiff

19  presents an insufficient legal basis for his or her claims."  *Id.*

20      **A.     Plaintiffs' Claims Arise from Acts in Furtherance of the Right to Free Speech**
                 **in Connection with a Public Issue**

21

22          At step one, the defendant must make a prima facie showing that the asserted claims arise

23  from protected activity.  The anti-SLAPP statute protects any "act . . . [1] in furtherance of [a]

24  person's right of petition or free speech under the United States or California Constitution [2] in

25  connection with a public issue."  Cal. Code Civ. Proc. § 425.16(b)(1).  Plaintiffs' claims satisfy

26  both elements.

27              1.      Plaintiffs' Claims Arise from Conduct in Furtherance of Speech

28          Whether the challenged activity is "in furtherance" of speech has been "interpreted . . .

-6-                                 Case No. 4:21-cv-06561-YGR

1   rather loosely," *Hilton v. Hallmark Cards*, 599 F.3d 894, 903–04 (9th Cir. 2010), and "[t]he

2   defendant's burden on this step 'is not a particularly demanding one,'" *Todd v. Lovecruft*, 2020

3   WL 60199, at *11 (N.D. Cal. Jan. 6, 2020) (quoting *Daniel v. Wayans*, 8 Cal. App. 5th 367, 387

4   (2017)).  The first prong sweeps broadly to capture more than just speech that is "constitutionally

5   protected under the First Amendment as a matter of law."  *Fox Searchlight Pictures, Inc. v.*

6   *Paladino*, 89 Cal. App. 4th 294, 305 (2001).  Conduct that *advances* or *assists* expressive activity

7   also "qualifies as a form of protected activity" under the statute.  *Hunter v. CBS Broadcasting,*

8   *Inc.*, 221 Cal. App. 4th 1510, 1521 (2013).

9       "[T]he form of the plaintiff's cause of action" does not control.  *Navellier v. Sletten*, 29

10  Cal. 4th 82, 92 (2002).  Rather, the analysis on the first step turns on the "*activity* that gives rise to

11  [the] asserted liability—and whether that activity constitutes protected speech or petitioning."  *Id.*

12  (emphasis in original).  Courts therefore look to the "*principal thrust* or *gravamen*" of the claim.

13  *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App. 4th 181, 188 (2003) (emphasis in original).  This

14  standard is generally satisfied where "but for" the defendant's speech-related activity, the claim

15  would have no basis.  *See, e.g.*, *Doe v. Gangland Prods., Inc.*, 730 F.3d 946, 955 (9th Cir. 2013)

16  (citing *Navellier*, 29 Cal. 4th at 90) (concluding producers of documentary television series had

17  met their burden under first step because "[b]ut for the [television] broadcast and [their] actions in

18  connection with that broadcast, [p]laintiff would have no reason to sue").

19      Here, Plaintiffs' theories of liability plainly arise from acts in furtherance of Netflix's right

20  to free speech.

21      ***Plaintiffs' failure-to-warn theory*** arises from speech because it is directly premised on the

22  content of the show itself.[2]  The gravamen of the failure-to-warn claim is that *13 Reasons Why* is

23  "dangerous" and that the show's "dangerous features"— i.e., *its content*—gave rise to a purported

24  duty to warn.  *See, e.g.*, FAC ¶ 26.  Section D of the FAC, which details Plaintiffs' failure to warn

25  _____

26  [2] The show, of course, is expressive speech at the heart of the First Amendment's protections.
    *See, e.g.*, *Guglielmi v. Spelling-Goldberg Prods.*, 25 Cal. 3d 860, 865 (1979) (Bird, C.J.,
    concurring) ("[W]hether exhibited in theaters or on television, a film is a medium which is

27  protected by the constitutional guarantees of free expression."); *Joseph Burstyn, Inc. v. Wilson*,

28  343 U.S. 495, 501–02 (1952) ("It cannot be doubted that motion pictures are a significant medium
    for the communication of ideas.").

1  theory, repeatedly references the show's "depictions," "content," and "themes" in asserting that

2  Netflix should have provided different or additional warnings.  *Id.* ¶¶ 28, 31, 35–43.

3      Plaintiffs cannot avoid the anti-SLAPP statute by labeling Netflix's expressive conduct a

4  "dangerous feature" or a "health risk."  *See, e.g.*, *Wang v. Wal-Mart Real Estate Bus. Tr.*, 153 Cal.

5  App. 4th 790, 801–02 (2007) ("It is well-established that a plaintiff will not avoid the application

6  of the anti-SLAPP statute by disguising the pleading as a 'garden variety' tort claim if the basis of

7  the alleged liability is predicated on protected speech or conduct.").  *Bill v. Superior Court* is

8  instructive.  There, the plaintiff alleged that the defendant had a duty to warn about a movie's

9  alleged tendency to attract violence-prone viewers.  The court held that such a claim implicated

10  the First Amendment, and could not be separated from a claim against the content of the film

11  itself.  *See* 137 Cal. App. 3d at 1007–08.  The same is true here.  "[I]t is precisely because of the

12  [show's] content, and for no other reason," that Plaintiffs allege Netflix owed a duty to warn.  *Id.*

13      Plaintiffs' allegation that Netflix's content required additional warnings thus squarely

14  targets acts in furtherance of speech.  *See* Cal. Code Civ. Proc. § 425.16(e)(3) (defining such acts

15  to include "any written or oral statement or writing made in a place open to the public or a public

16  forum"); *Metabolife Int'l, Inc. v. Wornick*, 72 F. Supp. 2d 1160, 1165 (S.D. Cal. 1999), *aff'd in

17  part, rev'd in part on other grounds*, 264 F.3d 832 ("[A] widely disseminated television broadcast

18  . . . is undoubtedly a public forum.").[3]

19      **_Plaintiffs' failure-to-protect theory_** also arises from Netflix's protected speech.  This

20  theory is premised on Netflix's recommendations system, which displays an array of suggested

21  titles to members.  FAC ¶ 59.  The recommendations system, and the display of suggested titles, is

22

23  _____

   [3] Moreover, the failure-to-warn claim also implicates Netflix's free speech right to make its own

24  decisions about what to say—and what not to say—about the show.  Such decisions are, of course,
   a well-settled, fundamental part of the constitutional right of free speech.  *See, e.g.*, *Hurley v.

25  Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 573–74 (1995) ("[O]ne who
   chooses to speak may also decide 'what not to say'") (quoting *Pac. Gas & Elec. Co. v. Pub. Utils.

26  Comm'n of Cal.*, 471 U.S. 1, 16 (1986)); *Kronemyer v. Internet Movie Data Base, Inc.*, 150 Cal.
   App. 4th 941, 947 (2007) (defendant's refusal to list plaintiff's name in credits was an act in

27  furtherance of the defendant's free speech right not to speak); *see also Rivera v. First DataBank,
   Inc.*, 187 Cal. App. 4th 709, 715 (2010) (complaint challenging adequacy of suicide warning in

28  Paxil pamphlet arose from publisher's exercise of free speech).

1    speech.  It evinces "[a]n intent to convey a particularized message," *Spence v. Washington*, 418

2    U.S. 405, 410–11 (1974)—namely, a message about what shows and movies a viewer might

3    choose from to watch.  *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*,

4    515 U.S. 557, 570 (1995) ("[T]he presentation of an edited compilation of speech generated by

5    other persons" falls "squarely within the core of First Amendment security."); *Forsyth v. Motion*

6    *Picture Assoc. of Am., Inc.*, 2016 WL 6650059, at *2 (N.D. Cal. Nov. 10, 2016) (holding movie

7    ratings are protected speech because they "speak generally to the content of movies and their

8    suitability for different audiences").  The recommendations fall within the well-recognized right to

9    exercise "editorial control and judgment."  *Miami Herald Pub. Co. Tornillo*, 418 U.S. 241, 258

10   (1974).  Plaintiffs allege that the recommendations here are different because they are dictated by

11   an algorithm.  *See, e.g.*, FAC ¶ 57.  But the fact that the recommendations "may be produced

12   algorithmically" makes no difference to the analysis.  *See Jian Zhang v. Baidu.com Inc.*, 10 F.

13   Supp. 3d 433, 438–39 (S.D.N.Y. 2014).  "After all, the algorithms themselves were written by

14   human beings, and they 'inherently incorporate . . . engineers' judgments . . . .'"  *Id.* (internal

15   citation omitted).  The recommendations generated are "much like many other familiar editorial

16   judgments," such as "the guidebook writer's judgments about which attractions to mention and

17   how to display them, and Matt Drudge's judgments about which stories to link and how

18   prominently to feature them."  *Id.*

19        Even if there were some question about the recommendations themselves constituting

20   protected speech (and there is not), Plaintiffs' failure-to-protect theory would still trigger the first

21   prong of the anti-SLAPP statute.  "By its terms, [the anti-SLAPP statute] includes not merely

22   actual exercises of free speech rights but also *conduct that furthers such rights*."  *Doe*, 730 F.3d at

23   953 (citation omitted) (emphasis added).  "An act is in furtherance of the right of free speech if the

24   act helps to advance that right or assists in exercise of that right."  *Tamkin v. CBS Broad., Inc.*, 193

25   Cal. App. 4th 133, 143 (2011).  The suggestion that a viewer watch a particular show falls within

26   the broad scope of conduct in furtherance of the right to free speech.  The subject of the

27   recommendation—*13 Reasons Why*—is itself protected speech, and the recommendations

28   facilitate Netflix's protected distribution and dissemination of that speech.  *See id.* (acts that

"help[] to advance or assist in the . . . broadcasting of an episode of a popular television show" constitute activity in furtherance of speech); *GLAAD*, 742 F.3d at 422–24 (editorial decision to forgo captioning for online videos was an act "in furtherance of" CNN's reporting and delivering of the news); *Forsyth*, 2016 WL 6650059, at *2 ("Movie ratings are . . . 'in furtherance of free speech,' because movies themselves are a form of free speech, and the ratings help advance that free speech by giving potential audiences an indication of a movie's content or suitability.").

Finally, like Plaintiffs' failure-to-warn theory, Plaintiffs' recommendation theory cannot be disentangled from Plaintiffs' allegation that the underlying content is "dangerous":  the entire premise of the claim is that Netflix had a duty to identify which viewers are "vulnerable," and ensure that the algorithm does not recommend *13 Reasons Why* (or other content Plaintiffs deem unsuitable) to such viewers.

> 2.  The Challenged Conduct is in Connection with an Issue of Public Interest

Plaintiffs' claims also target Netflix's free-speech activities "in connection with a public issue or an issue of public interest."  Cal. Code Civ. Proc. § 425.16(e)(4).  The public-interest requirement is broadly construed.  *See id.* § 425.16(a).  Any issue "in which the public takes an interest" will suffice, *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042–43 (2008), so long as there is "some degree of closeness" between that public issue and the challenged conduct, *FilmOn Inc. v. DoubleVerify Inc.*, 7 Cal.5th 133, 150 (2019).  The speech at issue here easily falls within this broad standard.

The FAC makes clear on its face that *13 Reasons Why* has been the subject of substantial public discourse.  *See, e.g.*, FAC ¶ 15 (describing the source material's "huge following" and citing coverage of the show in *The New York Times*); *id.* ¶ 23 (describing the show as "a cultural event").  The large number of interested viewers and the public discourse surrounding the show are enough to satisfy the public interest requirement.  *See ITN Flix, LLC v. Hinojosa*, 2019 WL 3562669, at *4 (C.D. Cal. Aug. 6, 2019) (public interest requirement was satisfied where film was broadly released on over 2500 screens and thus "directly affected a large number of people"); *Tamkin*, 193 Cal. App. 4th at 144 (public was demonstrably interested in the broadcast of an episode of *CSI: Crime Scene Investigation* given the episode's ratings and various discussions of

1  the episode online); *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 651 (1996),

2  *disapproved on other grounds by Equilon Enters. v. Consumer Cases, Inc.*, 29 Cal.4th 53 (2002)

3  (speech about Church of Scientology was in connection with issue of public interest given size of

4  Church's membership and its extensive media coverage).

5       The fact that *13 Reasons Why* tackles real-world topics of widespread public interest such

6  as teen suicide, sexual assault, and substance abuse further confirms that it is contributing to the

7  public conversation on issues of public concern.  *See* FAC ¶ 34 (alleging the show opens with an

8  advisory that states:  "By shedding a light on these difficult topics, we hope our show can help

9  viewers start a conversation."); *see, e.g.*, *Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal

10 App. 4th 1050, 1064 (2005) (call-in radio talk show was matter of public interest because it

11 "address[ed] subjects of interest to the public at large").

12       **B.       Plaintiffs Cannot Demonstrate a Probability of Prevailing on Any Claims**

13       Because step one is satisfied, Plaintiffs must "demonstrate[] a probability of prevailing on

14 the merits" of their strict liability, negligence, and wrongful death claims.  *GLAAD*, 742 F.3d at

15 422.  Plaintiffs cannot meet their burden for multiple reasons.  In addition to being barred by the

16 First Amendment, Plaintiffs' claims fail under state law:  (1) the claims are procedurally barred, as

17 two claims (negligence and strict liability) are time-barred, and the plaintiffs on the third claim

18 (wrongful death) have no standing to bring it; and (2) all three claims fail under substantive

19 principles of California law.  Deferring to the principle of constitutional avoidance, we discuss the

20 state law grounds for dismissal before addressing the First Amendment.  *See Vernon v. City of

21 L.A.*, 27 F.3d 1385, 1391–92 (9th Cir. 1994) (under the constitutional avoidance doctrine, courts

22 "avoid adjudication of federal constitutional claims when alternative state grounds are available").

23       1.       The FAC Has Fatal Procedural Flaws

24              *(a)   The Negligence and Strict Liability Claims Are Time-Barred*

25       Plaintiffs' negligence and strict liability claims are both subject to a two-year statute of

26 limitations.  *See* Cal. Code Civ. Proc. § 335.1.  That they are survival claims, brought by

27 decedent's estate and her father, does not extend the limitations period.  *See id.* § 377.20(a)

28

1  ("Except as otherwise provided by statute, a cause of action for or against a person is not lost by

2  reason of the person's death, but survives subject to the applicable limitations period.").

3       The two-year limitations period began to run once the claim "accrued," meaning when the

4  claim was "'complete with all of its elements'—those elements being wrongdoing, harm, and

5  causation." *Pooshs v. Philip Morris USA, Inc.*, 51 Cal. 4th 788, 797 (2011) (citation omitted); *see*

6  Cal. Code Civ. Proc. § 312.  Here, accrual occurred no later than April 28, 2017, when decedent

7  passed away.  *See* FAC ¶ 69.  The limitations period expired two years later, April 28, 2019.

8  Plaintiffs did not file this lawsuit until April 30, 2021—two years too late.  As a result, Plaintiffs'

9  strict liability and negligence claims must be dismissed as time-barred.[4]

10                 *(b)  Decedent's Brothers Lack Standing To Bring A Wrongful Death Claim*

11       The claim for wrongful death is brought by decedent's two brothers (FAC ¶ 84), but they

12  lack standing.

13       Under California law, only those persons specified in the wrongful death statute, Cal. Code

14  Civ. Proc. § 377.60, have standing to bring a wrongful death claim.  *See Scott v. Thompson*, 184

15  Cal. App. 4th 1506, 1510 (2010).  "[S]tanding among multiple claimants is determined by

16  statutory rank," and is limited to "persons who, because of their relation to the deceased, are

17  presumed to be injured by his [or her] death."  *Nelson v. Cty. of Los Angeles*, 113 Cal. App. 4th

18  783, 789 & n.6 (2003).  Under § 377.60, when an individual dies without any "surviving spouse,

19  domestic partner, children, [or] issue of deceased children," standing is conferred on "the persons .

20  . . who would be entitled to the property of the decedent by intestate succession."  *See Rosales v.*

21  *Battle*, 113 Cal. App. 4th 1178, 1185 (2003) ("'heirs' refers to those individuals who may inherit

22  by intestate succession under California law").

23       Section 6402 of the Probate Code sets forth the chain of intestate succession.  Where, as

24  here, a decedent has no children, the parents are first in the line of succession.  *See* Cal. Prob.

25  ──────────────
[4] John Herndon's continued failure to execute and file an affidavit showing that he is the

26  decedent's successor in interest is another, separate basis for dismissing these survival claims.  *See*
   Cal. Code Civ. Proc. § 377.32; *see also, e.g., Thomas v. Cty. of San Diego*, 2021 WL 2715086, at

27  *5 (S.D. Cal. July 1, 2021) (dismissing survival claim where plaintiff failed to comply with the
   requirements of section 377.32 to establish standing); *Banks v. Mortimer*, 2019 WL 4600941, at

28  *4 (N.D. Cal. Sept. 23, 2019) (same).

Code § 6402(b).  That means decedent's father—and not her siblings—has exclusive standing to sue for wrongful death.  *See, e.g.*, *Scott*, 184 Cal. App. 4th at 1510 (granting defendants' summary judgment motion "[b]ecause California's wrongful death statute vests priority and exclusive standing in a decedent's surviving parent over a surviving sibling"); *Stoddard-Nunez v. City of Hayward*, 2015 WL 6954963, at *4 (N.D. Cal. Nov. 10, 2015) ("A sibling is barred from bringing a wrongful death action unless the decedent has no surviving issue or parents."); *Medrano v. Kern Cty. Sheriff's Officer*, 921 F. Supp. 2d 1009, 1018 (E.D. Cal. 2013) (dismissing decedent's brothers' wrongful death claim where plaintiffs did not allege that the decedent had no surviving issue or parents).

The FAC does not avoid this problem through its newly-added allegation that the brothers are "statutory beneficiaries with standing to assert wrongful death claims."  FAC ¶ 84.  This bald statement cannot remedy the incurable standing deficiency.  To establish statutory standing, decedent's brothers would have to allege there are "no surviving parents of the decedent." *Medrano*, 921 F. Supp. 2d at 1018.  They plainly cannot allege any such facts here, as decedent's surviving parent is a plaintiff in this very case.

That surviving parent—decedent's father—has brought no wrongful death claim in this suit.  *See* FAC ¶ 78.  Nor could he.  Wrongful death has the same two-year statute of limitations as the strict liability and negligence claims, so his time to bring such a claim lapsed two years before Plaintiffs filed suit.  *See* Cal. Code Civ. Proc. § 335.1.  Decedent's father also cannot assign or renounce his statutorily prescribed standing to give decedent's brothers (whose claims would otherwise be tolled until they reached the age of 18) the right to sue for wrongful death instead. *See, e.g.*, *Lewis v. Reg'l Ctr. of the East Bay*, 174 Cal. App. 3d 350, 354–55 (1985); *Mayo v. White*, 178 Cal. App. 3d 1083, 1090 (1986).  Nor does the failure of decedent's father to bring a timely claim for wrongful death confer standing on her brothers.  "[T]he right to sue for wrongful death damages is strictly a creature of statute," and the statute limits that right to those with priority in the chain of intestate succession—here, decedent's father.  *See Nelson*, 113 Cal. App. 4th at 789 & n.6 (collecting cases).

1

2.    <u>Plaintiffs' Claims Fail as a Matter of State Law</u>

2

Apart from these fundamental procedural defects that compel dismissal, all of Plaintiffs'

3

claims also fail under well-established principles of state law.

4

(a)  *Plaintiffs' Strict Liability Claim Fails Because* 13 Reasons Why *Is Not a "Product"*

5

6

Plaintiffs allege that the failure-to-warn claim is subject to strict liability because *13*

7

*Reasons Why* is a product.  FAC ¶ 79.  As a matter of settled law, however, strict liability for

8

failure to warn applies only to tangible products, and no tangible product is at issue here.[5]  *Winter*

9

*v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991); *Pierson v. Sharp Mem'l Hosp.*, 216

10

Cal. App. 3d 340, 345 (1989) ("A product is a physical article which results from a manufacturing

11

process and is ultimately delivered to a consumer.").  The Ninth Circuit has squarely held that

12

products liability law does not embrace the "ideas and expression" contained in intangible works

13

like *13 Reasons Why*.  *Winter*, 938 F.2d at 1034 (9th Cir. 1991) (holding products liability law did

14

not apply to *The Encyclopedia of Mushrooms*).

15

Because products liability law is "focused on the tangible world," it is ill equipped to

16

handle the "delicate issues" that arise in connection with the "unique characteristics of ideas and

17

expression."  *Winter*, 938 F.2d at 1034–36 ("We place a high priority on the unfettered exchange

18

of ideas.  We accept the risk that words and ideas have wings we cannot clip and which carry them

19

we know not where.  The threat of liability without fault . . . could seriously inhibit those who

20

wish to share thoughts and theories.").  As a result, every court to confront this question has

21

reached the same conclusion as the Ninth Circuit and rejected strict liability claims premised on

22

the expressive content in books, movies, or other media.  *Id.* at 1036 ("We know of no court that

23

has chosen the path to which the plaintiffs point.") (collecting cases); *accord Watters v. TSR, Inc.*,

24

904 F.2d 378, 381 (6th Cir. 1990) ("As far as we have been able to ascertain, . . . the doctrine of

25

strict liability has never been extended to words or pictures."); *Birmingham v. Fodor's Travel*

26

27

[5] "[I]t is for the court to determine as a matter of law whether something is, or is not, a product." Restatement (Third) of Torts § 19 cmt. a (1998); *accord Brooks v. Eugene Burger Mgmt. Corp.*, 215 Cal. App. 3d 1611, 1626 (1989).

28

1   *Publ'ns, Inc.*, 73 Haw. 359, 373–75 (1992) (plaintiff had no claim for relief based on strict/product

2   liability because Fodor's travel guide was not a "product").

3          Numerous courts have specifically rejected the theory advanced by Plaintiffs here—the

4   proposition that media is a "product" subject to strict liability if it is alleged to have caused a

5   personal injury.  *See, e.g.*, *James*, 300 F.3d at 701 (affirming dismissal of product liability claim

6   on the ground that video games, movies, and internet transmissions alleged to have incited

7   violence were not "products"); *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1278–79 (D.

8   Colo. 2002) (holding victims of school shooting had no strict liability claim against manufacturers

9   and distributors of violent video games and movies because "intangible thoughts, ideas, and

10  expressive content are not 'products' as contemplated by strict liability doctrine"); *Wilson v.

11  Midway Games, Inc.*, 198 F. Supp. 2d 167, 173 (D. Conn. 2002) (holding Mortal Kombat was not

12  a 'product' that could give rise to a product liability claim, noting that "[c]ourts that have

13  addressed the proposition that 'inciting' media speech is a 'product' for the purposes of strict

14  liability have rejected it) (collecting cases); *Davidson v. Time Warner, Inc.*, 1997 WL 405907, at

15  *14 (S.D. Tex. Mar. 3, 1997) (holding ideas contained in Tupac Shakur song recording were not a

16  product because "products liability theory does not encompass the *content* of a publication").

17         This uniform precedent compels dismissal of Plaintiffs' strict liability claim with

18  prejudice.

19                     *(b)   Plaintiffs' Negligence and Wrongful Death Claims Fail Because Netflix
                             Did Not Owe Plaintiffs a Duty*
20

21         The "*sine qua non* of any negligence action is, of course, the existence of a duty of care

22  owed by the alleged wrongdoer to the person injured."  *Gregorian v. Nat'l Convenience Stores,

23  Inc.*, 174 Cal. App. 3d 944, 948 (1985).  Plaintiffs' negligence claim falls apart at this threshold

24  element—as does their derivative wrongful death claim.[6]

25  _____

26  [6] The elements of a wrongful death action are "the tort (negligence or other wrongful act), the
    resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs."

27  *Lattimore v. Dickey*, 239 Cal. App. 4th 959, 968 (2015) (citation omitted).  Here, the alleged
    underlying torts consist of the strict liability failure to warn claim (which fails as a matter of law

28  for the reasons set forth above) and the negligence claim (which fails for the reasons set forth

1    Whether a plaintiff is owed a duty is a threshold question that can be decided as a matter of

2    law.  *See, e.g.*, *McCollum*, 202 Cal. App. 3d at 1004; *Bill*, 137 Cal. App. 3d at 1009.  The

3    imposition of a duty "is the court's expression of the sum total of those considerations of policy

4    which lead the law to say that the particular plaintiff is entitled to protection."  *Sakiyama v. AMF*

5    *Bowling Centers, Inc.*, 110 Cal. App. 4th 398, 405 (2003).  Courts use the policy considerations

6    inherent in the duty analysis to serve "as a gatekeeper for the otherwise extremely broad concept

7    of negligence."  *James*, 300 F.3d at 692.  Under California law, duty can be established through

8    either the multi-factor duty analysis set forth in *Rowland v. Christian*, 69 Cal. 2d 108 (1968),[7] or

9    by establishing the existence of a "special relationship."  Under either test, Netflix owed no duty to

10   the decedent.

11   The factors balanced in the *Rowland* analysis include "the foreseeability of harm to the

12   plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection

13   between the defendant's conduct and the injury suffered, the moral blame attached to the

14   defendant's conduct, the policy of preventing future harm, [and] the extent of the burden to the

15   defendant and consequences to the community of imposing a duty."  *Rowland*, 69 Cal. 2d at 112–

16   13.  Although foreseeability is a "primary consideration" in this analysis, foreseeability is not

17   "synonymous with duty."  *Sakiyama*, 110 Cal. App. 4th at 407 (citation omitted).  Rather, "policy

18   considerations may dictate a cause of action should not be sustained no matter how foreseeable the

19   risk."  *Id.* (citation omitted).  Ultimately, then, foreseeability is "an elastic factor."  *McCollum*, 202

20   Cal. App. 3d at 1004 (citation omitted).  "[I]n cases where the burden of preventing future harm is

21   great, a high degree of foreseeability may be required."  *Id.* (citation omitted).

22   The multi-factor *Rowland* analysis, and its underlying foreseeability inquiry, is a pure

23   question of law when "there is no room for a reasonable difference of opinion."  *Gregorian*, 174

24   Cal. App. 3d at 948.  There can be no reasonable difference of opinion here.  Recognizing a duty

25

26   below).  While the FAC includes passing allegations that the claim is also premised on
     "intentional acts and omissions" (FAC ¶ 85), Plaintiffs do not plead the elements of any

27   intentional tort—nor could they.

28   [7] *Superseded in part by statute on other grounds as stated in Calvillo-Silva v. Home Grocery*, 19
     Cal. 4th 714, 721–23 (1998).

1   on the facts alleged would "stretch the concepts of foreseeability and ordinary care to lengths that

2   would deprive them of all normal meaning." *Watters*, 904 F.2d at 381.  This is especially so

3   because of the chilling effects that would ensue from recognizing such a duty.  *See id.* ("The only

4   practicable way of [e]nsuring [media] could never reach a 'mentally fragile' individual would be

5   to refrain from selling it at all.").  The countervailing First Amendment concerns mean a "high

6   degree of foreseeability" is necessary to impose a duty here.  *McCollum*, 202 Cal. App. 3d at

7   1004; *accord Bill*, 137 Cal. App. 3d at 1013.

8          Plaintiffs' allegation that Netflix was warned there was a "potential for suicide-contagion

9   effects upon impressionable viewers" (*see, e.g.*, FAC ¶ 28) does not establish the requisite "high

10   degree of foreseeability" to give rise to a legal duty.  *See Sanders*, 188 F. Supp. 2d at 1272 ("A

11   speculative possibility . . . is not enough to create a legal duty.")  Suicide is "too idiosyncratic" of

12   a reaction for Netflix—or, for that matter, any other distributor of suicide-related content—to have

13   reasonably anticipated.  *See James*, 300 F.3d at 693.  As courts have recognized, committing

14   violence is "simply too far a leap" from watching violence play out on screen.  *See, e.g.*, *id.*

15   Plaintiffs' alleged "strenuous warnings" supposedly from Netflix's own retained experts (FAC

16   ¶ 90) do not make suicide a highly foreseeable reaction to a television show.  *See, e.g.*, *Olivia N.*,

17   126 Cal. App. 3d at 891, 893–94 (allegation that "NBC had knowledge of studies on child

18   violence and should have known that susceptible persons might imitate the crime enacted in the

19   film" insufficient to impose negligence liability).  Imposing a duty based on such allegations

20   "would provide no recognizable standard for the television industry to follow," as courts "lack[]

21   the legal and institutional capacity . . . to set the standard for media dissemination containing

22   'violence' in one form or the other."  *Zamora v. CBS*, 480 F. Supp. 199, 202–03, 206 (S.D. Fla.

23   1979) (declining to impose a duty on television producers because it would discriminate against

24   them "on the basis of content," "give birth to a legal morass," and "place broadcasters in jeopardy

25   for televising Hamlet, Julius Caesar, [and] Grimm's Fairy Tales").

26          Courts have thus consistently held that personal injury and death, including self-harm or

27   suicide, are not a foreseeable consequence of the distribution of artistic works.  *See, e.g.*,

28   *McCollum*, 202 Cal. App. 3d at 1005–06 (holding teen's suicide "was not a reasonably foreseeable

1    risk or consequence of defendants' remote artistic activities"); *Watters*, 904 F.2d at 379, 381

2    (rejecting plaintiff's argument that the manufacturer of *Dungeons & Dragons* had "duty to warn

3    that the game could cause psychological harm in fragile-minded children" because the plaintiff's

4    son's suicide was not foreseeable); *Sanders*, 188 F. Supp. 2d at 1273 (collecting cases from

5    "[c]ourts around the country [that] have rejected similar claims brought against media or

6    entertainment defendants"); *Way v. Boy Scouts of Am.*, 856 S.W.2d 230 (Tex. Ct. App. 1993), *writ*

7    *denied* (Oct. 6, 1993) (holding it was not reasonably foreseeable that a 12–year-old boy would

8    accidentally discharge a rifle and die after reading shooting supplement in magazine); *James v.*

9    *Meow Media, Inc.*, 90 F. Supp. 2d 798, 806 (W.D. Ky. 2000), *aff'd*, 300 F.3d 683 (6th Cir. 2002)

10   (granting motion to dismiss negligence claim against creators and distributors of *The Basketball*

11   *Diaries*, video game distributors, and internet websites; no duty because it was unforeseeable for a

12   minor to murder his classmates); *Brandt v. Weather Channel, Inc.*, 42 F. Supp. 2d 1344, 1346

13   (S.D. Fla. 1999) (collecting cases showing that "[i]t is well established that mass media

14   broadcasters and publishers owe no duty to the general public who may view their broadcasts").

15        In so holding, courts have expressly recognized that imposing any such duty would inhibit

16   artistic expression in a manner that is incompatible with the First Amendment.  *McCollum*, 202

17   Cal. App. 3d at 1005–06 ("[I]t is simply not acceptable to a free and democratic society to impose

18   a duty upon performing artists to limit and restrict their creativity in order to avoid the

19   dissemination of ideas in artistic speech which may adversely affect emotionally troubled

20   individuals."); *Winter*, 938 F.2d at 1037 ("Were we tempted to create this duty, the gentle tug of

21   the First Amendment and the values embodied therein would remind us of the social costs.");

22   *Widdoss v. Huffman*, 62 Pa. D. & C. 4th 251, 256–57 (Com. Pl. 2003) (sustaining demurrer where

23   "the defendants could not properly be found to have violated their duty of reasonable care by

24   exercising protected rights of free speech" in the production, distribution, and exhibition of *The*

25   *Fast and the Furious*); *Davidson*, 1997 WL 405907, at *12 (concluding the burden to prevent

26   harm resulting from the dissemination of *2Pacalypse Now* would be "enormous[]" and "would

27   result in the sale of only the most bland, least controversial music").

28        Plaintiffs fare no better under the other *Rowland* factors, notwithstanding their formulaic

1    recitation of the elements (*see* FAC ¶ 90):  drawing a "close connection" between decedent's

2    suicide and Netflix's alleged recommendation and failure to warn is impossible given the

3    innumerable other factors that might have influenced the decedent's decision to take her own life;

4    no moral blame can be attached to Netflix's conduct, *see, e.g.*, *Bill*, 137 Cal. App. 3d at 1011; and,

5    as set forth above, recognizing a duty would impose an intolerable burden on society and "have

6    the effect of reducing and limiting artistic expression to only the broadest standard[s] of taste and

7    acceptance and the lowest levels of offense, provocation and controversy," *McCollum*, 202 Cal.

8    App. 3d at 1005–06.  "No case has ever gone so far," and there is "no basis in law or public policy

9    for doing so here." *Id.* at 1006.

10       There is likewise no cognizable "special relationship" that could supply a duty here.

11   California courts have recognized a duty to prevent a foreseeable suicide only where a hospital or

12   in-patient facility has "accepted the responsibility to care for and attend to the needs of [a] suicidal

13   patient." *Nally v. Grace Cmty. Church of the Valley*, 47 Cal. 3d. 278, 294–96 (1998).  Under

14   California law, parties owe no such duty outside of the narrow confines of a party who has a

15   *custodial relationship* with a patient.  *See id.* (no duty owed by religious counselors).  Netflix

16   obviously has no such custodial relationship with those who use its service for entertainment,

17   much less with the "close friends and family of Netflix's paying customers"—the only purportedly

18   "special relationship" that the FAC attempts to allege.  FAC ¶ 90.

19                    *(c)  Plaintiffs Cannot Plausibly Allege Netflix Caused Plaintiffs' Harm*

20       Plaintiffs cannot state a negligence claim for the additional reason that they have not

21   sufficiently alleged the necessary element of causation.  "[W]here the facts are such that the only

22   reasonable conclusion is an absence of causation, the question is one of law, not of fact."

23   *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 152 (2018).  Plaintiffs fail to plead proximate

24   causation as a matter of law.

25       With limited exceptions involving "uncontrollable impulse[s]" and custodial relationships

26   not alleged here, suicide is an intervening, intentional act by the victim that breaks the chain of

27   causation, precluding any tort liability.  *See Tate v. Canonica*, 180 Cal. App. 2d 898, 913–15

28   (1960); *Watters*, 904 F.2d at 383–84 ("Courts have long been . . . reluctant to recognize suicide as

a proximate consequence of a defendant's wrongful act. . . . Tragedies such as this simply defy rational explanation, and courts should not pretend otherwise.").  Plaintiffs' amendments in the FAC add no such allegations, relying instead on a mere conclusory assertion that the show "proximately caused" B.H.'s suicide.  FAC ¶ 64.  Not only is such a conclusory statement of course insufficient to satisfy federal pleading standards, *see Bell Atlantic Corp. v. Twombly*, 500 U.S. 544, 555 (2007), it confirms Plaintiffs are unable to plead the necessary facts to establish proximate causation.  The lack of proximate causation provides yet another reason why Plaintiffs' claims must be dismissed.  *See, e.g.*, *Jones v. Cate*, 2016 WL 282699, at *11 (E.D. Cal. Jan. 26, 2016) (dismissing wrongful death claim on causation grounds where "[n]one of the allegations in the [complaint] state[d] or support[ed] an inference [decedent] was acting under an uncontrollable impulse when he committed suicide"); *King v. United States*, 756 F. Supp. 1357, 1361 (E.D. Cal. 1990) (holding decedent's "tragic death had to have involved an additional intervening, independent force—his own intention to kill himself").

### 3.   The First Amendment Bars All of Plaintiffs' Claims

#### (a)   *Plaintiffs' Claims Attack Speech That Is Protected by the First Amendment*

Plaintiffs' suit runs headfirst into a well-settled "overriding constitutional principle": "material communicated by the public media, including fictional material such as the television drama here at issue, is generally to be accorded protection under the First Amendment to the Constitution of the United States."  *Olivia N.*, 126 Cal. App. 3d at 492 (citation omitted); *see also, e.g.*, *McCollum*, 202 Cal. App. 3d at 999 ("First Amendment guaranties of freedom of speech and expression extend to all artistic and literary expression, whether in music, concerts, plays, pictures or books.").  This First Amendment protection "extends to [the] communication, to its source and to its recipients."  *Olivia N.*, 126 Cal. App. 3d at 492.

Through its own original television and film content, and by "exercising editorial discretion" over its slate of programming, Netflix "engage[s] in and transmit[s] speech."  *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994) (citation omitted).  The First Amendment guarantees that the Government may not interfere with this speech, or compel Netflix

1  to "to alter [its] message by including one more acceptable to others," *see Hurley*, 515 U.S. at 581,

2  regardless of whether Netflix's content choices "in someone's eyes are misguided, or even

3  hurtful," *id.* at 574.

4       Similarly, Netflix's subscribers have the First Amendment "right to receive information

5  and ideas, regardless of their social worth."  *Stanley v. Georgia*, 394 U.S. 557, 564 (1969); *see*

6  *also, e.g.*, *Young v. Am. Mini Theatres*, 427 U.S. 50, 77 (1976) (Powell, J., concurring) ("[T]he

7  central concern of the First Amendment in this area is that there be a free flow from creator to

8  audience of whatever message a film or book might convey.").  This right to receive information

9  extends to minors as well.  *See, e.g.*, *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 795 (2011)

10  ("Minors are entitled to a significant measure of First Amendment protection . . . Speech that is

11  neither obscene as to youths nor subject to some other legitimate proscription cannot be

12  suppressed solely to protect the young from ideas or images." (citation and alteration omitted));

13  *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975) ("In most circumstances, the values

14  protected by the First Amendment are no less applicable when the government seeks to control the

15  flow of information to minors.").

16       Given this First Amendment protection, Netflix's dissemination of *13 Reasons Why* is fully

17  immunized from civil liability here.  *See, e.g.*, *Sullivan*, 376 U.S. at 265, 277 (attaching liability to

18  protected speech violates the First Amendment); *McCollum*, 202 Cal. App. 3d at 1003 (First

19  Amendment "protection is not limited to merely serving as a bar to the prior restraint of

20  [protected] speech, but also prevents the assertion of a claim for civil damages. . . .  The deterrent

21  effect of subjecting the [entertainment] industry to such liability because of their programming

22  choices would lead to a self-censorship which would dampen the vigor and limit and variety of

23  artistic expression."); *Olivia N.*, 126 Cal. App. 3d at 494 ("[T]he chilling effect of permitting

24  negligence actions for a television broadcast is obvious. . . .  Realistically, television networks

25  would become significantly more inhibited in the selection of controversial materials if liability

26  were to be imposed on a simple negligence theory.").

27       Plaintiffs do not avoid the First Amendment's bar on liability by purporting to narrowly

28  target Netflix's recommendations and the adequacy of its viewer advisories.  Because both

theories of liability rest on Plaintiffs' allegation that the show is "dangerous," *see supra* at 7–10, they cannot be disentangled from the expressive content embodied in the show and amount to an attempt to punish Netflix for its speech.  The First Amendment does not allow Plaintiffs to use a civil action to achieve that result.  *See, e.g.*, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 675–76 n.4 (1991) (explaining the Supreme Court has long held that the law may not be used to punish protected expression by imposing civil liability); *James*, 300 F.3d at 696–97 (rejecting effort to impose tort liability for protected speech that plaintiff alleged "was not sufficiently prevented from reaching minors").

### (b)   The Challenged Speech Does Not Constitute Incitement

While the right to free expression guaranteed by the First Amendment is not absolute, only narrow categories of unprotected speech can be subject to civil liability, such as libel, obscenity, fighting words, and incitement.  *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504 (1984).  Nothing remotely resembling any such speech is at issue in this case, and Plaintiffs do not allege otherwise.  To the extent Plaintiffs seek to overcome the First Amendment's protections on an incitement theory, they cannot do so as a matter of well-established law.[8]

"[T]he incitement exception" is narrow and "must be applied with extreme care" to avoid chilling effects.  *DeFilippo v. Nat'l Broad. Co., Inc.*, 446 A.2d 1036, 1042 (R.I. 1982) (holding that First Amendment barred wrongful death suit brought against NBC arising from thirteen-year-old's fatal imitation of stunt aired on *The Tonight Show*).  As a result, similar suits alleging that fictional works have incited suicide or other violence have been routinely dismissed on the pleadings as barred by the First Amendment.  *See, e.g.*, *McCollum*, 202 Cal. App. 3d at 1008 (affirming dismissal where music did not incite teenager's suicide as a matter of law; concluding "[t]he trial court was thus correct in bringing this action to a prompt end").[9]  The same result

---

[8] "The inquiry into the protected status of speech is one of law." *Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983).

[9] *See also, e.g.*, *James*, 300 F.3d 683 (affirming dismissal and noting First Amendment problems in action alleging violent video games, movies, and websites caused student to shoot his classmates); *Wilson*, 198 F. Supp. 2d at 182 (dismissing tort claims against manufacturer of violent video games); *Sanders*, 188 F. Supp. 2d 1264 (holding violent video games were entitled

1   should follow here.

2       Speech constitutes unprotected incitement or "fighting words" only if it is (1) "*directed to*

3   inciting or producing *imminent* lawless action," and (2) "*likely to* incite or produce such

4   [imminent] action." *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (emphasis added). The

5   FAC's allegations fall far short of meeting this high bar.

6                    (i)    Plaintiffs Do Not And Cannot Allege The Requisite Specific
                            Intent To Incite
7

8       The threshold "directed to inciting" element of the *Brandenburg* test imposes a specific-

9   intent requirement. *See Hess v. Indiana*, 414 U.S. 105, 108–09 (1973). This means the imminent

10  violent response to the speech "must have been a specifically intended consequence" of the

11  speaker. *McCollum*, 202 Cal. App. 3d at 1000–01. Plaintiffs do not allege that Netflix harbored

12  any such specific intent—nor could they do so consistent with Rule 11.[10]

13      If anything, the FAC acknowledges the opposite is true: the creators of *13 Reasons Why*

14  depicted the "ugliness and brutality of suicide" with the intent to "*deter*" teenage suicides. FAC

15  ¶ 28 (emphasis added). Netflix's advisories at the beginning of the show, and the suicide

16  prevention resources it makes available online at 13ReasonsWhy.info, likewise negate any

17  plausible inference of an intent to incite suicide. *See id.* ¶ 34. The lack of any hint of a specific

18  intent to incite is enough to push the show well beyond the narrow confines of *Brandenburg*.

19                   (ii)   Plaintiffs Do Not Plausibly Allege A Reasonable Likelihood Of
                            Imminent Harm
20

21      The content of the show further confirms that it cannot be construed as unprotected

22  incitement. The FAC alleges only that *13 Reasons Why* depicted suicide—like innumerable other

23  _____

24  to full First Amendment protection in action brought by family members of teacher killed in
    Columbine shooting); *Zamora*, 480 F. Supp. 199 (dismissing action against network that aired
25  violent programming as barred by First Amendment).

26  [10] *See, e.g.*, *James*, 300 F.3d at 698 (affirming district court's dismissal where producers of video
    games and the film *The Basketball Diaries* "certainly did not 'intend' to produce violent actions
27  by the consumers"); *Wilson*, 198 F. Supp. 2d at 182 (dismissing claim on First Amendment
    grounds where plaintiff "claim[ed] only that [defendant] intended to addict players [to Mortal
28  Kombat], and knew or should have known that its conduct would bring about harm").

1  films, television shows, plays, and works of literature that are consumed by teen audiences.  At

2  most, Plaintiffs allege that the show "arguably glorifies teenage suicide" (FAC ¶ 25) and that the

3  creators should have known the show's depiction of the main character's suicide in "unflinching

4  detail" (*id.* ¶ 18) had "the potential for suicide-contagion effects upon impressionable viewers" (*id.*

5  ¶ 28).  This is a far cry from the overt encouragement necessary to satisfy the *Brandenburg* test.

6  The incitement requirements are not satisfied as a matter of law where, as here, the speaker is

7  physically and temporally removed from the viewer and the speech at issue conveys abstract ideas

8  as opposed to overt encouragement.  *See, e.g.*, *McCollum*, 202 Cal. App. 3d at 1001 (speech

9  cannot be punished as incitement if it merely "has a tendency to lead to suicide or other violence"

10  (citing *Hess*, 414 U.S. at 107–09)); *Wilson*, 198 F. Supp. 2d at 182 (same).[11]

11  　　*McCollum v. CBS, Inc.*, which involved allegations that a teenager shot himself after

12  listening to Ozzy Osbourne's song "Suicide Solution," is directly on point.  The song at issue there

13  featured lyrics directed to the listener, including the line "get the gun and try it / shoot, shoot,

14  shoot." 202 Cal. App. 3d at 996–97.  In holding plaintiffs' claims were absolutely barred by the

15  First Amendment, the court emphasized that "[m]erely because art may evoke a mood of

16  depression as it figuratively depicts the darker side of human nature does not mean it constitutes a

17  direct 'incitement to imminent violence.'"  *Id.* 1001.

18  　　So too here.  Nowhere does the FAC allege the show included anything that "could be

19  characterized as a command to an immediate suicidal act."  *Id.*  If a song that tells its listeners to

20  "shoot, shoot, shoot" and "may well express a philosophical view that suicide is an acceptable

21  alternative to a life that has become unendurable" does not constitute an imminent incitement to

22  violence as a matter of law (*see id.*), then a television show's depiction of a fictional character's

23  suicide certainly does not.  *13 Reasons Why* "cannot be construed to contain the requisite 'call to

24  

25  [11] *See also, e.g.*, *James*, 300 F.3d at 698 (threat of violent reaction to material in video games and film was not "imminent"); *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1021–23 (5th Cir.

26  1987) (holding "Orgasm of Death" article in *Hustler* could not be construed as incitement, even if the article describes dangerous practice in "glowing terms"); *Byers v. Edmonson*, 826 So.2d 551,

27  556 (La. Ct. App. 2002) (holding the film *Natural Born Killers* did not satisfy incitement standard because it did "not purport to order or command anyone to perform any concrete action

28  immediately or at any specific time").

action' for [an] elementary reason": no rational person could mistake the depiction of suicide in a narrative work of fiction "for literal commands or directives to immediate action." *See id.* at 1002. "To do so would indulge a fiction which neither common sense nor the First Amendment will permit." *Id.* Given the absence of any incitement to imminent lawless action in the show, Plaintiffs' claims are absolutely barred by the First Amendment.

## II.   Alternatively, the FAC Should Be Dismissed With Prejudice For Failure to State a Claim for Relief under Rule 12(b)(6)

For the same reasons that Plaintiffs fail to establish a probability of succeeding on the merits as required under the anti-SLAPP statute, they also fail to plausibly state a claim for relief under Rule 12(b)(6). To the extent the Court holds that this case is not appropriate for dismissal under the anti-SLAPP statute, it should dismiss the FAC under Rule 12(b)(6).

The FAC's ineffectual amendments confirm that the suit's fundamental defects are irremediable, and that any further amendment would be equally futile. *See, e.g.*, *El Dorado Cmty. Serv. Ctr. v. Cty. of Los Angeles*, 2017 WL 6017297, at *3 (C.D. Cal. Jan. 3, 2017) (denying leave to amend because "Plaintiff has already amended his Complaint once and has failed to provide . . . any facts . . . that indicate leave to amend would not be futile"). Plaintiffs have no basis for tolling their time-barred claims, and decedent's brothers cannot plead any facts that would change the statutorily established priority for wrongful death claims. Nor can Plaintiffs allege a cognizable duty, plead plausible facts to establish proximate causation, or evade the First Amendment's absolute bar on liability. The FAC should be dismissed without leave to amend. *See, e.g.*, *Dougherty v. City of Covina*, 654 F.3d 892, 901 (9th Cir. 2011).

## CONCLUSION

For the foregoing reasons, Plaintiffs' FAC should be stricken pursuant to the anti-SLAPP statute or, alternatively, dismissed with prejudice.

1    DATED:  October 6, 2021                    MUNGER, TOLLES & OLSON LLP

2

3                                               By:      /s/ Blanca F. Young
4                                                     BLANCA F. YOUNG
                                                Attorneys for NETFLIX, INC.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28